## WAYMAN CROW ET AL. vs. THE STATE OF MISSOURI.

"The act of 1849, which purports to establish a system of taxation upon merchants and grocers "in lieu" of other enactments then existing, is not of itself such a departure from the basis of taxation ordained by the constitution, as to require the interposition of the judiciary; but the proviso to that enactment is in the nature of a saving repugnant to the constitution of this State. Taxes may be collected from merchants and grocers under the authority of that act alone—using for that purpose the machinery merely, which is provided and directed by the act of 1845."

## APPEAL from St. Louis Criminal Court.

### STATEMENT OF THE CASE.

Crow and others, defendants, were jointly indicted by the grand jury of St. Louis county for dealing as merchants without a license as required by law. The indictment contains six counts substantially as follows:

The first count charges that defendants, as co-partners in trade as merchants at St. Louis county, on, &c., and divers other days and times between that day and the day of the finding of this indictment, unlawfully did receive for sale, and unlawfully did deal as merchants in the selling of goods, wares and merchandise, not the growth, produce or manufactures of this

---

Crow et al. vs. The State of Missouri.

---

State, by then and there, &c., receiving for sale, and selling as merchants various articles of dry goods in said count mentioned, at a place occupied by the defendants for that purpose. to divers persons, to the jurors unknown, at a certain per yard for said goods, without having a license therefor in force.

The second count is the same as the first, with the exception that it omits to allege that the goods were not the growth, produce, or manufactures of this State.

The third count, in addition to the allegations contained in the first, alleges that the goods were imported into this State by defendants. That the goods were the growth, produce, and manufacture of England, in Great Britain, a foreign country, upon which duty had been paid by defendants under the laws of the U. S. at St. Louis county, and sold in the original nn-broken packages.

The fourth count, in addition to the allegations of the first count, alleges that defendants imported the goods into this State from various sister States of the Union, and sold the same in the original imported packages and in broken packages, said goods being of the growth, produce and manufactures of said sister States.

The fith count is the same as the fourth, except that it alleges that the goods were sold in the original imported packages at wholesale.

The sixth count is the same as the first, except that it does not charge defendants with dealing as co-partners.

The defendants filed a general demurrer to this indictment, and the court sustained it to the second and third counts, and overruled it as to the others.

To the decision of the court sustaining the demurrer to the second and third counts, the State excepted, and to the decision overruling the demurrer to the other counts, defendants excepted.

Upon the trial the following statement was read in evidence to the jury: "The defendants admit that at the time mentioned in the indictment, they were merchants doing business in St. Louis. That at the time specified in the indictment, they had received for sale at their store in the city of St. Louis, the goods and merchandize mentioned in the indictment, in manner and form as therein charged, and that they had no license then in force as required by statute, and have not at any time since had any such license. But that all the goods and merchandise so received and offered for sale by defendants, were imported directly by defendants into this State from other States of the Union, and were not of the growth, produce or manufactures of this State. And it is further submitted that the defendants exercised the business of merchants by dealing in the selling of the goods, wares, and merchandize mentioned in the counts held good upon demurrer at the times and in manner and form as therein charged."

Defendants then asked the court to give the following instruction, to wit: "The court instructs the jury that if the defendants received for sale, or sold at their store in St. Louis no other goods except such as were imported into this State by them directly from other States of the Union, the jury will find defendants not guilty; which instruction the court refused, and defendants excepted.

The jury found defendants guilty, and assessed a fine against each of them amounting to fifty dollars.

Defendants then moved the court to set aside the verdict and grant a new trial, for the following reasons, to wit: 1st. Because the court refused the instructions to the jury asked on behalf of the defendants. 2nd. Because the verdict and judgment on the facts and law ought to have been for the defendants.

Defendants also moved the court to arrest the judgment, for the reasons that the indictment is insufficient in this; that it does not set forth or charge any offence in law against the defendants,

Both which motions the court overruled, and rendered judgment upon the verdict, to which defendants excepted and appealed to this court.

Crow et al. vs. The State of Missouri.

GLOVER & CAMPBELL, for appellants.

1. That the several acts of the general assembly of Missouri as follows, to wit: "An act to regulate license and taxes on merchants and grocers," approved March 12, 1849. An act to amend an act entitled an act to license and tax merchants. Approved March 27, 1845. Approved February 13 1847.

"An act to encourage agriculture," approved February 6, 1847. "An act to license and tax merchants," approved March 25th, 1845; and "an act to sustain the credit of the State;" approved February 16th, 1847; being all inpari materia, must upon a well established principle of law, be construed as if they were all parts and parcels of one single statute, and adjudged accordingly.

2. That from the several provisions of the statutes, it is plainly deducible that all goods, wares and merchandise, introduced into this State from beyond its limits, and received for sale by any merchant or grocer, are required to pay 20 cents for $100 value thereof, provided the packages have not been broken; while there is no tax whatever required to be collected by these statutes from goods, wares and merchandize of the same kind, produced, manufactured or grown within the State.

3. That such a discriminating tax, if sanctioned by the principle of the government, may be used to exclude all foreign productions, and lay a perfect embargo upon trade between the citizens of Missouri and the whole world.

4. That such a discriminating tax is not essential to the prosperity or dignity of the State government. They have the right to tax all property within the limits of the State, (once mixed up with the common mass of the domestic property of the State) for the purposes of revenue, but no object of State policy calls for or sanctions a discriminating tax like this, tending directly to exclude from its borders all foreign production. The power to tax is conceded to the State; but the power to tax in the manner here adopted is denied.

5. The States have the power to tax property within their limits and not employed in commerce, "between the States or with foreign nations, or "Indian tribes," to make internal improvements, to establish quarantines, promote health and education, punish crime, protect property, life and liberty, restrain vicious indulgencies, and do many other things which may be generally defined as following within the compass of State police power. 12 Con. R. p. 7; 4 Shep. 9; 3 Alabama, 137; 24 Pick. 352; ib. 359; 14 Ohio, 586; 1 Hump. 94; 9 Wheat. 203; 4 Pick. 460; 3 Dana; 3 Black, 193; 13 Sarg. & Rawle, 405; 1 Dec. & Bat. 19; 4 Black. 107; 3 Smedes & Marsh, 584; 4 Dec. & Bat. 320; 1 Denio, 540; 4 Ohio, 107; 8 Ohio, 521; 8 How 73; 10 M. R. 591; 2 Peters, 250; the License cases, 5 How.; the Passenger cases, 7 Howard.

There is more attempted by these Missouri statutes than is authorized by the mere taxing power of the State, or than has ever been conceded to any branch of State police power. The statutes in question are regulations of commerce with foreign nations, and between the States, and no State can regulate commerce, the power being vested in the government of the United States by the third number of the 8th section of the first article of the constitution of the United States. 1 Brook. R. 423; 2 Story R. 455; 2 Spear's, 769; 1 U. S. Dig. 404; 3 Cow. 713; 2 Story's Consti. 511, 508; Madison papers, 112, 113; 1 Kent, 269, and note (a;) 9 Wheat. 196, 222; 5 Wheat. 23; 14 Peters, 570; 15 Peters, 504; 12 Wheat. 448; 11 Peters, 102; License case, 5 Howard; Passenger cases, 7 Howard; 3 Mo. R. 1, State vs. Tracy, &c.

7. That the discriminating tax here imposed, is in violation of the second number of the tenth section of the first article of the constitution of the United States, which denies to the States the power to lay duties on imports or exports, without consent of congress. (See Madison papers, 119, and the authorities last quoted.)

8. The discriminating tax in question is imposed in violation of the constitution of Mis-

souri, which requires "all property subject to taxation in the State to be paid in proportion to value,"

See 19th section of the 13th art. constitution of Missouri; 1 Gill's (Maryland) R. 308; 5 Pike (Arkansas) R. 207; 2 ib. (Arkansas) R.; 2 Pike (Arkansas) R. 207; 3 Leam (Illinois) R. 138; 1 Yerger Tennessee R. 456; 2 Pike Arkansas, 309; 5 Pike, 142.

6. A tax by way of license on the property holder, graduated by the amount of property he holds, or may hold, is a tax indirectly on the property itself. 12 Wheat. 448, 5 How. license cases, and 7 Howard Passenger cases generally. The difference between the direct tax and the license tax, is merely formal; both are property taxes in the meaning of the constitution.

10. The question in this case is not one merely of intention. If the State has assumed to exercise a power which does not belong to it, its acts are void, no matter how justifiable the motives.

### Crockett & Kasson, for appellants.

1. The law licensing and taxing merchants, in its present form, is contrary to the constitution of the State of Missouri. Art. XIII; Decl. Rights, § 19.

II. Said law, as now existing, is contrary, also, to the provisions of the constitution of the United States, and in conflict with the supreme law of the land. Art. I, sec. 8, pp. 1, 3, sec. 9, p. 5, sec. 10, p. 2.

The State constitution provides that "all property subject to taxation in this State shall be taxed in proportion to its value"—*ut supra*.

The United State's constitution provides "the congress shall have power to lay and collect taxes, duties, imposts and excises," "but all duties, imposts and excises shall be uniform throughout the United States," "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." Art. I, sec. 8, pp. 1, 3.

"No tax or duty shall be laid on articles exported from any State." Sec. 9, p. 5.

"No State shall, without the consent of congress, lay any imposts or duties, on imports or exports, except what may be absolutely necessary for executing its inspection laws." Sec. 10, p. 2.

And that the constitution shall be the supreme law of the land, and all judges in each State shall swear to support it. Art. VI, secs. 2, 3.

I. With reference to the first chief branch of our enquiry, let us examine the course of legislation upon the subject in Missouri.

This has been uncertain and variable; the legislature seems itself to have at times entertained doubts respecting the extent of its power.

The first act was entitled "an act imposing tax on licenses to retailers of merchandize and pedlars," 1820, Dec. 12.

The first clause defines who is a retailer, within the meaning of the act : "every person who shall deal in the selling of any goods, wares or merchandize, at any store, stand or place, used and occupied for that purpose, except such as are the growth, produce, or manufacture of this State, and except such as are sold by the importer thereof, in the original, cask, case box, or package, wherein the same shall have been imported." Sec. I.

"A State tax," from $15 to $200 in the discretion of the county court, was assessed on each license to an individual or a company, regard being had to the value of their business, to continue in force for six months. Sec. 2.

This act was the next year repealed, and the repealing act was entitled as before except the substitution of "vendors" of merchandize for "retailers." 1821, Dec. 3. And wholly omitting the exception contained in the former law, in favor of importers selling by the original package. It thus abolished all distinction between wholesale and retail dealers, importers. and made discrimination solely according to the place of production, a "vendor of merchandize"

Crow et al. vs. The State of Missouri.

being only one, and every one, who sold goods in any way, introduced into the State from without its borders. Sec. I.

It also varies the rate of assessment, so as to make it depend, not on the discretion of the county court, but upon a sworn statement of the value of the goods not the produce of this State, received the preceding six months, for sale by the vendor of merchandize. Secs. 3, 4.

This act was again repealed in 1825, by an act entitled the same as the act of 1821 ; and it defines a "vendor of merchandize" in the same words, excluding him who sells the produce of this State from the operation of the act. 1825, Feb. 19, sec. 1.

But this act makes a new and important distinction for it excludes from the assessment of the pro rata tax of 25 cents on each 100 dollars, all goods which are the produce of any other of the United States, putting them in the same category with the products of this State. It still, however, requires like the former acts, a license only from those who deal in goods, introduced into this State from without. Thus the dealer in native products pays nothing and only the dealer in the products of foreign nations, pays the pro rata tax, according to the value of the goods received, and the dealer in the products of a foreign nation, or of any other State, pays $15 for a license, in the first instance with the pro rata tax, and in the second, without it. Secs. 4, 5.

This act was modified by an amendment in 1829, which abolished the distinction between foreign goods and the goods of other States, and took the products of other States from the Missouri category, and placed them in the foreign category, and subjected them again to the pro rata license tax, from which they had been exempted. 1829, Jan. 22, sec. 1. It also increased the regular semi-annual tax from 15 to 40 dollars, and authorized counties to assess a tax on licenses in like manner with the State. Secs. 2, 5.

The act of 1831, to provide for levying taxes for State and county purposes, modifies both the acts of 1825 and of 1829, by reducing the pro rata tax on all taxable property from 25 cents to 16 2-3 cents. But it still saves Missouri from any assessment of the like sort. Jan. 18, 1831. And the act of 1833 modifies the act of 1831, by reducing the rate again, from 16 2-3 cents to 12 1-2 cents, and the clerks fee for issuing the license, from $1 to 50 cents. Feb. 12, 1833, secs. 1, 2.

In the Revised Statutes of 1835, the legislature returned to what we maintain to be, except in one point, the sound basis of taxation, by the act entitled "an act to license and tax merchants." By this act all discrimination according to place of production was abolished, and a tax of $15 was assessed upon all licenses to merchants, and every one "who shall deal in the selling of goods, wares, or merchandize, at any store, stand or place occupied for that purpose, is declared to be a merchant," and the property belonging to them was assessed like the property of all other citizens. Secs. 3, 1, 4·

In 1837, this act was amended by repealing the 3d and 4th sections, and again giving a discretion to the county court in the tax upon licenses, between the sums of ten and twenty-five dollars, according to the amount of business, and a tax of 1-12 of one per centum was laid "on all merchandize offered for sale in this State," excepting that offered in original unbroken packages, as imported. This tax was to be based upon the merchant's statement of his taxable property, so that the same goods should be assessed only once a year. This does not seem to vary the important principle established by the act of 1835, except to exempt original foreign importations, with a view to avoid conflict with the provisions of the U. States constitution, hereafter referred to, through a mistaken application of the principle. Feb. 1837, secs. 1, 2, 3, 4, 9, 10.

In 1839 "an act to regulate merchants' licenses" was passed, repealing all portions of the two last above mentioned acts, which conflicted with the act. Feb. 19, 1839, sec. 6.

Here again the legislature returned to the unequal system of discrimination, the partial legislation exempting the products of this State from the "statement" to be rendered by the merchant, and taxing his license as such from ten to twenty-five dollars, according to the amount of goods received by him "for retail," except such as were the products of this State. It also assessed an ad valorem tax in addition, (still exempting here also the products of this State)

Crow et al. vs. The State of Missouri.

upon all merchandize brought into this State, except what was offerred in the original packages, as imported, and unbroken, which tax was to be the same as that assessed upon real estate for the time being. Secs, 2, 3, 4.

And there was no reservation here in the favor of the merchant, so that he should not be compelled to pay his ad valorem tax twice a year. The ad valorem tax was assessed upon the same goods, and same semi-annual statement as the license tax—an important departure from the principle previously established by the legislature.

The license tax, it is to be noticed, was assessed hereby upon all goods introduced into the State, without exception; and the ad valorem tax upon all the same, except foreign importations in the original package.

The next act touching the questions at law, (except two acts in 1841, and 1843, authorizing by farmers, the sale of goods received by them, in exchange for the products of their own farms, without a license,) is the act of 1845, contained in the R. S. of that year, entitled "an act to license and tax merchants." 1845.

It took the definition of a "merchant" from the act of 1835, and prohibited the dealing as a merchant without a license, in any case, for which license 50 cents was to be paid in all cases. "Merchants," sections 1, 2, 9.

This act was in only two particulars varied, by the act of 1849, i. e. by changing the rate of the license tax proper, in sec. 8, from certain gross sums, to a rate of 20 cents on each 100 dollars of value contained in the statement, and by abolishing all distinctions between wholesale and retail dealers. This act and the amendment will therefore be considered together. Upon the construction of this act hangs the whole issue. This act therefore demands a careful analysis. March 12.

We find that before the merchant can by possibility of law, obtain a license, to deal at wholesale or retail he must do the following things: First, (§5.) "He must deliver to the collector an aggregate statement in writing, of the amount of all goods, wares, and merchandize (except such as are the growth, produce or manufacture of this State,) received" by him "for retail" within the preceding six months—or "wholesale" by the act of 1849.

Second, (§6.) He must swear to this statement as a just and true account of all the goods, &c , received for sale within the last six months."

Third, (§8, and 1849, March 12.) He must pay upon the statement 20 cents upon each hundred dollars of value.

Fourth. He must pay the collector 50 cents for his fee. .

Fifth. He shall pay to the collector, (§ 10) "as an ad valorem tax," "upon all merchandize offered for sale as aforesaid," (except goods offered as foreign importations, in original and unbroken packages,) such an amount as may, for the time being, be paid as a tax upon real estate, with a proviso, that it shall not be levied on the same goods, (§ 11,) oftener than once in 12 months, which shows that the ad valorem tax is semi annual, and like license tax proper, it is to be collected semi annually, at the delivery of the license; and on property received, as agent or owner.

If any one deals as a merchant "contrary to the provisions of this act," he is to be arrested, examined and is made liable to arrest and imprisonment—sec. 8, 19, 20.

Thus by the act of 1845, in connection with that of 1849, all wholesale and retail dealers, whether in native or external products must take a license before they can sell at all, and must pay 50 cents for it. If they deal in external products, whether at wholesale or retail, they must also pay 20 cents on each hundred dollars of goods received for sale. ,

Thus far there is no exception at all, in favor of any body, except the owner of State products, none having any reference to the importer, in whatever shape he received or sells his goods.

Then, afterwards, comes the ad valorem tax, which contains an exception in favor of the importer who holds his original packages, unbroken. He may get his license, upon paying the first mentioned pro rata tax, and a tax ad valorem on all his unbroken packages imported, but not till then.

MARCH TERM, 1851. 243

Crow et al. vs. The State of Missouri.

Now we see important distinctions between the statutes of 1825, 1829, and those of 1845, and 1849. In the first there is no ad valorem tax, besides, and in addition to the license tax. In the last, there is. In the first the merchant received his license upon payment of his license tax proper. In the last he cannot receive it till he also pays his ad valorem tax, on imported and broken packages, even though he should wish his license to apply to original foreign importations only, so that the non-payment of the State tax, would render him indictable for selling original, foreign, imported and unbroken packages.

For these and other reasons it will appear already, that the case of Tracy vs. Oahrendorf by no means governs this case; if indeed it could in any event be an authority after the judicial remark at the close of that opinion, that decisionis not in *pari materia* with this, nor was its repugnance to the constitution of Missouri even suggested.

Constitution of Arkansas, article VII. til. Rev., sec. 2, establishes this principle.

"All property subject to taxation, shall be taxed according to its value, that value to be ascertained in such manner as the general assembly shall direct, making the same equal and uniform throughout the State."

It will be observed that the last clause in no manner enlarged the legislative power, beyond the limits left by the first.

By Rengo, C. J., giving the opinion of the court.

"From the view which we have taken, not only of the provision above quoted, but of every part of the constitution, we considered the rule then prescribed to be this, that property of every character and description, upon which a State tax may be levied, must be taxed in proportion to its real and true value, and according to that basis be made to contribute to the revenue of the State, and that no portion of any distinct genus or species of property upon which such tax is imposed, can ever be exempt therefrom—5 Ark. 204, Pike vs. State.

Pike vs. the State of Arkansas, 5 Ark. R., 204—see also 2 Ark. R.—same point.

If the merchant cannot obtain his license, without complying with an unconstitutional legislation, he is not required to do it.

This tax thus imposed is singularly unequal, unjust and oppressive, considered solely with reference to our first head, the declaration in our bill of rights. If this be so, then this court exercising its high functions, as a co-ordinate and not inferior, branch of the government should declare the law a nullity.

Under our first head, we therefore object to this act.

1st. Because it contravenes the constitution of Missouri, in taxing one person higher for his property than another for the same property, taxing one license 50 cents, and another license, 5,00 dollars of precisely the same value, both licenses being not only "property subject to taxation," but actually taxed by one and the same act.

2nd. Because it taxes, in assessing its ad valorem tax, property in hands of a merchant, if it has crossed the Mississippi river, higher than the same property which has come into his warehouse from the Missouri river, or from the county in which he lives.

And because it expressly lays aside the question of value, prescribed by the constitution as the sole standard of assessment, and discriminates solely by the place of production, and thus becomes grossly partial in its application to different merchants, who stand equally protected by the constitution, in respect to the value of the thing taxed, whether it be the license itself, or the thing to be sold.

3rd. Because the tax is not according to the amount of sales, nor according to the amount of profits, nor according to the ownership, nor according to the possession on a given day, in any adequate mode for ascertaining the value of the subject of taxation, but it is simply on the amount of merchandise in any way received for sale.

4th. Because other taxes are payable only once a year, and are assessed only on the property which belongs to the holder on a given day in the year; while here they are assessed twice a year, and are thus assessed upon the same property precisely and inevitably as many times as the property shall have changed hands in the course of trade.

5th. Because other persons have this property taxed ad valorem, as they actually own it,

Crow et al. vs. The State of Missouri.

on a given day in the year; but the merchants, as it has passed through their hands in negotiation, at any time, whether belonging to them or not.

6th. Because, especially, the "property subject to taxation" here, is the privilege of dealing as a merchant, and so declared by the law at its opening and in its title; but the tax is unequally laid; different members of the same profession are unequally taxed though dealing in things the same in substance, the same in natural history, the same in condition, the same in quality, the same in commerce, and the same in name; and because the constitution gives no power unequally to tax according to the place of production.

7th. Because it is class legislation and practical favoritism, being partial to one branch of a profession, and laying a heavy imposition upon another branch, equally entitled to the fostering care of the State government, and equally within the protection of the State constitution, enjoying equally of burdens.

In all these respects the law is onerous, unequal, unjust and oppressive, and as we believe unconstitutional.

II. We proceed to consider this case, in its relation to the constitution of the United States.

We are not ignorant of the importance of preserving State Rights. But what are State rights? Only those governing powers which they have not voluntarily, and for a good consideration, surrendered to the general government. If we but draw the line of division rightly there is no conflict of sovereignty here—neither assumption on the one hand, nor submission on the other.

In order to avoid this conflict, this impinging of rights, the supreme court of the United States, has with judicial delicacy, adopted that construction of State laws, which has been deliberately settled and established by the State courts. But this must be material. Green v. Neal, 6 Pit. 291; Shelby vs. Gray, 11 Wheat. 361.

The State courts also adopt the construction of the U. S. laws, which has been established by the U. S. courts, as required by amity, and every just principle of construction. It is also in obedience to the supreme constitution, which makes itself binding on all State courts, and judges; which appoints a supreme court to adjudicate all its provisions, and which requires of all federal and State judges a solemn oath to support it. The constitution, thus, in fact, for all judicial purposes, is what that court declares it to be.

A. K. Marshall (Kenly) 3 vol., 423; 8 Pick. 196; 6 Cowen, 493; 6 Binney, 272; 5 Monroe, 294; Emendorf vs. Taylor, 10 Wheat., 182.

If the law of the State government, and the law of the U. S. government in any case conflict, then the State yields to the United States.

Jack vs. Martin, 12 Wend., 211; U. S. vs. Hart, Pet. C. C. R. 290.

"Every act of the legislature, repugnant to the constitution of the U. S., is *ipso facto* void; and it is the duty of the supreme court to declare it so." Vanhorne vs. Dorrance, 2 Dallas, 304.

We are to ascertain, then, in what respect this law, if any, conflicts with the U. S. constitution. 1st. It is a regulation of commerce with foreign nations, and among the several States, and in fact, with Indian tribes—and this power is tested in the United States congress exclusively.

What was the object of this clause of the constitution as operating on this State?

Johnson, J., 5 Con. S., 559; Story on Cons'n, vol. 2, § 1018, 1052, 1062; 3 Mad. Papers, 1585, &c., & c.

It is well known that St. Louis is a great mart for intercourse, barter exchange, for importation and exportation, both with foreign countries, with other States and with Indian tribes. The products of all nations are found in our warehouses—the principal nations of Europe are partially supplied with our products. The United States have established here a custom house, with constantly increasing revenues. Commerce of every kind known to our country, is thus carried on in Missouri.

If there be any doubt as to the meaning of the word "commerce," it has already been judi-

Crow et al. vs. The State of Missouri.

cially decided. In Gibbons vs. Ogden, 9 Wheat. 1; (5 Cond. R. 589) Johnson, J., says: "Commerce, in its simplest signification, means an exchange of goods." Marshall, C. J., says—(S. p. 569)—" Commerce undoubtedly is, traffic ; but it is something more—it is intercourse." He further says, giving the opinion of the whole court as to the clause of the constitution in question: "Commerce among the States cannot stop at the external boundary line of each State, but may be introduced into the interior—(the word among means intermingled with)—these words do not mean that commerce which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States." But, "that commerce which concerns more States than one." The thing excepted, and within State legislation, "must be the exclusively internal commerce of a State, which may be considered as reserved to the State itself."

And that the power of Congress whatever it may be, must be exercised within the territorial jurisdiction of the several States."

He adds . (S. 573) "When a State proceeds to regulate commerce with foreign nations, or among several States, it is exercising the very power that is granted to congress, and is doing the very thing that congress is authorized to do."

Mr. Justice Johnson's separate opinion, in concurrence, in the same case, is unanswerable, affirming the exclusiveness of the power in congress.

In Groves vs. Slaughter, Mr. J. McLean says explicitly, "that Gibbons & Ogden decided this power to be exclusive, and Mr. J. Baldwin also says that Gibbons & Ogden, and Brown vs. Maryland, both decided the exclusiveness of the power." Mr. C. J. Taney is not satisfied of that fact, though he does not deny that construction of the constitution to be correct. 15 Pet. 504.

In City of N. Y. vs. Miler, Mr. J. Story, who was himself a member of the court deciding the case of Gibbons and Ogden, which neither of the three last mentioned judges was, says that the whole question of concurrent authority over this subject, existing both in the State and in congress, "was then deliberately examined, and deemed inadmissible by the court." And in this case of the City of N. York, which was decided on other ground, Mr. J. Story says that C. J. Marshall concurred, as he knows personally, with him in this opinion, and the grounds of it, the chief of which was, that the power was exclusive in congress. P. 161.

We remark here that Mr. J. Barbour's opinion, as written out by him in the case for the court, had never the concurrence of the majority of the court, the majority resolved not to, and did not, decide it on the ground of exclusiveness or concurrence of the power to regulate commerce. And this is confirmed by J. Barbour himself, on the 132d page (Pet.) and most unequivocally declared by Mr. J. Wayne, in the Passenger Cases. (VII How, 429,) Mr. J. Baldwin's opinion, written out in this very cause, and by accident omitted in the case when published in the 11 Pet., but afterwards published by him, in his "View of the Constitution."

Thus in that case, though the majority of the court concurred in the decision, they did it only on the ground that the law in question, as far as it came before them was a police regulation. The opinion that this power to regulate commerce was concurrent, had the assent expressly of only J. J. Barbour and Thompson—impliedly of C. J. Taney—and has the express dissent of J. Story, as recorded in this case; and of J. Baldwin, as strenuously recorded in the case of Groves vs. Slaughter, a little later in the 15th of Peters, page 511, and in his opinion, itself published with his "View of the Constitution," and solemnly affirmed by J. Wayne; of J. Wayne himself, as emphatically declared in the Passenger Cases, p. 432, and of J. McLean, as most unequivocally given in Groves vs. Slaughter, p. 504. These seven judges, then, constitute the court; four of them have ably published their opinions, as at that time affirming the exclusiveness of the power in congress, against two who affirmed it to a concurrent power, and one silent, who had not yet in 1841, (Groves vs. Slaughter, 508,) expressed an opinion either way.

At the time of the decision in City of N. Y. vs. Milne, in 1837, we are fully satisfied as to

Crow et al. vs. The State of Missouri.

the supreme court of the U. S. on this question, whatever may be thought of the decision in Gibbon's and Brown's cases, 9 and 12 Wheat., which were very generally deemed conclusive of the question, and as establishing the exclusiveness of the power in Congress. In 1837 the supreme court so thought it to be.

The License cases and opinions therein expressed, and Passenger cases, (V How., VII How.,) and some opinions therein announced, have served again to throw the opinion of the supreme judges into the shade, or at least to obscure the opinions of enough of them to render the majority doubtful. In the License cases both McKenley and Wayne, J's, gave no opinion at all. J. McLean, with whom J. Grier agreed, deemed it exclusive, but both, as well as the other judges, thought the question not raised to that case.

J. Catron thought the States could regulate the admission of property, "so they do not tax," p. 608, 605; see also McCulloch vs. Maryland, 4 Cond. 487, and 4 Wheat.; also 7 How. Passenger cases, 461. J. Nelson expressed his concurrence with J. Catron. The opinion, however, of J. Wayne is well known by the record to be in favor of the exclusiveness of the power. J. McKinley's is shown in the Passenger cases, (p. 452, compared with 400) to be the same; he fully concurs with J. McLean. We have thus, by the record, at least six of the nine judges of the supreme court of the United States, who agree in this, that the State cannot regulate the admission of general property into the State by taxation. To these may be added the chief justice, who says in the Passenger cases, (p. 470) that States may make regulations of commerce in their own ports and harbors "for the convenience of trade, or for the security of health," thus excluding the hypothesis, as did also J. Catron, that it could be exercised for purposes of *revenue*.

All the opinions of this question in the license cases, nevertheless, were not elements of the *decision, it was decided to be a simple police regulation*, or health regulation and touching only the question of quantity after any one sale of a dangerous and deleterious *article, in two of the* States, and in the other, there was no charge at all upon the sales, and in all of them neither tax, duty, nor impost, was laid, no glance at revenue, no charge on *either the person or the goods*, (per Catron, J., p. 605, in stating the question before the court) and no prohibition against selling it (in two States) in large quantities. While the openly acknowledged purpose and aim of the laws were under the authority of that *suprema lex salus populi*, the lives, health, and morals of the people. These facts take it from the range of authorities in this case, neither of those laws so much as mention the subject, or word impost or importations, as within their application; no preference was given to citizens over non-residents, and none to State products over imported products. The motive which has been sometimes considered the test of constitutionality was of the highest moral and best legal nature.

In the Passenger cases the object was claimed to be entirely independent of revenue and aiming to prevent the introduction of pauperism and crime, (VII How.) Yet the major part of the court decided the laws to be unconstitutional mainly because it was a regulation of commerce. But, J. Wayne (p. 410, 11) affirms that the court long since decided the power to be exclusive, and also says that with him agree J. J. McLean, Catron, McKinley and Greer, but that they do not think it necessary to reaffirm it at this time; J. McLean, however, unequivocally affirms his long entertained opinions on that subject, and says the State cannot regulate commerce (400, 406, 410.) J. McKinley agrees with J. McLean (p. 452) and affirms, by a brief argument, the exclusiveness of the power in Congress, (p. 455.) J. J. Catron and Greer mutually concurred each with the other, and J. Catron actually adopted J. McKinley's opinion as forming a part of his own. When taken in connection with it, and expressly concurs with Mr. J. Greer in his summary of the conclusions arrived at (pp. 463, 4) which shows that States cannot touch commerce and intercourse in a way to affect it, between this and foreign countries and between the States.

And here for the first time since 1827, in any one record, have we the opinions of the majority of the court directly expressed in a manner free from doubt, upon the question, now under discussion. J. Catron was only one of the five who had even expressed a seemingly varying opinion, and in that instance there was nothing like a tax involved, and the point was not at issue.

Crow et al. vs. The State of Missouri.

We thus find that in 1849 the Supreme Court United Ssates has returned to what we maintain to be actual decision in 1824 in Gibbons vs. Ogden, and the actual opinion of the court in the city of New York vs. Milne, (9 Wheat, 1, 11 Get.) to which, according to Mr. J. Story (11 Get. 161) may be added the high, though unofficial authority, of Mr. C. J. Marshall, who had heard the arguments but was no longer on the bench; Mr. J. Story not only on the bench, but in the still more deliberate authority of his work on the constitution, maintains the same view here urged, (vol. 2, p. 1018, 1054, 1062.)

Whatever fluctuation has been witnessed in the judicial sea since 1827, it is very certain, that the authority of the two cases remains unmoved and unshaken, and not only so, but actually reaffirmed in the Passenger cases, in 1849.

It seems to us that no one can doubt the meaning and construction of the court, with reference to that clause of the constitution in question, after a careful examination of the two cases in the 9th and 12th Wheaton. We refer especially to the opinion of C. J. Marshall in definition of this power from the page 569 to 579 of the V. Cond. R. and to the whole opinion in the same case, of Mr. J. Johnson in concurrence. We refer especially also to the opinion of C. J. Marshall and of the whole court, in Brown's case, from page 558 to 566 and in the VI. Cond. R.

In the same connection is to be remembered, that there is an unamious concurrence, on the part of Judges and writers of commentaries and histories that the one great object of changing from the articles of confederation to the American constitution, was to annul, under state restrictions, on their mutual commerce and products, and to secure common privileges by treaties with foreign governments, and to have no enemy except a truly foreign one, either in arms, embargoes, or revenue. Having examined the extent and nature and object of the power to regulate commerce, it remains to give brief answers to the questions—what is "commerce?" and what is a regulation of it ?" We adopt the undisputed authority of Gibbons vs. Ogden, that "commerce undoubtedly is traffic," but it is something more, it is intercourse. It describes the commercial intercourse between nations, and part of nations in all its branches, and is regulated by prescribing rules for carrying on that intercourse." (See also 5 Cond. 589. H.)

"Commerce, considered in a legal point of view, consists in the various agreements which have for their objects, to facilitate the exchange of the products of the earth, or industry of man, with intent to realize a profit." (Perd. Dr. Comm. n. 1.) In a narrower sense, "it signifies any reciprocal agreement between two persons, by which one delivers to the other a thing which the latter accepts, and for which he pays a consideration. (Domet. Dr. pub. lib. 1. let. 7, 3, 1, n. 2.) And see Brown's Law Dictionary, "Commerce" and authorities there cited, it includes not only traffic, but intercourse, and navigation, as it is used in the United States constitution. Of course whatever enlarges or restricts, prohibits or directs, controls or prescribes, a mode to this traffic, this intercourse, this navigation, is a regulation of commerce, this is demonstrated by laws. Whatever is begar, continued and completed, within the State, having no relation nor effect without the State—is completely within the power of a State, and subject to its Legislative control.

Whatever controls or modifies the admission, or primary objects of the admission—the extradition of primary objects of the extradition of commodities, assumes the jurisdiction of congress, and the powers of the United States government as well with reference to other States as to foreign countries. The unanimous opinion of the court in Brown's case (12 Wheat) hitherto undoubted, declares both the powers touching foreign countries and other States, to stand with same cases—that " they suppose the principles laid down in the case to apply equally to importations from a sister State." (Per Marshall, C. J. at the close of the opinion.)

And is it credible, that a State should have a greater power to affect injuriously, the commerce of a sister State, under a common government, than it has to touch the interests of an absolutely foreign country ?"

Is this law then a regulation of commerce ? In proof that it is so see its plain provisions. It touches the only class of men known to commerce. in this negotiation, and by whom all its operations are solely carried on. 2nd. It controls every member of that profession, without ex-

Crow et al. vs. The State of Missouri.

ception, in favor of importer or non-importer, of foreign trade, inter-state trade, or domestic trade. 3rd. It prohibits all dealing at wholesale or retail, by any one of this whole class, without a license, either in original or broken or unbroken packages. 4th. It prohibits the license in any case, except on condition that he render and account of all goods received by him from any quarter of the world (out of Missouri) for sale in any mode in whole or broken packages in or out of the State, and pay thereon twenty cents on each hundred dollars of value. 5th. And also pay thereon an additional tax, except on foreign importations remaining unbroken as received— the same as the tax on real estate for the time. 6th. The tax is not on sales but on the receiving for sale. Certainly it here is not a regulation, none can exist in any case· Now the case of Brown vs. Maryland, whatever opinion this court may arrive at, upon the question of exclusiveness, of the power itself, has never been disturbed or impeached as authority. Apply these provisions to that case as a test. This case decides, that a tax on imports after they are in the country, is as much prohibited by the United States constitution as if it was required before they landed, that what tends to prohibit a sale, is equally culpaple with that which tends to prohibit an importation. That an onerous "light tax" is equally reprehensible as an onerous "heavy tax"— that a tax on the article, and a tax on the person in respect to the selling of the articles are merely varying forms; not varying in substance, and equally prohibited; and that those principles there laid down, apply equally to importation from a sister State; and that while importation remains in the importer's hands, and in the original form, they are certainly exempt from taxation, whether in the form of a license or of a direct impost.

That case does not decide exactly where the State power to tax begins; but certainly not before the property has become intermingled with the general mass of property in the State. Upon the same point the opinion of C. J. Tancy in the License cases is extremely pertinent. He says: " A tax upon them (goods imported) while they are in this condition, (i. e. as they came into, and while remaining in, the hands of the first holder) for State purposes, whether by direct assessment, or indirectly by requiring a license to sell, would be hardly more justifiable in principle, than a transit duty upon the merchandise, when passing through a State, a tax in any shape upon imports, is a tax upon the consumer by enhancing the price of the commodity. And if a State is permitted, to levy it in any form it will put it in the power of a maratime importing State to raise a revenue for the support of its own government, from citizens of other States, as certainly and effectually as if the tax was laid openly and without disguise as a ' duty upon imports (et. seq.)

We think it is demonstrated, that this law conflicts with the decision in the case, Brown vs. Maryland, and ought on that ground to be declared unconstitutional and void.

2nd. It is a law discriminating between different States, imposing restraints upon the commerce of productions of other States, at the point of admission into the State, a view not so much to protect and manage domestic trade and products, as to support State expenditures by burdens imposed upon the trade and property of neighboring States, and implies the right to prohibit, even to the extent of entire exclusion, the introduction of the goods and products of adjoining States.

For this it is unconstitutional and void. No case has ever been decided by the U. S. courts in which the element of discrimination exists, and this fact alone makes a most important additional argument against the validity of the law, if not absolutely final in the cause.

See Chapman vs. Miller, 2 Speers S. C. Rep. 769, and the authorities in the U. S. sup. court, above cited.

(See closing remark on Brown's case from the C. J.)

All the authorities concur, that a primary object in adopting the U. S. Constitution, was "to prevent the States from imposing a tax on the commerce of other States," (per Mc-Lean, J. S. How. 595; Catron J. do. p. 603; Woodbury, do. do, p. 622, 3, 6.

Suppose this law, instead of covering merchandize only, also applied to navigation, (which by Gibbons and Ogden is decided to be only another branch of commerce,) and discriminated in favor of goods brought here in Missouri steamboats, and against goods introduced by Ohio steamboats, and in the same manner taxed owners here differently for their interests in boats

Crow et al. vs. The State of Missouri.

built here and boats built in Kentucky, the enormity of the law would be only more evident, but not greater in principle. (5 Cond. 567, 9 Wheat.)

3rd. The tax imposed by this law is an impost or duty laid without the consent of congress, on imposts but from a foreign country, and from other States, and from the Indian tribes, and in each respect is unconstitutional and void.

Art. 1 § 10, p. 2, and Brown's case 6 Cond. 557. No consent of congress is pretended; nor is it even suggested that the law is designed or operates as an "inspection law."

The indictments and the agreed case, show that the merchants dealt only in goods directly and immediately imported by them from foreign countries and from other States, which were in their hands as first hands. This law forbid them selling without a license, and withheld the license until payment of 20 cents on each $100 of value of all goods of all shapes. But it has been indisputably decided (as before shown) that this personal charge with respect to the selling of the goods, is the same as if laid on the goods, and indeed this tax is here so expressly and pro rata laid, so as to remove all doubt in this case. (Brown vs. Maryland, 6 Cond. 562 '3 & '5; Gibbons & Ogden, 5 do. 573, '4. See also How. 5, 594, 5, 6, 603; Taney C. J. and Catron J.)

The impost is laid before selling upon the mere receiving, and upon the first entrance of the merchandize into the State. Here there is, unquestionably a duty or impost on these imports, which the defendants are indicted for selling.

4th. It impedes and prevents the plain and evident object of requirement of the U. S. constitution to secure uniformity of imposts and duties throughout all the United States.

All the cases and all the elementary writers concur in this, that a fundamental and leading object in casting off the ineffectual articles of confederation, and adopting the constitution, was to prevent interstate conflicts of laws, imposition of duties, restrictions against their mutual intercourse of trade, and to prevent exasperating retaliations. See especially opinion of Johnson J. in Gibbons and Ogden, at its opening, and page 590; ib. 5 Cond. K. J. 592, 3, of McLean J. 5 How. 595; and of Woodbury do. 622, 3, 6.

5th. So far as merchandize is received in Missouri for sale to non residents, to go to the other markets, this law imposes a tax on exports from this State, and herein is unconstitutional and void. Art. 1, § 9, p. 5 and § 10, p. 2.

It is already stated that St. Louis is a great distributing mart for merchandize of all kinds, and the centrepal for this State and other States. It is within the general information that the greater part of the goods here introduced are sold at once, and sent out of this State to the territories, and to Iowa, Wisconsin, Illinois, Kentucky, &c , &c.

All such goods are swept into the vortex of this universal law, whether ever owned in this State or not, and are taxed though they may never leave the original boxes, in which they were imported. They cannot be sold even to go out of the State, to be exported, except a revenue is first derived from them to the State.

We object, therefore, to the aforesaid act of our legislature.

Because, disembarrass the act of its verbal concealment, and before permitting any sales whatever by a merchant, it exacts the payment of duties and imposts assessed upon every species of merchandize imported from adjoining States, or foreign countries, and whether in the hands of commission merchants, or of the real owners of the property, and is a tax on importations.

Because it prohibits all sales, in all cases, without a license, and prohibits every license, unless the merchant comply with an unconstitutional requisition, and buy at the rate of twenty cents per one hundred dollars, leave to sell what he has an undoubted right, under the laws of the United States to bring on for sale, forbidding him to sell them in the original form of importation, or in any other form whatever, whether at wholesale or retail; or whether in first hands, or any subsequent hands ; whether received for wholesale or retail, and directly conflict with the privilege purchased by the importer by the payment of duties to United States, and locking up all imports from sale, until payment of the license tax or duty.

21

Crow et al. vs. The State of Missouri.

Because, to find a market here, other products must be offered, as cheaply as our own and to do this, the holder of them cannot obtain a price for them equal to the price of our own, by the amount less of the license and *ad valorem* tax which must therefore be a tax to that extent upon the citizens of other States, compelling them to bear our burdens.

Because, it discriminates between different States, between Illinois wheat and Missouri wheat, between Kentucky hemp and Missouri hemp, and so regulates the inter-state commerce, by prefering Missouri productions over the productions of any sister State, sent to this market for sale and taxing the growth of fabrics of other States as such, expressly, and in the hands, and before they leave the hands, into which they first come.

Because, it is not even a tax on sales in this State, but it is a charge for the receiving for sale, and though the property may never be sold at all, though it be sold by the importer to a citizen of Iowa, and immediately taken there in the original unbroken package as first received, and though it be sent by an Illinois holder to a commission merchant here for sale, and then withdrawn by him unsold and sent to another market or appropriated to his own use, still, it must pay the assessment, though never in ownership, or by breaking the package, mingled with the property of this State.

Because, it implies a power in any State, upon the same principle, to license all common carriers in the State, as well as merchants, and to require them to pay a per centage, upon all goods brought by them from other States into this State, and so in fact impose upon the products of all sister States, or foreign countries, by the like indirection as in this case, a transit duty under the name of a personal license, charge upon the licentiate.

We object to it, because it taxes personal property of non-residents, which may happen to be here for sale in the hands of agents, e. y. it comes from Wisconsin to a commission merchant in St. Louis who receives it for sale; the price is not adequate, and he sends it on to New Orleans; yet it must by reason of this transit pay a tax; it may be recalled to Wisconsin, yet it must pay its tax, it is practically a duty laid even on the transit of goods through our territory, while no person is or may ever have been into this State, to whom the property belongs.

Because, it exacts, prior to granting the license, the payment of a tax on every thing "received for sale." While no opinion of the Supreme Court of the United States construes the constitutional liberty of this State, in this respect, to extend beyond imposing a tax upon that which is, "broken up for sale or for retail."

We object to it—

Because, it conflicts with the equality of the States of this Union, by conferring priority upon one over another; if we have the right to tax all the products of all the other States, in favor of Missouri, we have the right to tax any of the products of any of the other States.

Because, a State can no more regulate the State commerce, than foreign commerce, and any thing which affects freedom of Commercial intercourse, and impartial exchange of commodities is a regulation of commerce, contravening the condition of things required by the constitution of the U. S., and willed by all our congressional action.

Because, while a State can only charge upon imports, their absolutely necessary inspection expenses, which relate solely to the thing imported, as an import. The Missouri legislature have in the instance before us, charged a large proportion of our State expenditure, or the payment of salaries, and discharging State obligations, and for all other purposes, on such imports.

Because, it overrides that provision of the U. S. constitution, which requires that "all duties and imposts shall be uniform," and impose a special tariff upon merchandise imported, burdening it specifically as an import, applicable to the State of Missouri, and to no other State; and were each State to possess and exercise this power, the imposts upon exports, from other countries and other States, would probably present thirty-one variations, in that number of States, instead of the constitutional uniformity.

We object to it—

Because, if a State can thus tax what is received from other States, it can also tax what

---

Crow et al. vs. The State of Missouri.

---

goes out to other States, without an express and unconstitutional compact between two or more States. Southern States may tax all their exports of cotton, rice and tobacco, sent to eastern States, and eastern States may tax all their cotton and woollen fabrics, sent to the Gulf States; and complete non-intercourse become established between different States of the Union, under cover of revenue laws for the State herself, considerations of some importance at this period.

Because, it inevitably involves a most dangerous power, and one which must excite dissentions beween conterminous States; it involves the right to tax a large as well as a small per centum on the imports of property in the hands of the importer, and even in the hands of a domestic agent of the foreign owner, by asserting the right thus to tax and restrict, it affirms the right to exclude and destroy; (McCulloch vs. Maryland, 4 Wheat., and 4 ch. Cond., 487, Passenger cases, VII, How. 461;) it openly discriminates between Missouri products and all other products, to the extent of the ad valorem and license tax, and so involves the power of positive prohibition of all these products, the admission of which is taxed, if even the legislature think it advantageous to Missouri were she to do so, and to pass embargoes and acts of non-intercourse by navigation.

Because, if this law is constitutional, then Missouri may pass all minor laws, to thoroughly effectuate the interest and object of this act, which she declares to be for the purposes of taxation. She may establish ports of entry for extra State products and manufactories; she may build custom houses and require all the goods to pass through them; she may appoint corps of collectors, inspectors and custom house officers, whose permit should be indespensible to the offering of the goods for sale; and all this would only be auxiliary to the rendering of a correct account as required by the states.

Finally, we object to this enactment—

Because, it excites to vindictive feeling and retaliatory measures, on the part of other States which if once indulged would lead to the most disastrous consequences, and restore the miseries of the old confederation, it would violate the harmonious interests and provisions of the United States constitution, and that fraternal equality guaranteed to the States by that instrument, and the peaceful security against mutual aggression enjoyed under its protection.

For all these reasons, good and true as we consider them, we respectfully urge the court, to declare the law in question unequal, unjust, and unconstitutional, and therefore void, and to order the St. Louis criminal court to discharge these defendants without day.

## LACKLAND, for the State.

The court below erred in sustaining the demurrer to the second count in the indictment. The fact that the second count fails to allege that the goods, wares and merchandise with the selling of which defendants are charged were not the growth, produce and manufactures of this State does not make it bad.

The 5th sec. of the act of 1845, "to. license and tax merchants" is repealed by the act of 1849, entitled "an act to regulate license and taxes upon merchants and grocers, session acts of '49, p. 68." Because said fifth section restricts the data upon which the amount the license tax under the act of '49, is to be calulated.

Although the 5th sec. of the act of 1845, may not be repealed by the act of 1849; yet the court erred in sustaining the demurrer to the second count. Where an offence is created by statute and exceptions are contained in the statute, but not contained in the section creating the offence, it is not necessary to negative such exceptions in the indictment, but defendant by proof at the trial must bring himself within the exception; State vs. Godfrey, 11 Shep., 232; State vs. Price, 12 Gill and Johns., 260; Bennett vs. Hurd, 3 Johns. 438; Teel vs. Fonda, 4 Johns. 304; Com. vs. Odlin, 23 Pick., 275; Rex vs. James, 1 East Rep. 644 and note h. Spires vs. Parker, 1 T. R., 144 and 5.

The court erred in sustaining the demurrer in the 3rd count. Although said 3rd coun

Crow et al. vs. The State of Missouri.

charges that defendants imported the goods mentioned, from England, paid duty thereon under the laws of U. S., and sold the same in the original unbroken imported packages, the acts of Missouri above referred to seek to tax the vocation without respect to the place from whence the property may be imported, or the codition of the propery rused in the exercise of such vocation.

The court overruled the demurrer as to the other counts in the indictment and thus are raised the question whether the above acts of Missouri conflict with the first part of the 8th sec. of the first article of constitution of U. S., which provides that the congress shall have power to lay and collect taxes, duties, imposts and excises, &c., on the third part of same section and article, which provides that the congress shall have power to regulate commerce with foreign nations among the several States and with the Indian tribes; or the second part of section 10, same article which declares that no State shall without the consent of congress levy any imposts or duties on imports or exports except what may be absolutely necessary for executing its inspection laws, or the 19th sec. of the 13th art. of the constitution of Missouri which says, that all property subject to taxation in this State, shall be taxed in proportion to its value.

It is denied that acts of Missouri levy any imposts or duties. The goods of the merchants are in nowise responsible for the license tax imposed by these acts. Said tax does not follow or attach the goods, nor does it procure admission for the goods into any State which are the ingredients of an impost or duty.

Admitting for the sake of argument while we utterly deny the fact that the acts of Missouri operate as regulation of commerce "among the several States." Said acts are not therefore in conflict with third part of 8th sec. of first article of constitution of U. S. because the power to power to regulate commerce among the several States is a dormant power and is concurrent in the States until congress legislates upon the subject.

Wilson et al. v. Blackbird Creek, Marsh co., 2 Peters 251-2; Raguet vs. Wade, 4 Ohio 109; C. J. Taney's opinion in License cases, 5 How. 584; J. Catron's do., 607; J. Nelson's do., 618; J. Daniel's do., 615; J. Woodbury's do., 624—a majority of the court.

The power to organize, arm and discipline, &c., the militia is concurrent and dormant—Houston vs. Moore, 5 Wheat. 1.

So is the power to make uniform laws upon the subject of Bankruptcies, Sturges v. Crowninshield, 4 Wheat. 196.

Also to make standards of weights and measures.

The question whether the power to regulate commerce among the States could be exercised by the States while dormant, was not before the court in Gibbon vs. Ogden. The chief justice, in delivering the opinion of the court in this case (9 Wheat. 200) expressly says, "The sole question is, can a State regulate commerce with foreign nations and among the States while congress is regulating." In other words can the States legislate upon the subject after congress has legislated. In this case the acts of New York were declared void, because they came in conflict with the acts of congress on the same subject.

Nor did the court, in the case of Brown v. Maryland, 12 Wheat, 419, lay down a different doctine from that declared in Gibbon vs. Ogden. The legislature of Maryland passed an act taxing all imports and vendors of imports as such. And the court decided that this was interference with the legislation of congress on that subject. Harrison vs. Vicksburg, 3 S. & M. 581; Beal v. State, 4 Blackf. 108.

In the Passenger cases, 7 How., the acts of N. York and Massachusetts were declared void because they interfered with certain treaties and acts of the United States on the same subject.

No act of any of the States has been declared void, because of the existence of 3d part of 8th § of art. of U. S. constitution, but because of some act or treaty of the U. S. This establishes the position that the power to regulate commerce among the States is dormant till congress acts, and up to that time the State may exercise the power. And as there are no acts or treaties of U. S. to come in conflict with the acts of Missouri upon the subject, they are valid.

Crow et al. vs. The State of Missouri.

The acts of Missouri above mentioned do not amount to a regulation of commerce within the intent and meaning of the constitution of U. S. If so, then the several acts of Missouri concerning pedlars, auctioners and brokers are of the same character and all must be void, if any one is.

The acts of Missouri concerning merchants although they may have an indirect or remote bearing upon commerce are not for that reason void. There can be no interference by the legislature with personal property without being liable to the same objection. Raguet vs. Wade, 4 Ohio, 114; Beal vs. State, 4 Blackf. 108.

A law imposing a tax on the sale of merchandise is constitutional. Cummings vs. Savannah R. M. Charlt. 26.

The acts of Missouri under consideration merely impose a tax upon vocation or business, and the State has a right to lay such tax by law.

Austin vs. State, 10 Mo. 593; Simmons vs. State, 12 Mo. 268; Nathan vs. Louisiana, 8 How., 73.

In the case last cited, the supreme court of the U. S. clearly and fully establish the following propositions :

1st. That the several States have the power of taxing the business or vocation of their citizens (vendors of merchandize inclusive) carried on within their jurisdictions.

2. That a tax upon the business or vocation is not a tax upon the property used in the exercise of such business or vocation.

3. That although a tax imposed upon business or vocation or property may have an indirect or remote bearing upon commerce, this does not make such tax unconstitutional.

This case alone it is contended decides the cause for the State so far as constitutional law is involved.

The above points and authorities also show that the tax imposed is not a tax upon property, and therefore do not come in conflict with the provision of the constitution of the State of Missouri, which says all property subject to taxation shall be taxed in proportion to its value. We are at a loss to perceive the grounds upon which this is called a tax upon property. It does not follow, or attach to the property; nor is the property in any manner whatever liable or responsible for the tax. These are essential ingredients after tax upon property. We may admit, for argument sake, now, that this is a tax upon property, although we cannot look upon it as such. The tax imposed is in proportion to value. The 10th § of the act of 1845 says expressly that the tax imposed by that section shall be ad valorem. The tax imposed by the 1st § of the act of 1849 amounts to twenty cents per hundred dollars, or one-fifth of one per cent. This seems to us to be taxing in proportion to value.

It is said this is subjecting the same property to two taxes. It is now too late to deny the State this power. The State taxes vocations and property, and also gives cities and towns throughout the State, within their respective jurisdictions, the same power, and this power has been exercised by the cities and towns without being questioned. It must be admitted that if the State can delegate this power to other corporations, it can be retained and exercised by the State. The right to lay the tax is a question of power, which is now before the court. The number or amount of taxes laid is merely a question of policy, and is foreign to the point in controversy.

It is also said that this is a discriminating tax. That a discrimination is made between the property of the merchant and that of others. We know of no constitutional prohibition of such tax. The State certainly has the power of selecting the subjects of taxation. Whether the subjects are wisely or unwisely selected is a question of policy with which we have nothing to do. The question of power is the only one before the court.

The above constitutional provision of the State of Missouri has nothing to do with the cause. It is merely a prohibition of specific taxation. That A's horse shall not be taxed the same as B's merely because they are both horses, when one may be of ten times the value of the other. That if property, as such, be subjected to taxation by law, then it shall be taxed upon the ad valorem principle.

Crow et al. vs. The State of Missouri.

H. R. GAMBLE also filed a written argument on the part of the State.

BIRCH, J., delivered the opinion of the court.

It is deemed unnecessary to allude further to the statement which was agreed upon as furnishing the *basis* for our decision in this case, than to remark, that the point which it was mainly intended to present for our consideration, was and is, whether the act of the 12th March, 1849, in connexion with the act of the 25th March, 1845, "to license and tax merchants," is authorized under the constitution of the United States and this State.

The circumstances under which a necessarily hasty, and, therefore, "concededly incomplete" opinion was written and rendered in the case at the last term of this court, were deemed to be such as, if not magnanimously to exempt it from all criticisms amongst those to whom the facts alluded to were known, would at least have suggested a degree of forbearant fairness in the discussion to which it gave rise. That there might be presented to the legislative department of the government then soon to assemble, the mere general considerations upon which was then, as there is yet, rested the conviction that the legislation in question was interdicted by the higher guaranty of the constitution, was the respectful purpose which was entertained, and constituted the reason which was entertained, and constituted the reason which preponderated, to induce us at that term, and under the circumstances referred to, to render an opinion at all.

The legislature having since held its session without passing any enactment upon the subject, the inference is, perhaps, but a legitimate one, that at least a majority of its members intelligently comprehend the scope and effect of the opinion and judgment alluded to, and satisfied themselves that a probable adherence to it would not reduce the aggregate revenue of the State below the requirements to which they had subjected the treasury ; for, in addition to the fact that the estimate of the Auditor for the two succeeding years assumes a *surplus for* the treasury several times greater than an adherence to that decision could possibly cut off, it may have been also deemed probable enough that a very short period would intervene, after such a shackle as is complained of was removed from our exterior commerce, before the whole sale business of our otherwise attractive commercial metropolis, exempted thereby from the discouraging burthen to which it is at present subjected, would be able so to commend itself to the intelligent retailers and customers in the country, as to result in at least doubling the amount

of their present importations and sales, thereby supplying in this city alone the basis of a constitutional tax,which would result in even a greater aggregate to the treasury than the oppressive and unconstitutional one of which the defendants here complain.  In other words, that there would probably soon be settled here at least twice the present number of wholesale merchants, who would "receive," because they could then sell to the country merchants twice the quantity of goods they now do, whereby the ad valorem or ordinary tax upon them would be paid into our own treasury (through the wholesalers) instead of being paid, as now, into the treasuries of the eastern States and cities, through t ose of our interior merchants whose customers compel them to furnish them with goods which have not been doubly or even trebly taxed between Philadelphia and the country stores.   In this manner, it need scarcely be argued that custom is not only driven by,and from our own emporium, but taxes driven from our own treasury—the argument seeming plain and conclusive enough, and one upon which both merchants and their customers would rationally and readily act, namely: that where goods are less heavily pressed upon by the taxing power than the wholesalers here are, they can be purchased cheaper, and of course brought home and sold cheaper.   Be this, however, as it may, the fault, if any, of leaving the treasury deficient, and ourselves (with others) thereby unprovided for, could not be ours—such considerations being addressed to legislative and not judicial provision or discretion.

Proceeding, therefore, rather to restate and to amplify our previous positions and conclusions, than to write or deliver a new opinion, we commence by repeating, that "by the 19th subdivision of the 13th article of our State constitution, it is declared that all property subject to taxation in this State shall be taxed in proportion to its value ; and it would seem that whether reference be had to the meaning most naturally and directly imported and conveyed by the sentence itself, or (in connexion) to the cotemporaneous concurrences which probably contributed to suggest and to shape it, our language is perhaps inadequate to furnish a combination of words, as a text, which would less ambiguously denote and enforce an observance of the great political maxim upon which they were doubtless predicated."

"Concerning the mere grammatical signification of the sentence, there can probably be no disagreement of opinion ; and when it is considered in connexion with the cotemporary fact, that under the terms of our admission into the Union, the State was, on the same day the constitution was adopted, binding itself by ordinance to forbear to tax certain descriptions of property, and that in virtue of the residue of its sovereignty

in that respect, "all" other property was "subject to taxation," the sentence would seem almost historically, no less than verbally, to have been predicated upon the design which was entertained to repudiate and repress all favoritism or oppression, in the nature of class legislation; or otherwise, by ordaining that in Missouri, as in other States, a general pro rata assessment and taxation—as simple and comparatively unexpensive in its enactment and execution, as it was unvaryingly just and equitable in its design and in its consequences—should be interposed as the irreversible rule of action and of right in the State they were founding."

"Although writing here, instead of an essay upon political economy, a mere and more rigid judicial opinion, it may not, perhaps, be wholly impermissible so far to anticipate the legitimate criticism to which this virtual denial of the discretion of the legislature may subject a co-ordinate department of the government, as to remark that it was doubtless present to the reflection and the forecast of the statesmen who founded our system, that unless the temper and the disposition of those for whom they were acting in that day and in this, should become exempt in the future which was before them from the infirmities implied in the record of all the past, a discretion in the majority to tax according to their judgment or their will, would find its periodical possible, if not probable denoument, in the comparative (perhaps specious) exemptions of the many of the strong, at the expense of the weaker class of the community. It was doubtless, therefore, deemed and acted upon, that in order to avoid the despotism of even an unchecked majority of men of like passions with our own, a subjection and adherence to the constitutional requision we are considering—in theory and in practice in spirit and in truth—in the legislation which is direct, and in that which is indirect, constituted then, as it will ever constitute, the only reliable guaranty that "the burdens and the blessings of government, like the dews of Heaven, will fall upon all alike."

"That such a consummation is only compassed, when each and every citizen is subjected to the same specific tax for the personal protection afforded him by the government and the laws, and for the protection afforded to his property, (let it come from whence it may,) to a tax in proportion to its value, needs but rational reflection to beget rational concession—and that the exact reverse ensues, whenever the laws are so framed as that the expense of protecting the property of one citizen, is raised by the imposition of taxes, either exclusively, or disproportionately, upon the property of another, need not, of course, be further demonstrated. The one is deemed to be the unvarying equity and justice

Crow et al. vs The State of Missouri.

of the constitution—the other the varying and alternate injustice of interest, design or misapprehension.

Such being the estimate we have formed, not only of the terms of the constitutional requisition itself, but of the great and immutable principle which constitutes its basis and defence, it is to our minds insufficient to answer, that the discriminating tax complained of in the present instance, was levied through the machinery of a discriminating license, instead of the more direct manner which it sought to avoid. If it be repugnant to the constitution in the one sense, it cannot be conformable to its spirit or design in the other—so that we are left without either the official alternative of the moral power to uphold what we can but regard as at least an unauthorized evasion of the constitutional guaranty in question. And whilst but little argument would seem necessary to demonstrate that even the imaginary success of such devices almost invariably contemplates and compasses even a more onerous and complicated tax, of multiplied inequality, upon the people at large, than if levied upon them directly and simply—in plain terms, for a plain purpose, and once for all—it is sufficient for the purposes of this opinion, and for the judgment which must be consequent upon it, that the object being the same, and the effect the same, the decision we are called to pronounce cannot vary in the one case from what the very terms of the law would have imposed in the other."

What, indeed, is the law of 1849, when considered in connexion with the 10th section of the act of 1845, (which it essays to re-enact and retain,) except it be at least a double ad valorem tax upon the property of merchants and grocers? The provisions of the first section of the act of '49 are, that "in lieu of the taxes assessed upon merchants and grocers, licensed by the existing law, there shall be levied and collected upon every merchant's and grocer's license, a tax at the following rate, to wit: Where the amount of merchandize received for sale by any merchant or grocer shall amount in value to as much as five hundred dollars or less, the tax shall be one dollar; where the amount of merchandize so received shall amount in value to more than five hundred dollars and not exceed six hundred dollars, the tax shall be one dollar and twenty cents; where the amount of merchandize so received shall amount in value to more than six hundred dollars, and not exceed seven hundred dollars, the tax shall be one dollar and forty cents; and so on in the same proportion, increasing the tax at the rate of 20 cents for every additional one hundred dollars' worth of merchandize so received."

Sec. 2. The provisions of the preceding section shall be applicable to all merchants, commission merchants and grocers, whether trading as

wholesale or retail dealers : Provided, that nothing in this act shall be so construed as to repeal the 10th section of an act entitled "an act to license and tax merchants," approved March 25th, 1845, so far as the same relates to the collection of an ad valorem tax upon all merchandise offered for sale as aforesaid."

The 10th section of the act of 1845, referring to the previous section, (8,) which may be called the discriminatiug or license section of that year, and to sec. 5 of the same act which exempts all goods which are of the "growth, produce or manufacture of this State," is in these words :

"The collector shall collect as an *ad valorem* tax, such a per cent. upon all merchandize offered for sale as aforesaid, (except such as may be offered in the packages, boxes, bales, barrels, or crates, in which they were imported, or in which they may have remained without being broken,) such an amount as may, for the time being, be paid as a tax upon real estate."

That section therefore continuing in force, three sections thus quoted in connexion with the fifth section, which discriminates in favor of our own goods, and the general law of the 16th of February, 1847, which levies upon real estate and other general property one-fifth of one per centum on its "value," constitute the existing enactments relating to the property or business of the defendants, and should therefore be considered in *pari materia*. It will be seen by their context, that they not only make the aggregate unequal tax, for the non-payment of which the defendants are indicted, to depend by their very *terms* upon the "value" of the merchantable "property" received by them, but that notwithstanding the sections are differently worded, the tax or per centum is substantially the same under each, being in short, under both sections, twenty cents on every hundred dollars' worth, and consequently producing an aggregate exactly double that which is levied upon the general property of the State. In other words, the property which comes amongst us from other States is, in any view of the case, taxed twice as much as similar property in our own State is taxed.

It is perhaps not unworthy of remark in this connexion, that the Legislature itself seems not to have been exempt from the apprehension, that the extra tax they were thus levying upon one class of the community, or more strictly speaking, upon one description of "property," to be paid in the end by those who consumed or used it, was at least of doubtful sanction under the constitutional guaranty we have quoted. Why, otherwise, resort to two sections of law, each to raise one-fifth of one per cent. on the value of a merchant's goods, instead of enacting openly and at once, in a single section, that the tax to be charged upon

Crow et al. vs. The State of Missouri.

his license, should be *two*-fifths of one per centum? No other reason is perceived for such an apparent redundancy of sections and provisos, except that it was not intended to peril the collection of a single ad valorem, or constitutional tax, (which it was doubtless assumed would be conceded in reference to the scope or requirements of one or the other of the sections) by so combining the double ad valorem we are considering in a single section as that the whole must stand or fall together. Hence most probably resulted what we can but regard as the unconstitutional proviso to the act of 1849, by which the attempt is made to keep up the additional ad valorem established by the 10th section of the act of 1845, notwithstanding the object of the subsequent act of 1849 seemed to be to establish a general ad valorem system, "*in lieu* of the taxes assessed upon merchants and grocers" by the various laws then existing. It is perhaps fortunate, however, that the legislation upon the subject is as it is—presenting thereby to the court which disconcurs in the constitutional competency of the legislature to assess upon one description of property, a tax or rate differing from that which is assessed upon all other descriptions of property, the alternative or option of rejecting that section which will least impair the general revenue to which the State is legitimately entitled, and also least disturb the harmony and simplicity of the system, as their decision may leave it.

It happens to the author of this opinion to know that the power to discriminate (as here complained of) between different descriptions of property "subject to taxation," has long been denied or doubted by intelligent members of both branches of the legislature, without regard to avocation or to party; and as the question involved is conceded throughout the argument to be as much or more a political than a *merely* legal one, no impropriety is perceived either in thus alluding to the fact, or in briefly essaying such additional considerations as may be supposed to have been present to the mind of the convention, when adopting what is conceived to be by far the most important line in the constitution. Where, indeed, a sentence of this character is held to be open to construction at all, as the counsel for the State holds this to be, it becomes comparatively indispensable to its satisfactory solution, to summon in review the various considerations, historical and otherwise, which may be supposed to have legitimately borne upon or influenced its adoption, and thus educe, as satisfactorily as may be, the key to its proper construction.

It must be borne in mind, however, that we are discussing the question before us as one involving the power, and not the wisdom or virtue of the legislature. If it had been conceded when our constitution was

under discussion, or could be conceded now, that the legislative department of the government would be always exempt from the infirmity of our common nature, there would not then have been, nor would there now be, a necessity for any constitution at all. It need not, however, be more specifically stated, that constitutions are founded in distrust of the very infirmities alluded to, and as constituting the permanent reliance of all men—the weaker portion, especially—that under all circumstances, and at all times, there are limits and guaranties which even a majority cannot transcend or impair. Repeating, therefore, that this question can only properly be discussed as one of political or constitutional POWER, it has seemed to us as being but too readily susceptible of demonstration, that with a concession of the authority in question here, there would be no limit to the ramification or exercise of powers so exactly analagous as to have been in fact claimed and insisted upon in the course of this discussion; and that, instead of taxing "all property" equally, or "in proportion to its value," the system of licensing particular avocations or professions, and then taxing them according to the interests or the prejudices of a temporary majority of the legislature would cause the constitutional guaranty we have been considering to be remembered for little else than to be contemned and evaded.

What, for instance, would restrain an interested and unchecked majority from enacting that no citizen should purchase, or sell, or hire, or even own a slave, without obtaining therefor an annual, or (as in the case before us) a semi-annual *license*—paying for *it* (and not for the property, as the fallacy runs,) such sum as the legislative wisdom or virtue may enact? What would prevent an enactment that no man should work a mine, cultivate more than a given quantity of land in hemp or tobacco, or keep more than a certain number or description of horses or cattle, without "a *license* therefor," to be taxed and paid for, in either case or in all, according to the predominating interest, or the coalesced and combined interests and prejudices of an accidental and unchecked majority of the legislature? It is deemed sufficient to suggest, without amplifying or elaborating these and kindred abuses, in order to awaken such enquiry and reflection as we are fain to believe must resistlessly beget concurrence in the conclusion, that the constitutional guaranty in question is not only a farce, but an absolute fraud, if it be liable to such palpable every-day evasions.

But the very able and ingenious counsel who was employed by the county, and who presented in its petition for a rehearing of this cause the reasons upon which it was respectfully holden, that the restricted

construction denoted by our previous opinion was too literal, assumes not only in his argument, but in the example he has presented, that the guaranty in question simply restricts the legislature to an ad valorem instead of a *specific* tax, upon such property as it may "subject to taxa- ation." And the proposition is illustrated by assuming (for example) that it was and is a simple denial of the legislative authority to tax a pleasure carriage worth a hundred dollars as much as one worth a thou- sand dollars. However disagreeing with this 'construction, as rendering the object of too little practical utility to comport either with the general and' solemn terms of the sentence itself, or to justify for it a place amongst the highest and most radical guaranties contained in 'our "Bill of Rights," yet even this, as it seems to us, concedes too much for the argument here—it having been already demonstrated that under the power assumed to license whatever the legislature sees fit, carria- ges (or of course anything else) worth a given sum might be taxed a given per cent. by that process, whilst others worth more or less might be either assessed and 'taxed only in the usual way, or exempted alto- gether. Adopting, therefore, at least for the present, the single illustra- tion of the learned counsel, it will of itself, perhaps, be sufficient to suggest and to demonstrate the general proposition upon which we rely, which is, that the distinction between the tax on the property or thing owned, and on the person or business of the owner, merely because he owns it, should have but little influence in the consideration of a' great and radical proposition like the present one, in which the community and the court should look to the substance of *the thing done*, instead of the mere name under which it is done. If 'otherwise, what we have been wont to regard as the most vital principle'of the constitution, may be contemptuously overriden by a mere form !

It is deemed unnecessary here to enter at large into the discussion of the kindred or resulting proposition, which has also been necessarily maintained in this discussion, being an affirmance of the po ver of the legislature may raise by direct taxation all the revenue of the State from a single species of property—land or negroes for example. That question is not so strictly before us as to require an elaborate exposition of the reasons upon which we place not only our denial of any such con- stitutional authority, but its virtual inhibition by both the letter and the spirit of the constitution. For the present, therefore, (at least in this connexion,) it will suffice to repeat that the sentence we have quoted is perhaps as expressive and imperative as language could render it—the words "may" and "shall" with their negatives, being conceded to be

the proper auxiliaries of the enacting verb, and that where simply the latter is apopted, appropriately, (as in this case) to join the legal subject to the legal action, there can be no pretence of ambiguity, and hence no doubt or uncertainty, respecting either the purpose intended or the duty enjoined. We but reiterate, therefore, before perhaps resuming the consideration of the proposition in another connexion, that the emphatic words of the constitution are, that "all property subject to taxation shall be taxed in proportion to its value," and that at the time this fundamental and unchanging basis for raising the revenue of the State was agreed upon and ratified, every description of property not exempted by the compact of the same date was thus constitutionally "subject" to equal taxation. The term "property," we need scarcely remark, has a most extensive signification, consisting, according to its legal definition, "in the free use, enjoyment and disposal by a person of all his acquisitions, without any control or dimunition, save only by the law of the land." What is that "law of the land" in this State, except it be the very constitutional guaranty under consideration, namely—that a merchant's "acquisitions" or "property" (as in the definition just quoted) shall be taxed only as the acquisitions or property of another person; or in the very words of the supreme "law of the land," "in proportion to its value?" and what is the tax on the sale of an article, acquired or purchased expressly for sale, but a tax on the article itself?"

If, therefore, under words thus imperative, and grammatically adapted to imply or signify an ever present or future present tense as to the taxation of all property" not exempted as above, the legislature may nevertheless elect what descriptions of property it will from time to time "subject" to the burdens of the treasury, (whether directly or indirectly) the plain provision of the constitution, so seemingly to the contrary, both in its letter and in the great public and private considerations upon which it is supposed to have been founded, is worth even less than the line it occupies upon the page before us.

Whilst it will not be controverted that if the convention had remained silent as to any particular mode or basis of raising a revenue, there would have resulted to the legislature, in this State as in others, where no particular plan has been pointed out, the necessarily implied authority to levy and collect a sum sufficient to carry forward the legitimate operations of the government, in a manner conformable to their discretion alone, the case is conceived to be exactly the reverse where a basis or method has been distinctly intimated; for thereby, according to the general rule of interpreting such delegations of authority or of duty the imperative specification of that particular method of executing it is

to be regarded as the virtual exclusion of all others. "*Expressio uni-us, exclusio est alierius.*"

Acting, doubtless, upon this undeniable and only safe principle of construction, it is perceived by reference to the constitution of the neighboring State of Arkansas, where the convention inserted a general provision upon the subject of taxation, substantially conforming to our own, that it was deemed necessary, in order to confer the additional power of taxing merchants and others in that State, in the manner they are taxed by existing enactments here, to insert in their constitution an express authority in these words: "The general assembly shall have power to tax merchants, hawkers, pedlars and privileges, in such manner as may from time to time be prescribed by law."

But for the specific authority thus quoted, which may not inaptly be called a proviso to the general guaranty or plan of raising the revenue in that State, it was doubtless foreseen that it would have been as incompetent for its legislature to enact such a law as the one we are considering, as (without such proviso) it is deemed incompetent for the legislature of this State to do—and why? Not that the right of the State was overshadowed or swallowed up by any pre-existing or paramount federal authority, but because the people of the States themselves in their own organic law, had intelligently and wisely withheld* the power from their agents or government, by ordaining a different and all-embracing permanent rule as the least erring criterion of right, and comprehensible alike to all its citizens, whose property is taxed precisely in the ratio it protected it. Such a rule, it was doubtless foreseen, had to be but simply adhered to, in order to repress the biennial clashings and contests which spring up from the rivalries and the prejudices of different legislative interests—reducing thus its entire duty respecting

*The deservedly high authority of Mr. Justice Woodbury having been referred to, not only here but elsewhere, as in contravention of the general conclusion at which we have arrived, it is deemed simply necessary to extract from his separate opinion in the Passenger cases (7th Howard, 531) not only the pith and conclusion, but as we apprehend, the substance of the conclusion beyond which no enlighted American jurist or statesman would be found to commit himself. We of course make no commentary—simply denoting by italics the very exception which we have assumed may distinguish the case before us (under our peculiar constitution) from almost any which has previously passed the ordeal of the courts. Judge W. says: "The power of taxation, *generally*, in all independent States, is unlimited as to persons and things, except as they may have been pleased, by contract or *otherwise*, to restrict *themselves.*" So, also, Chancellor Kent states the true doctrine concerning the "rights" or the powers of the States, when speaking of them as exempt from the control of the United States, thus: "The power of State taxation is to be measured by the extent of State sovereignty, and this leaves to a State the command of all its resources, and the unimpaired power of taxing the people and property of the State." It is trusted that it need scarcely again be impressed, that this and kindred conceded authorities can have no intelligent application in a case like the present, where the question (with the author of this opinion, at least,) is not between the State law and the constitution of the United States, but simply whether the people of the State themselves have seen fit, in their own organic law, to prescribe a mode or basis of taxation, to the spirit of which the system of the law in question is not only palpably repugnant, but of which it may be rendered wholly destructive.

the revenue into a simple revision of the arithmetical calculations of the Auditor, based upon the official statistics of the probable amount of "all property subject to taxation" on the one hand, and the like probable requirements of the reasury upon the other.

The section or line we are considering had therefore the additional reason to commend its adoption by the convention, that an adherence to its injunctions would absolutely save to the treasury, in the repression of days, or sometimes even weeks, of wrangling legislation, as much or more money than would probably be produced by any law which sought to evade or avoid it. We desire, therefore, that it be reimpressed and and remembered in this connexion, that the doctrine of "State rights" with which the question we are considering is sometimes unintelligently confused and confounded, remains wholly untouched, although not unconsidered, in the opinion heretofore, and now again rendered. The question then and now decided is, not whether the State has directly or indirectly relinquished this alleged "right" to the federal government but did her people virtually, or not, prohibit the exercise of such a power er by their own constitution—for their own security—preserving it thereby amongst the great mass of powers and privileges not delegated to her government, but withheld and retained by her citizens, of whom the defendants and men of their class comprise a portion or part.

It is not, perhaps, wholly unnecessary in this connexion to endeavor to attain to exact, and hence correct, ideas of a few general terms in use amongst us, but having different significations, in different countries, or under different forms of government, and concerning which indefinite or incorrect impressions may come to prevail, by even as simple a process as the reading of a single book. Thus, it is held by Blackstone, an eminent British commentator, that " sovereignty and legislature are convertible terms," and that "one cannot exist without the other." The idea, therefore, with those, whether in the legal profession, or out of it, who undiscriminatingly examine and imbibe alone the views of this advocate of the unchecked authority of Parliament, would, perhaps, almost, of course, be that the State of Missouri was not "sovereign" unless her legislature was sovereign ; and there might, naturally enough, spring up with such an one a consequential bias in favor of what he supposed to be the implicated "sovereignty of his State" in her relation to the government or authority of the United States. Mr. Justice Story however, an equally accomplished American commentator, makes the matter sufficiently clear under our constitutions or forms of government, by holding that "in every limited government the power of legislation is,

or at least may be, limited at the will of the State, and therefore the legislature is not, in an absolute sense, sovereign." The learned commentator yet further and still more perspicuously elucidates the difference between the sovereignty of the people composing a State, and the sovereignty or authority of their mere government, and the partition of its powers, as follows: "But there is a more limited sense, in which the word ["State"] is often used, where it expresses merely the positive or actual organization of the legislative, executive, or judicial powers.— Thus, the actual government of a State is frequently designated by the name of the State. We say the State has power to do this or that; the State has passed a law, or prohibited an act, meaning no more than that the proper functionaries, organized for that purpose, have power to do the act, or have passed the law, or prohibited the particular action. The sovereignty of a nation or State, considered with reference to its association, may be absolute and uncontrollable in all respects, except the limitations which it chooses to impose upon itself. But the sovereignty of the government, organized within the State, may be of a very limited nature. It may extend to few or to many objects. It may be unlimited as to some ; it may be restricted as to others. To the extent of the power given the government may be sovereign, and its acts may be deemed the sovereign acts of the State. Nay, the State—by which we mean the people composing the State—may divide its sovereign powers among various functionaries, and each, in the limited sense, would be sovereign in respect to the powers confided to each, and dependent in all other cases. * * * The residuary sovereignty of each State, not granted to any of its public functionaries, is in the people of the State." Book 2, chap. 1, sec. 208.)

The question, we repeat, therefore, when considered in reference to the rule of interpretation previously alluded to, and which of course excludes as "authority" the adjudications of other States where the power is either expressly conferred, or necessarily implied for what may be termed the silent reasons in this connexion before adverted to— such a question, we respectfully reiterate, appears to us to admit but a single answer, and that is, that the legislature is not sovereign in the respect here claimed for it, because the people of the State have chosen that it should not be. On the contrary, in the language we have quoted and adopted, the power is yet "in the people of the State," and will remain there until they see fit either to amend their constitution or provide for a different exposition of it.

It results from these premises, that whilst in other countries the privileges or prerogatives to which the advocates of this measure assign

22

late it here, are either extorted or otherwise proceed from the govern-
ment or sovereign, it is the distinguishing boast of American institu-
tions, that the people who uphold them are their own free agents, so
far at least as not to be governed a hair beyond the line that was agreed
upon by their fathers, and written down and signed in their constitu-
tions. Whilst, therefore, it may be, as it is, a proud and noble boast in
other States, that a majority of the people, in this respect, and through
their agents, govern themselves, it is deemed to be a prouder and yet
more noble and secure one to a Missourian, that the people here have
already permanently done so, whereby, in respect to that most impor-
tant of all other considerations—namely, the power to tax him—he is
beyond the reach or the possibility of injustice or of wrong, even by a
temporary majority of "men of like passions with his own." In other
words, American governments are precisely what their constitutions
make them—no more—from which the inference is but naturally and
readily deducible, that whilst in respect to the federal government all
the States are equal, the right, or rather the authority conferred by the
people upon the government of one State, may materially exceed those
conferred by another people upon the government of another State.
The constitutions we have thus spoken of being therefore but the poli-
tical articles of agreement or association, by which the people of each
State (themselves, alone, originally sovereign) agree to entrust certain
powers and duties to certain designated agents, in order to carry on the
limited sovereignty or government they have created, may it not be
deferentially submitted, that if these constitutions were acted upon and
administered in the spirit of fairness and candor in which they were
most probably adopted, there would result but little comparative dis-
agreement or strife, and even less complication, or mystery, either in our
policy or our laws? The fact, however, has become alike historical and
proverbial, that like the mere private contracts or agreements amongst
men, no sooner are they ratified and consummated, than the parties to
them, each looking in the direction of his own prejudices, or his own
supposed interests, seeks to establish, by degrees, such a practical con-
struction of them, as best to subserve his own present or ulterior de-
signs. If successful in such purposes, and they are for a period ac-
quiesced in, it is of course not difficult to imagine either the time or
the circumstances, when the magistrate or the citizen will be consider-
ed a bold one, if not indeed denounced as himself an innovator, who
attempts to construe the constitution either by its own provisions, or
by summoning to his aid the probable cotemporary reasons upon which
it was predicated, instead of adopting the constructive interpolations

to which it has been thus subjected. Is it, indeed, assuming too much to suppose, that we are not wholly exempt from that condition in reference to the great question we are considering to-day—it being seen by reference to the first act upon the subject, which passed on the 12th of December, 1820; that the system which has so grown upon us as to be deemed longer insupportable, commenced with little, if any thing, more than varying the mere form of levying the usual or probable ad valorem tax of the constitution.

We are not unaware, however, that it is the main argument in this case, that it is the "privilege" or the "occupation" of the merchant which is thus taxed, and which may be taxed, *ad libitum*, according to the mere discretion of the legislature; and as it is not improbable that the illegitimate latitude of signification which that term has almost imperceptibly assumed, even amongst intelligent and otherwise discriminating men, may have produced, in some measure at least, the diversity of opinion which exists in reference to the question we are considering, it becomes our duty to somewhat examine it. It is therefore in no disrespectful or assuming spirit that we deem it proper to premise, that the most earnest and solicitous investigation which it has been our occasional duty to bestow upon questions analagous to the present one, has left us without resourse or escape from the conclusion, that the judicial, no less than other departments of human government, yielding themselves, at times, either sluggishly or imperceptibly to the miscalled analogies of what are hence mis-termed "authorities"—mistaken or deceptive, because perhaps rendered under political systems essentially distinguishable from their own—have laid the foundation for those subsequent radical errors of interpretation or construction, which can alone be arrested and corrected (if at all) by a respectful yet self-relying recurrence to great original principles, as constituting perhaps the only anchorage longer held forth for the rescue and restoration of the very system itself, as ordained by their fathers.

We have perhaps thus sufficiently denoted or suggested, that in order to render a rational or common sense exposition of what constitutes a "privilege" in this State, where the powers withheld from the government are reserved to the people at large, it is not necessary to encumber either the argument or the illustration with definitions or examples drawn from England, where, by the theory of the common law, what are there termed privileges, liberties or franchises, sprang from, and in many instances returned to the crown. As little will it be necessary here to repeat the international signification of the term "license," or the reasons upon which the system was originally built up amongst bel-

ligerent States or nations. It will, on the contrary, suffice to state, that under our constitution or system of State government, we can conceive of no such thing as a privilege, or what is more professionally classable as a franchise, being made to embrace any species of general occupation, which a citizen may lawfully pursue under the general freedom of the constitution.

It results, therefore, that as under the constitution merely, the right to own and sell goods or merchandize was exactly the same as the right to own or sell any other property, such a right cannot be transmuted into a franchise or privilege, for the mere purpose which is here alone pretended, of realizing from the property, or the business of buying and selling it, a higher revenue—so that the constitutional question is the same, or must be decided upon the same principles, and in the same manner, whether it be applied to the right of the legislature to transmute the purchase and sale of such property into a privilege or franchise, for the purpose of doubly taxing it, or to doubly tax the merchandise at once, without such pretended transmutation. It is substantially the same question—such a privilege as may be taxed for the purpose of mere revenue, (as here,) consisting alone of what may be termed new rights, devised and created by legislative grant, of which the permission to keep a toll-bridge, a ferry, a canal or a railroad may be mentioned as instances or examples. They constitute, in short, a portion of the conceded prerogatives of the government or State, (the very point in controversy,) carved out as it were and given to an individual, an association or incorporation. For the exercise, enjoyment and protection of such a privilege, it is unquestionably competent for the legislature which grants it to prescribe the terms upon which it shall be exercised, and it would hence be no less incompetent than indelicate for the courts to assume to review either the wisdom or the discretion of such enactments. Their more grateful and appropriate duty would accordingly consist in simply enforcing them.

Except, however, in a class of cases which depend upon a principle wholly different from any which can be pretended here, (namely, the unfettered municipal or police authority of the State,) it is deemed evasive and incompetent for the legislature to single out the employment in which any class of citizens may be engaged, under the constitution, and by annexing to its exercise penal prohibitions, (as in this case,) attempt to construe or convert its subsequent exercise or enjoyment into a "privilege" or "franchise," to be paid for according to the unlimited discretion of the legislature. If this can, indeed, be done, we need but repeat the wholly deceptive and even contemptible

Crow et al. vs. The State of Missouri.

inefficiency of the constitutional guaranty in question; for it is but too strikingly obvious to be gainsaid or parleyed with, that if the right to sell one description of property, not injurious to the public morality, or otherwise within the exception above alluded to, may be thus legislated into a "privilege," any and every thing else may be similarly transmuted into a "privilege," and thereby, by undergoing so simple a process, an article worth an hundred dollars, or any other given sum, may be taxed a tenth of its value at one session, a fifth at a subsequent session, and finally as much or more than it is worth, whilst other property of the same value may be taxed either not at all, or in a sum so nominal as to be in mere seeming conformity to the constitutional requisition we are considering.

Unless, therefore, it be intended to assert and maintain that the taxing power of the legislature is virtually unlimited, it seems to us that the construction which assumes the legislative competency to create and tax "privileges" or "occupations," except for the purposes twice before alluded to and not pretended here, must be inevitably and wholly abandoned—leaving the license system of specific or extra taxation to its only legitimate functions under such a constitution as ours, namely, its application to new and special rights or privileges legitimately created by legislative authority, and as a measure of police or municipal regulation. Considered in reference to this class of cases, we concur in a former judgment and opinion of this court, when one of that nature was pending before it, in reference to which it was held that " whenever the legislature prohibits any calling or profession it ceases to be a lawful pursuit ; and when the legislature do not prohibit it, but allow it to be exercised by certain persons, having certain qualifications prescribed in the law, it then becomes a municipal privilege, which may be only exercised by those persons who have the qualifications and pursue the steps required by law." (Austin vs. the State, 10 Mo. 594.)

The question there before the court, being the constitutionality of the dram-shop license, any remarks or arguments which the opinion may be supposed to contain outside of the case made, or at furthest, cases of its class, would of course be no further authoritative or binding than as they might commend themselves to the understanding or the reason of those who read them. Standing as the basis of this class of objects, upon a principle distinct from that of mere revenue, and concerning which the law-making authority is thus left comparatively without control, considerations involving the public morals, the public health and the general public security, will doubtless at once most prominently suggest themselves. No such question, however, being

here involved, we proceed to enquire yet a little further, whether the obvious purpose of the constitution, in respect to simplicity and equality of taxation, can be frustrated and overthrown by the mere adoption of a different system, than which none could perhaps be better designed to blind and cheat the people, under cover of their supposed indisposition, or incapacity, to trace it to its source and follow it to its inevitable results.

No reflecting citizen need be told that in the end the consumers of the merchandise thus licensed or taxed, pay back to the merchant not only the whole amount of the tax he has been compelled to advance, but a per centum upon that amount exactly equal to the average profit on the goods themselves. In other words, the profit of the merchant is necessarily laid upon the stock of goods he has purchased, in such manner as to cover all the expenses he has had about them, whether in first cost, freights, licenses, or any thing else. No fair and upright merchant will deny this, and if he were even to do so, he would probably find few customers accommodating enough to believe him. Suppose, then, the average profit which the merchant is compelled to lay upon his stock, in order to cover bad debts and every thing else, be but twenty per cent. on his goods, we thus establish the rate of interest which the people pay to their merchant for advancing that portion of the revenue for them—thus demonstrating that the indirect and unequal method of raising revenue by that system of taxation is by far the most expensive that could well be adopted. To illustrate : Assuming that $50,000 is thus annually advanced to the collectors by the merchants, the increased aggregate addition to their bills against their customers (in consequence of the license tax) would of course be $60,000, and this sum, according to the usual course of trade and business, is payable by the customers alluded to, to their merchants, about the same time of the year that their more open and direct taxes are payable to their various collectors. It being thus apparent that every citizen who thus contributes to the treasury through his merchant, pays at least twenty cents in the dollar more than if he were to pay it in an open and direct manner to the collector—a process which all can understand, and about which there can be no mystery—what solitary substantial consideration even of policy or expediency, can be adduced for pushing such a system beyond the design of realizing from its application a more certain collection of the merely constitutional or general ratio, to which such property is also additionally subjected by the proviso in question.

But let us still further demonstrate the inequalities to which such a system is always liable, and in doing so furnish yet another reason

which may be supposed to have had its weight with the convention, in inducing them, as they doubtless intended, to guard against it by the strong and emphatic line we have so often quoted: There are doubtless in the State many thousands of families, who, having no land, and perhaps but little else to be protected by the government, should be comparatively exempt from taxation for that purpose. Their necessities or their avocations, however, oblige or induce them to supply themselves from the stores of merchants in even a heavier degree (many of them) than some of the more wealthy classes have to do—so that, in this point of view, the citizen who may be compelled to rely upon his daily avocations or employment for the maintainance and support of his family, pays even a greater proportion of this branch of the State and county revenue, than the comparatively well-off man who has none. If a worse or more unequal and oppressive system can be conceived of, than thus to apportion one branch of the taxes of the people according to the size of a man's family, instead of the size of his estate, we are fain to confess the obtuseness of perception which prevents us from discovering it; nor can we believe that the convention could have imagined it possible that they had left the legislature invested with the constructive authority, not only to adopt such a system whereby to collect the constitutional ad valorem to which "all property" should be subjected, but to make it an excuse for thus doubling the taxes upon thousands least able to bear them, and yet further indeed, (as the argument here implies,) to levy thus the entire revenue of the State! Whilst a volume would little more than suffice to trace the varying, sometimes uncertain, scarce noticed, yet always iniquitous consequences of such indirectness of veiled or indirect taxation, all of it may be nevertheless supposed to have weighed with the convention who founded our system, and who, but intelligently realizing the great and all pervading truth, that "no people can be strictly free whose trade is not free," intended to exempt ours, as far as practicable, from the indirect shackle and the ramified injustice of the unfair and oppressive laws in question.

We will restrict ourselves, therefore, in this connexion, to a single additional example of their injustice and inequality, and even that will be introduced more than any thing else for the purpose of connecting with it a suggestion which we conceive to result as a corollary from the decision we are about to render. It is seen by the report of the Auditor, that considerably more than half the sum derived from license was last year paid by the merchants of this city. It is, indeed, most probably the fact, that the wholesale dealers alone pay one half the whole

amount.   It will at least suffice, for the sake of the argument, to assume that they annually pay $25,000 as the State, and double* that sum as the county levy, upon their aggregate licenses.   As their profits consist wholly upon their sales to the retail or country merchants, and as that of the retailers consists wholly in their sales to their customers, each citizen of the State at large can estimate for himself how much and in what disproportion even to the citizens more immediately interested, he is thus forced to contribute through his village merchant to the treasury of the county of St. Louis, and decide for himself, without the authority of a law book, whether found in a library or inadvertently misapplied in a newspaper, whether a system thus devised and thus operating, can be upheld with even seeming professions of respect for the great principle of equal and open taxation, according to the value of "property," as provided for, ordained and written down in his bill of rights.

Having thus demonstrated that under any and every view of the case, it is the consumers and not the merchants who ultimately pay these indirect, unequal and most odious assessments, whilst the latter may well enough resist, and complain as they have done, that they are compelled to advance for their customers a double or a four-fold tax upon the "property" which the daily wants of the country require to be supplied, just as other necessaries of life are daily supplied, we are nevertheless unable to perceive, at least as a general proposition, what just or equitable claim they could present, for having reimbursed to them, either from the treasury of the State or the treasuries of their counties, even the acknowledged excess of taxes they have thus advanced, but which the reasoning employed discloses to have been added to the cost and charged to the consumer or purchaser.   This question is not, however, judicially before us, and as we suppose it probably never will be, he proposition need scarcely be further elaborated.

*The first section of the fourth article of the revenue act of 1845, is in these words: "The several county courts are empowered to levy such sum as may be annually necessary to defray the expenses of their respective counties, by a tax upon all property and licenses made taxable by law for State purposes; but the county tax shall in no case exceed the State tax, on the same subject of taxation, more than one hundred per centum for the same time; but the county court of St. Louis county is empowered to impose an additional tax, not exceeding one twentieth of one per centum, if they deem it necessary, in order to pay jurors summoned in the several courts of said county; which tax, if imposed, shall be applied to the payment of jurors only."

It might be as readily demonstrated that the mere injustice of thus enforcing the payment of even a concededly constitutional tax upon property designed solely for the consumption of other people, (and upon which they, of course, ultimately pay the whole tax,) by no means stops short with the extra tax thus authorised to this county. As, however, the various taxes which are levied upon the same property by the authorities of the city, are probably enough derivative from the municipal authority of the legislature herein before alluded to, that subject is, of course, beyond the scope of legitimate inquiry here, and might, therefore, have remained unadverted to, even thus briefly, except as perhaps sufficiently suggesting the inapplicability of a portion of the argument which has been filed at the present term by the counsel for the State.

Crow et al. vs. The State of Missouri.

A more appropriate connection, however, may not present itself, in which to answer the argument sometimes advanced in favor of this indirect taxation, which is, that however enormous, the people pay it willingly, inasmuch as no one is compelled to buy the goods thus taxed unless he sees fit. The same argument, precisely, (if it be an argument,) would apply to the payment of the more ordinary taxes of the country, namely, that those who do not like to pay them can move away from the county, the State, or the city, which inflicts or imposes them. We have previously intimated that in the present structure, or rather under the present wants of society, the cottons, the coffee, and other articles from the shelves of the merchant, are as indispensable to the comfort and the support of families, as almost any thing else that is taxed; and it results, therefore, that the customers of stores, upon whom falls the ultimate oppressive weight of this unconstitutional legislation, have scarce more option in evading or avoiding it than if the tax upon them were direct instead of indirect.

Recurring to the line of argument, from which we have somewhat digressed, may we not respectfully inquire why, for what sufficient end or object, was this provision inserted so formally, and so solemnly in the declaration or Bill of Rights, if the construction contended for be at all correct ? If the legislature has the power to declare what property shall be "subject to taxation," and to impose all the burthens of government upon a single species of it, or upon one or more vocations, callings or professions, and exempt all others, and is restricted only to an equal ad valorem tax upon the same kind of articles, then the unlimited power to over-tax any article of property, without the slightest regard to its value, must follow as a necessary inference, and this provision in the Constitution become, of course, an openly contemned absurdity, as well as a practical nullity. The legislature may declare, for instance, that cotton fabrics shall be subject to taxation, and impose a tax of one or five per centum on such "merchandize," and in the same act declare that woolen fabrics shall be exempt from taxation, or pay but the nominal sum which may for the time be charged upon other general property—or vice versa—thus establishing an unjust and unequal rule of discrimination, by which property will be taxed not according, but in utter disproportion to its value. We deem that the Constitution scarce less expressly forbids this, than it does the suspension of the writ of habeas corpus ; for, independent of the rule of construction heretofore alluded to, which restricts the agent to the method designated, and (where imperative, as this is,) excludes all other methods, language could scarcely be more explicit or direct, or when considered

with reference to the historical reasons already briefly adverted to, less susceptible of any other construction than the one enforced by the words themselves. The Declaration of Rights, especially, in which the injunction or guaranty is preserved, was drawn up and adopted, confessedly and only to preserve unimpaired the principles of liberty and equality on which our government was designed to be founded. The lessons of all antecedent history had taught the framers of the Constitution the necessity of providing guaranties for religious freedom; for the administration of justice without sale, denial or delay; for the liberty of the citizen and the liberty of the press; for the freedom of elections, and, in the same enumeration, for that equality of taxation, which is alone in issue here. The same historic voice, moreover, which led them to regard it as of the greatest moment and importance, that the right of trial by jury, the liberty of the press, and the inviolability of private property, should be placed beyond legislative control or the ever varying prejudices of the hour, must have impressed upon them with equal or even greater force, and *as of the last importance* (*as otherwise having and holding a mastery over all other guaranties*) to close up irrevocably that main avenue to wrong and oppression, which legislative tyranny had in all ages resorted to—namely, the abuse of the power to tax! From the time when Hampden and his compeers, by refusing to pay "ship money," aroused England to a defence of popular rights, down to the period when the American colonies denied and resisted the asserted right of the British Parliament to tax them without limit, or, "in all cases whatsoever," the minds of reflecting statesmen had been studiously and solicitously directed to the great and all-embracing question of taxation, as most concerning and most affecting the ultimate liberties of the people.

It is, therefore, that although it will not of course be expected that in *a mere judicial opinion there should be reviewed at much length the* historical argument thus again suggested, it may be appropriate enough to so far condense an outline of some of the most prominent modifications which become apparent from a chronological review of the history and laws of a single government—and that the one from whose oppression our own has sprung. It will be thereby perceivable, that amongst the radical changes which the so-called British Constitution has undergone, the great question of taxation was but too fearfully and oppressively prominent in all the causes which concurred to produce it.

With the introduction of the feudal system into England, came various modes of exacting or extorting those revenues, by which the sub-

## MARCH TERM, 1851. 275

Crow et al. vs. The State of Missouri.

stance of the people was swallowed up and devoured, to pamper the monarch and the ascendant few by whom they were devised. It is not necessary, of course, to trace the encroachments of "Royal Prerogative" upon the life and the liberty of the subject, but to refer simply to its encroachments upon his rights of property, by the mere resort to disingenuous and unjust systems of taxation. It is true that under that Constitution there was waged for centuries a fierce and relentless struggle between the Monarch, on the one hand, and the Parliament and the people on the other—the general question we are here considering assuming various shapes, according to the particular grievance at the moment complained of; but with that controversy our subject has of course no further connection than as denoting the abuse of the power to tax, whether perpetrated by the King or the Parliament.

The contest was at first necessarily waged against the royal claim, as the monarch in the exercise of his then asserted and generally conceded prerogative, determined for himself, without the intervention of parliament or council, the mode and the measure of taxation. It need scarcely be suggested, therefore, that during the long period in which such a prerogative was exercised, both English history and English lawbooks, became but too replete with the stories of the most varied, stealthy and outrageous exactions. Contenting ourselves, from necessity, with the branches, or titles alone, of some of the most prominent ones—in as much as a chapter would be necessary to explain the flagitious pretences, and the oppressive bearing and construction of many of them—we find them written by Blackstone, thus :

" Custody of the temporalities of the bishop, corodies, tithes in extra parochial places, first fruits and tenths of spiritual preferment, rents and profits of demesne lands of the crown ; the various profits and commutations growing out of military tendres ; escuage ; scutage ; talliage ; wine licenses ; forest laws with their amercements ; deodands ; forfeitures and amercements through courts of justice ; fumago customs ; prisage and butlerage ; right to all royal fish ; all wrecks ; tonage and poundage ; treasure trover ; waifs ; estrays ; bona confiscata ; escheats ; custody of idots' estates ; purveyance ; (subsequently compounded for beer license,) game laws ; servile fruits and appendages, such as aids, reliefs, primer seisins, wardships, marriages, fines for alienation, &c., &c."

These constituted, as already intimated, a portion of the elements or subjects of British taxation, under the exercise of which a system of servility grew up which ages have subsequently but comparatively overturned. The charter of Henry the First promised a seeming relief;

but was apparently forgotten by his immediate successors. Passing, therefore, over the history of the struggle prior to King John, we refer to the Magna Charta and the Charta de Foresta, as demonstrating that the abuse of the taxing power at that period contributed its full quota to the noble uprising which wrested from the crown those "Declarations of Rights" that have served as the sources or models of all subsequent "Bills of Rights"—whether in England or in our own country—in the National Convention of '87, and gaining ever afterwards, reaching perhaps their first full and explicit recognition, in the "Bill of Rights" annexed to the constitution of Illinois,* 1818, and afterwards in our own constitution in 1820.

By the English charters alluded to "many grievances and encroachments of the Crown in the execution of forest laws" were provided against and redressed, as were also "many grievances incident to feudal tenures," including "unreasonable amercements, illegal distress by the Crown, purveyance, and pre-emption, exclusive grants of fisheries,"

---

*By reference to the digest of Mr. Geyer, containing a compilation of the revenue laws which were in force at the time the convention was in session, it is seen that "all property then subject to taxation" was not "taxed in proportion to its value." Not only were many things of value, and which were of course under the protection of the government and the laws, wholly exempted from any of the burdens of government protection, but the inequality in respect to the things taxed was in many points of view glaringly and even ludicrously unequal. Thus, while some lands were taxed sixty cents for every hundred arpens, and others twelve and a half cents for every hundred arpens, town lots, together with the houses and improvements upon them, and dwelling houses in the country, were taxed thirty cents for every hundred dollars worth. Slaves above ten years old were taxed sixty-two and a half cents, whilst pleasure carriages were taxed one dollar and a half for every hundred dollars at which they were valued. Stores, for selling and retailing merchandise, were taxed fifteen dollars for every six months, and pedlars fourteen dollars—the goods themselves paying no ad valorem. "Stud-horses" were taxed "the same they stood at," and saw and grist-mills, tanyards and distilleries, forty cents on the hundred dollars! Nothing, indeed, seems to have been taxed "in proportion to" the "value" afterwards ordained in the constitution—the articles that did pay an ad valorem tax having it imposed upon them in different proportions according to the discretion of the legislature or the county courts. It being with such laws as these before them, practically recalling the more general history of unequal and oppressive taxation already alluded to, that the convention wrote it down and signed it in their constitution that "all property" should "be taxed according to its value," could its authors have reasonably anticipated that thirty years would not only suffice to supplant so plain and imperative a rule as was agreed upon by them and ratified by the people, but to introduce a practical construction of the constitution, asserting the legislative power to restore the very system they sought to repress and forever interdict? Could this have been anticipated by those who only forbore to write it out at once that "all property shall be taxed in proportion to its value," purely because there were several descriptions of land in the State, and to be afterwards located, which they were prospectively agreeing on the same day, and in the same breath, by their ordinance or compact with the general government, they would not tax. With this reason for the additional words "subject to taxation," can even a reasonable doubt be entertained but that they regarded "all" other property as "subject" or liable to taxation, and that, in fact, it was so? To hesitate or to doubt in reference to such a proposition is, to our minds, equivalent to the seeming distrust which recognizes the conclusiveness of no reasoning, nor indeed of demonstration itself. Why else, may it not be respectfully enquired in connection with this merely verbal analysis—why else did the convention employ the verb instead of the participle, to denote their meaning—the term "subject," (or "liable,") instead of the term "subjected," (or "made to undergo,")—if they intended to include only such property as the legislature subjected to taxation? Can philologist or grammarian satisfactorily answer even this?

&c. Thus, "scutage," for instance, which the King had been arbitrarily levying upon the land-holders, was by the Magna Charta expressly denied to the monarch, unless first imposed by the common consent of the council of the realm. So, in the charters of Henry the Third, there were in many respects similar provisions, although the restriction above was again essentially modified. Under Edward the First, and his grandson, it was at last expressly provided, that the King should not take any aids or tasks, any talliage or tax, but by the common assent of the great men and Commons in Parliament. A great concession for that period was thus obtained. And so we might progress with the alternations of this continued struggle to the period of the accession of Charles the First. A few additional facts, however, to illustrate the single point at which we aim, will here suffice.

In the time of Henry the Seventh, the celebrated Star Chamber, court or council, was remodelled with reference to the most extended oppressions, of which the more facile exercise of a tyranous and unrestrained authority over the "property" of the subject, may be said to have constituted the aim or the concentration of the whole. The author already alluded to informs us, that the marked feature of the reign of that prince was "that of amassing treasures in the king's coffers by every means that could be devised," and that all laws were framed and construed accordingly. This exercise of unjust and despotic power was resorted to under different phases and in different degrees by subsequent sovereigns, until Charles the First, regardless of the petition of right, revived the Forest Laws, upheld and enlarged the powers of the Star Chamber, and in the most unblushing and arbitrary manner resorted to levies of tonage, poundage, ship-money, &c.

We have already alluded to Hampden and others, under whom began the struggle by which that monarch first lost his life, and his house its throne. Passing thence to the Restoration, it is seen that Charles the Second was compelled to approve many laws for the removal of taxes, and to disclaim the various oppressive prerogatives insisted upon for filling the coffers of his ancestors by unjust taxation of the people.

The revolution of 1688 gave birth to the "Bill of Rights," which again provided many wholesome restraints or checks upon the power to tax, and may hence perhaps be considered, in connection with the prior revolution of 1644, to have settled (in the main, at least) one great question of taxation, namely that the King should not tax the people without their previous consent through the Parliament or Legislature. From that period, therefore, the abuse of the taxing power may be considered, under that government as under ours, as being mainly of legis-

lative usurpation; and it will be seen that as the royal power over the creation of revenues diminished, parliamentary assumptions grew up and increased in proportion, until that body, at last claiming to be omnipotent, (as is virtually claimed for the legislature here,) and representing as it always had the wealthy alone, (and even that class unequally and unfairly,) there was brought about a yet more glorious revolution, of which we shall remark a word hereafter—our object being to demonstrate that the question we are here considering, is but a modification of the struggle which has existed from the days of William the Conqueror, as well under Legislatures as under Kings, respecting the legitimate basis or right upon which men are taxed at all, except in the proportion or ratio in which they are protected.

A brief reference to parliamentary taxation is deemed sufficient for that object—it being, as already intimated, to illustrate merely the progress of a struggle which ever has existed and ever will exist, respecting the proportion in which one class of men may tax another class of men, (whether directly or indirectly,) unless the basis be definitely and definitively written down and fairly lived up to, under written charters or constitutions. Under the general names of "aids, subsidies and supplies," the parliament imposed, amongst many others, the following revenues: Land tax, malt tax, customs or duties, tolls, tributes or tariffs, payable upon exports or imports, poundage; aliens duty, excise duty, salt duty, postage, stamp duties, house and window taxes, tax on servants, taxes on hackney coaches and chairs, duty upon offices, pensions, &c. The land tax was not assessed "in proportion to its value," but by the least defensible and most arbitrary rules, and the same may be said of the custom or duties upon exports and imports—substantially, in one sense, the question before us here. Nor had the excise imposed by them any just reference to the "value" of the article taxed, wherefore even Blackstone was constrained to admit that "their rigor and arbitrary proceedings seemed hardly compatible with the temper of a free nation." If, therefore, an eminent British jurist, holding as we have seen to the absolute omnipotence of the legislature of that kingdom, could not forbear a reprehension of the inequality here complained of, what would seem to be denoted as the judgment or the commentary of an American judge—and of such, most especially, a judge of last resort in a State whose constitution is believed to have been among the first in which there was specifically, and as we think unconditionally, interposed between the governed and their government, the only practicable guaranty for that absolute justice and equality of taxation, at which previous revolutions and conventions had unpropitiously, and therefore,

but unsuccessfully aimed.   Admitting if the power exists, that however much a judge may deprecate, he cannot interpose to prevent its exercise, it has been the single object of the summary review, which we will not further protract, to group together a few only of the more prominent historical considerations which may be fairly assumed to have influenced the men of the convention, to write down the single imperative and unambigous line they have left us, respecting a subject which we have seen by the merest glance at its history in a single government, has been "the fruitful mother and foodful nurse of mischiefs monstrous and innumerable."

Not England alone, however, but France, and other European nations, under the maddening and despondent pressure of financial struggles, and financial wrongs, had witnessed a resort to popular violence as the only mode apparent to the people for a redress of their grievances, so that it has, in modern times, passed almost into political axiom, that in constitutional or comparatively limited governments, the rights of the people are most generally, because the most stealthily, assailable and assailed, through gradually increasing abuses of the taxing power, and that revolutions but follow (almost naturally, as it were,) and close for the time the overgrown and ramified abuses which come at length and inevitably to be realized in the maturity of an all-embracing and hence all-pervading development.   The duty and propriety, therefore, of inserting in our bill of rights—the Magna Charta, as it has been termed, of our constitution—a sure and unambigous guaranty against even the possible abuses of such power, was doubtless as apparent to the understanding, as it seems to us to have been imperative in the will, of the wise and partiotic men who laid the foundations of our system. They had seen that in addition to the lessons of English history above condensed, the Parliament of England had asserted the unlimited right to tax their fathers, and that the power was heroically resisted, not because the comparatively paltry sum imposed was too burdensome for them to bear, but because it was the assertion of a principle—a different modification of the principle here, but still a principle—which, (i. not resisted) would draw to it and with it an absolute and unrestrained control over the "property of the colonists."   It being, in short, the resistance of such a principle that eventually made us free, and can alone preserve us so, it was with wise and patriotic forecast, that the authors of our own great charter or bill of rights sought to close and forever bar that broad and specious doorway through which a thousand evils had poured upon other lands, and which before their own eyes had well nigh served even the original confederacy of these States, before

it ultimately gave place to our present "more perfect union." This, it is but assumed in this opinion, they have done, by laying down as the undeviating rule of taxation for the purposes of general revenue, the only equal, just and secure one we have so often quoted. Would it not indeed, have been strange, at that comparatively advanced and enlightened era, and whilst guarding as they did agianst the other proverbial abuses of government, had the authors of these other provisions to secure comparative individual freedom in connextion with popular rights, overlooked this subject, confessedly the most mischievous and direful of either ancient or modern times? Would it have been less strange, had they, either intentionally or incautiously, left it open to the construction here contended for, seeing, as we have seen, that what they have there written is the only line or syllable they have left us upon the subject of revenue, and hence the only barrier interposed by the constitution, between oppression, and the creation of favored interests and classes on the one hand, and the rights and equality of the people on the other.

We have elsewhere already remarked, that the question to be passed upon here, (and soon, thence it may be added, to be passed upon by the people,) is not whether the legislative department of the government, periodically elected by themselves, will probably lend themselves to the perpetration of any or all the wrongs enumerated or supposed, but whether the constitution of the State, shall be held by all departments of its government, to mean what it says? Upon our own minds, we are fain to confess that the subject has so grown and fixed itself, that we deem it almost inexplicable how so just and beautiful a political and legal principle should any where be held to involve even the slightest mystery, or that the force of its plain and simple application to the case before us should be less clearly apparent. That a system of taxation should have crept upon us, whether by inadvertence or design, or in part by both, by which one citizen pays, under the most favorable circumstances, more than twice as much in proportion to the value of his "property," as his neighbor pays for other "property" of exactly the same "value"—the law, in the meantime, protecting one no more than the other—and that it should, nevertheless, be considered as even arguable that such legislation is not in derogation of the constitutional injunction that "all property shall be taxed in proportion to its value," has caused us to doubt whether it be longer possible to adapt human language to the assertion or maintainance of human rights. Looking in this connexion to the case made by the record alone, and giving to the State, for the sake of the argument, the benefit of the con-

struction for which its counsel contends—namely, that the constitutional provision in question does not apply until the property is subjected to taxation by the legislature—still much of the property of the defendants was so "subjected" (in breaking it up for country dealers) under the 10th section of the law we have previously quoted. There would seem therefore no resource in this case, save it be in the yet broader position assumed by the counsel for the county in their petition for a rehearing, which is, that the constitution does not even require that all property which is assessed and taxed in the ordinary manner shall be taxed the same per centum upon its value, but that each kind of property may be taxed, each at a different per cent. or rate, provided that the sum imposed bear simply a proportion or per centum according to "value." Whilst this construction has at least the merit of contemning boldly and directly the more broad and general application which was affirmed for the guaranty in question by the terms of our former opinion, and of marching openly to its object through the medium of direct and undisguised discrimination, in reference to the different property of different citizens, it is deemed here a sufficient reply to such an assumption, that the constitution does not say every different kind of property, or every different class or article of property, shall or may be taxed, some in one and some in another proportion to its value, as compared simply with other articles of the same class or kind, but simply and unambiguously "all property."

Whilst, therefore it would seem to have been the object of the people, in the great and all-embracing provisions which they thus caused to be engrafted upon their constitution, to provide against the proverbial and pre-existent evils of unequal taxation, with reference not only to those herein historically alluded to, but also, as having afflicted themselves under their territorial organization,* and probably the fathers of some of them in the older States from whence they came, the CONSTRUCTION of their work, as here contended for, not only defeats this natural and noble purpose, but fixes upon the convention either the unpatriotic object, or the degrading igorance, or both, not only of em-

---

*In the profound dissertation of M. De Tocqueville, an eminent French author, upon the institutions of this country, he expresses the conclusion with equal force and wisdom, that "if the free institutions of America are to be destroyed, it will be owing to the tyranny of majorities driving minorities to desperation." Of similar opinions are a number of the most eminent and disinterested English writers upon the same subject; and it may not, perhaps, be undeferential or improper to add, that the history and result of the political agitation through which the country has been called to pass during the last few years, must have inclined the minds of most reflecting persons to the conclusion, that however much may be predicated upon the patriotism, fraternalness and mere justice of political communities, there can be no security equal to that of the constitution, and hence no errors (even) so safe as those which may be committed in deference to its supposed restraints or guaranties." "The world is governed TOO MUCH."

23

balming (as it were) this very evil, but with seemingly dividing it beforehand, with malignant prospective gratification, into castes and classes, according to their alternate hour of legislative domination!

Let us suppose, however, that this was the true design of the convention, and that the true reading of the clause in question should hence be, that no citizen should be thus plundered of the money or the property he had acquired, singly, but that it was merely authorized by the constitution, that the oppressive legislation complained of by the defendants, might be wreaked at one session upon all owners of land or slaves in a body, and at the next one upon all owners of merchandize in a body, and so on, and that (according to the construction contended for) any of these kinds of property could be held to mean "*all* property"—*what then?* Even such a construction could not redeem or help the case we are considering, because by the laws which are here alone complained of, the property of one merchant in this city may be taxed, for State and county purposes alone, a dollar and a quarter on every hundred dollars' worth, whilst even the same description of property belonging to another merchant pays at most (and that but constructively, through the land and labor which produced it,) but the constitutional or uniform ad valorem of, at the utmost, *sixty* cents on the hundred dollars worth. We argue not here this question of construction or assumption, seeing that in no view of the case can merchandize which is of the "growth, produce or manufacture of this State" be held to be taxed as other merchandize is—so that even the extreme *class* argument of construction fails in its office here, requiring the helping hand of the judgment by which we shall strike off the excess,* to give it proper application. Driven, therefore, from that, should the mind, "convinced against its will," wander again to the pretence that it is the occupation or the business, and not the property at all, which is thus taxed—if the subject can thus, and thus only, be rescued from the plain and honest grasp of the constitution, and if such a distinction is allowed to have the force contended for, it need not of course be further, because it has been already but too redundantly demonstrated that the constitution itself stands self-annihilated—at once a pander and a prey to the corrupting legislation of castes and classes, instead of being alike the palladium and the protection of all.

---

*It may be incidentally remarked that it is in this point of view alone, and in view of the rendition of the judgment we propose, that whatever may be thought of the policy of the amended revenue act of the 10th of March, 1849, in respect to money on hand, invested, due, &c., its provisions being equally applicable to all classes of citizens, and restricted simply to the general advalorem upon other property, the tax thus imposed seems to possess at least the sanction of sufficient seeming conformity to the constitutional rule, to be sustainable and sustained before a court which abrogates the license tax here in issue, purely because it is an unequal or discriminating one.

The last position which perhaps claims our consideration in the petition for a rehearing, and which has also been renewed and enforced in the written argument which has been filed for the attorney for the county at the present term, is, that as the amount of the merchant tax is graduated not by the goods he has on hand, but by the amount received for sale by him during the preceding six months, the assessment complained of is not a tax upon his *property*. Whether the true design of this mode of levying the tax was, by thus ascertaining the probable amount of the merchants' business to arrive at the like probable amount of merchantable property, or goods, he would receive during the succeeding six months, and levy and collect a tax upon that; or whether it was designed as a tax on the property already received, need in no sense perplex the understanding, or receive here judicial solution. The effect is the same, to-wit, a tax upon "property," or upon a citizen, because he owns property and claims simply the right to sell it as other citizens are permitted to sell theirs. In practice, it is known that the new merchant, before he can legally sell a dollars' worth, is compelled to take out his license—paying therefor the fee and the taxes—but if it be even as contended for by the counsel for the county, the same *principle* prevails in the more ordinary assessment of general property, namely, that the citizen gives in and pays for what he had on the 1st day of February, in each year, whether he continues to own or has disposed of it at the period of assessment. We perceive nothing, therefore, in this point of the argument, to in any manner embarrass us; but on the contrary, it seems to us to be thereby the more fully demonstrated, so far as the argument is relevant at all, that if the one be a tax upon property, so is the other.

We might perhaps justifiably enough here rest and conclude the reasoning which it has become our duty to render upon the question in issue, but as other suggestions have been thrown out in connexion with the discussion the subject has elicited, which have not been perhaps as fully remarked upon as their importance may seem to deserve, it may be proper, at least not unjudicial—to yet briefly advert to the consequences and conclusions to which they but legitimately and inevitably tend.

Except as assumed in the argument, or as *necessarily* resulting from an affirmance of the power to pass the law under consideration, the proposition that it is competent for the legislature to subject only the property it pleases to taxation, and to levy and collect the entire revenue of the State from a single species of property, is not judicially presented for consideration here. It may not be improper, however, to

essay such a demonstration of its fallacy, if not indeed its danger, as may serve to leave the real question before us without the slightest countenance from the construction thus collaterally or incidentally brought to its support.

If the legislature possesses the power thus asserted for it, to designate a particular species or class of property, and renders it alone "subject to taxation," it results, of course, as heretofore demonstrated, that they might not only levy and collect the entire revenue from slaves, (as an example,) but they might, with the same exemption from criticism (as a question of mere power) direct that it should be levied and collected off of the value of *female* slaves, or slaves hereafter to be brought into the State, or slaves within a given age—between twenty and fifty years, for instance—thus practically emancipating or driving away all within those ages, and indeed all ages, notwithstanding there is an express constitutional guaranty to the contrary. We allude to this description of property, and to the guaranty concerning it, mainly for the purpose of demonstrating how wholly at the mercy of an undefined an unrestrained power to tax are all other guaranties of written constitutions, and thereby the more conclusively to justify our previous assumption, that the guaranty of equal taxation, which we are here considering, constitutes by far the most vital provision in the constitution.

As little would it avail under the latitude of construction we are here proposing, that emigrants or others would invoke another constitutional guaranty intended to inhibit the passing of laws to prevent them from coming amonst us with their slaves, because the argument would be quite as plausible that taxation, merely, did not deprive a man of his option to own and work a slave, and therefore did not prevent him from coming or from staying here, as it is or can be in the case before us, that to tax a merchant's property twice—in one section on the general advalorem basis, and in another section with substantially an additional advalorem—was no evasion nor invasion of the constitutional guaranty that "all property shall be taxed alike."

The legislature might therefore do as we have been supposing, or, anon, abandoning all taxation of slaves, another legislature, differently constituted or differently combining, might assess upon horses and upon lands all the taxes of the State, decreeing thereby, that groceries and merchandize should pay none of them. In short, concede to the legislature the power to "subject" to the circumstances without which the clause in the constitution cannot attach, and that they can destroy any given property or department of business, by simply and alone subjecting it to taxation, and a power is thereby surrendered and given up,

Crow et al vs. The State of Missouri.

than which a Venitian oligarchy possessed none more dangerous to the private citizen.   Can it be doubted that this is precisely what, with the volume of the past before them, and looking to the least possible volume of the future, the convention intended to most sedulously guard against whereby the State they were founding for "their children, and their children's children," should not add another example, speaking from the tomb of buried empires, that *"the power to Tax, is the power to Destroy !"*

Looking simply to the net proceeds of a revenue system, it is doubtless conformable to the spirit of the Constitution that the Legislature should direct the assessment of such property only (if made in kind) as would yield something beyond the expenses of assessment and collection.   There may also be reasons for other seeming exceptions, which need not be here discussed.   The provision in question becomes, however, a reproach instead of a guaranty, if under cover of a classification, or description, or declaration of property to be taxed, the legislature may bring what citizens they please, within the circle intended to be guarded by the Constitution, and by that very act destroy the value. of their property, or cripple and prostrate their possessions or estates.

That this could not be done, even upon the general principles of American institutions, (to say nothing of our own express guaranty) we quote from the most approved American commentator—a name which stands to the lawyer or the judge in this country, in the same, or even greater estimation, than that of Sir William Blackstone does in England.   Upon page 361 of the second volume of his great work upon American law, Chancellor Kent holds the following explicit language :

"Every person is entitled to be protected in the enjoyment of his property, not only from invasions of it by individuals, but from all unequal and undue assessments on the part of the government.   It is not sufficient that no tax or imposition can be imposed upon the citizens but by their representatives in the legislature.   The citizens are entitled to require that the legislature itself shall cause all public taxation to be fair and equal, in proportion to the value of property, so that no one class of individuals, and no one species of property may be unequally or unduly assessed."

As a question of power, then, may we not safely submit even to the candor and intelligence of the gentlemen who have so ably presented this question for the State and the county, whether there is more reason for denying to the legislature the authority to describe as taxable a por-

tion of a class, (as in the sex of slaves, and other examples previously mentioned) than there is for denying to it the power to describe slaves alone, or cattle alone, or merchandize alone, as subject to taxation, all of them being in fact but fractional parts of the general class of property known as personal?

Concede, then, this power to the legislature, and the only instrument of tyranny which is longer deprecated in the comparatively free governments of modern times, receives an efficiency never designed by our fathers, and too dangerous to be contemplated without the greatest solicitude. The cotton-milling and the woolen-milling business, for instance, and as furnishing the only additional example we shall adduce or amplify—these great and rival interests are in competition, each seeking, directly and indirectly, (and in the latter respect by systems and combinations sometimes the least generally understood or suspected) the favorable aid of special legislation. Suppose either to obtain the major influence with the legislature, is it not palpable that it has but to lay its taxing hand upon the other, either directly or indirectly, (for, in the argument here, the power is assumed for both,) and thus remove it from rivalry with the interest which it designs to specially favor? Who does not perceive that in this manner all the business arrangements of the community may be deranged and disturbed by the alternate preponderance of class interests in the halls of legislation? Investments made upon the faith of an equal constitution and equal laws, may be rendered worthless or ruinous, because every branch of business in the community may be alternately subjected to an influence (it may be,) as remorseless as that of the usurer, a power as unlimited as the Inquisition, and a dictation as absolute as if it were under an Austrian police! Every man's occupation, however useful in itself, however moral in its character, however indispensable to his own support, however his entire fortune may be involved in its pursuit, is absolutely at the "tender mercy" of special legislation, through the mysterious yet all-potential medium of the taxing power!

To answer that there is no danger to be apprehended of such results, is not to argue, but to beg the question—to treat it as one of child-like confidence in the legislature, instead of a constitutional guaranty, intended for the absolute security of all,—and the weaker classes most of all—to pass upon it, in short, as though we had no constitution, and not as Judges sworn to support and uphold it. We will not, therefore, further dwell upon these or kindred propositions, than by respectfully resubmitting the single enquiry, whether a greater solecism or absurdity can be conceived of, than to admit, on the one hand, that the obvious

# MARCH TERM, 1851.    287

Crow et al. vs. The State of Missouri.

spirit and design of the constitution was to insure uniformity and equal- ity in taxation, yet contend, upon the other hand, that the framers of that instrument left it so completely the subject for subsequent mock- ery and practical disregard, as that it is competent for one of the de- partments of their own creation either to choose directly the interests which it will "subject" to, and those it will exempt from taxation, or, indirectly, to so license and tax the "occupations," or what it may choose to call the "privileges" of the country, as to throw the burdens of governmental support how and where it pleases? We but reiterate that whilst admitting the entire competency of the legislature, upon oc- casions and for reasons not to be pretended here, to resort to the system we are reviewing as the occasional medicine of society, the people or the State, to countenance or sanction it as its daily food, involves not only a danger, but a constitutional absurdity, than which if there be one more palpable and wholly indefensible, we fain confess our inability to perceive it. And although this question is but incidentally or collat- erally before us, and we are perhaps too little prone to grope for "au- thority," where great and acknowledged principles can be found to light the pathway of our understanding, we nevertheless deem the conclusion of the court in an adjoining State, in a case where the incidental ques- tion we have been considering was there the direct or main one, too appropriate and conclusive to be foregone or omitted. In the case of Stevens & Woods vs. The State, (2 Arkansas Reports, 299,) Chief Justice Ringo, remarking upon that clause of their Constitution which is similar to our own, sums up its whole legitimate interpretation in the following plain and explicit language:

"From this quotation it will be perceived that the legislature is bound by the constitution, in fixing the State tax on property, so to regulate it that every species or description of property subject to taxation shall, according to its value, pay an equal ratio or amount of revenue to the State; or, in other words, property shall be taxed according to its value, and the tax thereon shall be equal and uniform throughout the State. This rule, as to the State revenue, is inflexible, and leaves with the legislature no power to discriminate and fix upon one description or spe- cies of property a greater tax than that fixed by law upon every other description or species of property, of equal value, subject to tax- ation."

It will be perceived that in what we have thus far written, we have not denied, but rather conceded to the legislature the power or author- ity of adopting the license system as perhaps the most reliable and c? venient means it could devise for collecting (as nearly as may be)

Crow et al. vs. The State of Missouri.

constitutional ad valorem upon merchandize—that being a description of "property" arriving in the State, and thence distributed through its counties, in a manner essentially different from the less marketable and more stationary property of other occupations. It would be equally competent however—and it may, perhaps, be added no less proper—to adopt the same system in relation to other property, if the probable expense would not exceed the probable returns to the treasury, thereby expending instead of raising revenue or taxes. Recurring, however, to our previous recognition of the authority of the legislature, for the reasons stated, to collect a revenue upon all merchandize embraced in the law, wherever the collector may find it, equal to what is assessed and collected upon other "property," we frankly acknowledge the difficulty we have realized in so far deferring to the legislative, the inclinations of our own judgment, as to overlook the seeming wrong of taxing anew, even in the constitutional ratio, the goods of the country merchant, or rather the goods for country customers, after they have already run the gauntlet of a State and county taxation here.

The sum then of the opinion here rendered, and of what is understood to be the concurring judgment of a majority of the court is, that the act of 1849, which purports to establish a system of taxation upon merchants and grocers, "in lieu" of other enactments then existing, is not of itself such a departure from the basis of taxation ordained by the constitution, as to require the interposition of this tribunal in the case here made; but that the proviso to that enactment, cannot be otherwise regarded by a differently constituted majority of the bench, than as being in the nature of a saving repugnant to the constitution of this State. That constitution, therefore, being the act of the people, agreeing and speaking in their original or sovereign character, and defining the permanent condition of the social alliance under which we live, it follows as a consequence, that the proviso in question must be regarded as inoperative, null and void. It will be seen to result, therefore, from a comparison of the different opinions herein rendered, that taxes may be collected from merchants and grocers under the authority of that act alone—using for that purpose the machinery merely, which is provided and directed by the act of 1845. The judgment of the criminal court will accordingly be reversed and the defendants discharged.

If the conclusions thus arrived at satisfy the understandings and the judgment of the men of this generation, upon whom and their posterity, for good or for evil, they are alone to act and operate, it will not suffice in the attempts which may be made to weaken or impair them, that a seemingly different concession, as to the legislative discretion which has

Crow et al. vs. The State of Missouri.

been heretofore rather varyingly exercised, has been tacitly acquiesced in for so long a period.  To this it might be answered, that such concession has been, in fact, but seeming, and that such acquiescense most probably resulted from the fact, that the constitutional injustice which has ever been held to be involved in such legislation, was never before carried to an extreme which induced persons aggrieved to incur the trouble and expense of carrying the question through the appropriate judicial tribunals.  Be that, however, as it may, if such an argument, or rather such a want of argument, could have availed in other and previous cases, then to say nothing of the period when even the law of Moses was obscured by human traditions and constructions, whereby the morality of the Israelites, themselves, became correspondingly corrupted and defiled—to deduce nothing from this, nor from the concurring illustrations of more than eighteen hundred years of intermediate history, it may suffice that in addition to the Loan Office, the Stay Laws, and the Divorce Laws, each and all of which have had their day, as omnipotently as the law we are considering has had its day in our own State, passing by all this, however, if the "argument" alluded to, could have availed in lieu of the deliberate judgment which it is the duty of all to exercise, the statute-book of even the Federal government might have continued to blush under the disgrace of an alien law, a sedition law, and a fearfully corrupting engine of national incorporation, to make and lend money !  To enact the two former statutes, there are doubtless few who will contend in this day that congress possessed even the slightest constitutional power ; and it may perhaps be scarce less safely assumed, that it has already become at least comparatively inoffensive, to as broadly and as wholly deny the existence of that constitutional "necessity and propriety," upon which alone can legitimately be predicated the competency of congress to set up in the States, a mammoth paper money bank !  As, then, in their day, after being triumphantly swept through the two houses of congress, and receiving the deliberate sanction of the national executive, the constitutionality of these several enactments were adjudged of and maintained by the highest courts then or now known to our jurisprudence, the masculine and hence self-relying intelligence of the men of the present day, after having taken to themselves the selection of their own "judges," would scarcely anathematise it as sacreligious or improper, had we, in the case before us, and in the conclusions at which we have arrived, overruled even the opinions of our predecessors upon the bench we occupy. Much less, perhaps, will it be so deemed of, when it is known and appreciated that the great and momentous question which it has fallen to

our duty thus to consider and to pass upon, and which we deem to be settled upon every legitimate principle of construction, no less than the very terms of the constitution itself, has never before occupied the attention of the judicial department of the government. It has been on the contrary, in the sense in which it has been alone herein considered "an open question"—receiving for the first time, in our courts, the consideration of the bench or the bar—soon thence to receive, (it may be) under the fortunate coincidence of a judicial election, the authoritative stamp, and the final and enduring impress, of the popular judgment of the State. The power that ordained the constitution, having thus practically the privilege to confer upon it their own interpretation, from such an exposition, should the issue be presented and contested, there can, of course be no appeal.

RYLAND, J.

The appellants (defendants below) were indicted in the Criminal Court of St. Louis county, for dealing as merchants without taking out a license, as required by the statutes of the State.

The indictment contains six counts. The first charges that defendants unlawfully did receive for sale and unlawfully did deal as merchants in the selling of goods, wares and merchandise, not the growth, produce or manufacture of this State, by then and there and on divers other days and times, receiving for sale and selling as merchants as aforesaid, fifty yards of cloth, fifty yards of domestic, &c., &c., at a place then and there, and on other days and times, occupied by them for that purpose, to divers persons unknown, without having any license, &c.

The second count charges the same facts as the first, with this exception, that it omits to state that the goods, wares and merchandise received and sold were not the growth, produce and manufacture of this State. The third count charges that the defendants did import into the State, and unlawfully receive for sale and unlawfully did deal as merchants in selling, at the place and on the days aforesaid, goods, wares and merchandise, (naming them) not the growth manufacture or produce of this State, but of England in Great Britain; which importing, receiving and selling were in the original packages, bales and forms, as imported from England. This count also states that the duties had been regularly paid to the United States on the said goods, &c., without a license. The fourth count charges that defendants imported and received for sale, and sold on the days and times and at the place aforesaid, goods, wares and merchandise, the produce, growth and manufac-

ture of New York, Pennsylvania, and other States of the Union, which selling was in the original packages, and also in broken packages without a license.

The fifth count charges that defendants imported goods, wares and merchandise into this State from sister States, and received and sold the same as aforesaid in the original packages unbroken, in which they were received by wholesale and without a license.

The sixth count is not materially different from the first. The defendants filed a demurrer to all the counts of the indictment. The demurrer was sustained to the second and third counts, and overruled as to all the others. A jury was then empannelled to try the issue of not guilty to the counts which had been held good on the demurrer. The evidence was as follows : The defendants at the time mentioned in the indictment were merchants, doing business in St. Louis, and received for sale at their store the goods, wares and merchandise mentioned in the indictment, in manner and form as therein charged without a license. That all the goods, &c., so received and offered for sale by defendants were imported directly by them into this State from other States of the Union and foreign countries, and were not the growth, produce or manufacture of this State, and that the defendants did exercise the business of merchants by selling the goods, &c., mentioned in the indictment, as charged in all the said counts, except the second and third counts, and that was all the evidence.

The defendants then moved the court to give the following instruction to the jury, that "if defendants received for sale, and sold at their store in St. Louis, no other goods except such as were imported into this State by them, directly from other States of the Union, the jury will find for the defendants." This the court refused to give, and the defendants excepted. The defendants were found guilty. They afterwards filed their motion for a new trial, and in arrest of judgment, raising again the questions of the propriety of the convictions on the testimony and of the legal sufficiency of the indictment. The court decided both these motions against the defendants; they again excepted, and bring the case before this court for revision. A reversal of the judgment of the criminal court has been insisted on before this court, upon grounds radical and fundamental, looking to nothing less than the absolute nullity of the laws upon which the counsel for the State rely to uphold the indictment. The cause was first brought before this court at the October term, 1850, at which time it was ably discussed at the bar, and was decided by the court, a majority feeling themselves bound by a sense of duty to declare the indictment insufficient to sustain the judg-

ment of the criminal court, the provision of the statutes upon which it was found, being in their opinion unconstitutional.    Subsequently, a re-argument was asked for and obtained by the counsel for the State.    This court being deeply impressed with the magnitude of the subject, and of the great importance to the State, of coming to a right conclusion, at this present term, the cause was again submitted to the court on full written arguments by the respective counsel, and the whole field of the controversy once more carefully reviewed.    It is now my duty to state the effect of these repeated labors on my own judgment, and if they have had the effect to satisfy my judgment as to what disposition ought to be made of this case, there is no other consideration worth a reflection.    I confess the subject has been one of much difficulty and perplexing doubt, but my conclusions, such as they are shall be given.    The questions discussed at the bar involve the construction of several acts of our leg-islature, as well as the constitutionality of  some of the leading features of  the said acts, and the questions of constitutionality are raised with reference both to the constitution of the State and of the United States.

So much of these acts will  be here stated as will  be necessary to show the points which are made upon them.    By the first section of an act to regulate licenses and taxes on  merchants and grocers, approved March 12th, 1849, it is provided " that in lieu of  the taxes assessed upon merchants and grocers, licensed by the existing law, there shall be levied and collected upon every merchant and grocer's license a tax at  the following rate, to-wit:  Where the amount of merchandise re-ceived for sale by any merchant or grocer, shall amount in value to as much as five hundred dollars or less, the tax shall be one dollar.    Where the amount so received shall  amount in value to  more than five hun-dred dollars and not exceeding six hundred dollars, the tax shall be one dollar and twenty cents, and  so on in the same proportion, the tax in-creasing at the rate of  twenty cents on  every additional hundred dol-lars' worth of merchandise so received."    This act does not purport by its title to  be amendatory, but it is impossible to  give effect to  its provisions without treating it in that light.    By itself, we are unable to ascertain who is a merchant or grocer, or what is  the nature or dura-tion of the license referred to.    How the amount mentioned is to be as-certained ; what period of time is to  be computed in its ascertainment, or what place is  contemplated by the  law for receiving the same, by the merchant or grocer.    It might also be remarked that, standing alone, it is entirely without sanction or means of enforcement.    These difficulties are all referred, by the act itself, to  the  existing law.    I must endeavor, therefore, to  find  out what is the existing  law.    " An

act" to amend "an act entitled an act to license and tax merchants, approved March 27th, 1845, approved February 13, 1847," declares there shall be levied upon every such license, to be paid to the collector before the delivery thereof, as follows, viz : First, where the amount of merchandise received for sale according to the provisions of the pre-ceding sections of the above recited act, to which this is amendatory, does not exceed five hundred dollars, the sum of two dollars and fifty cents. The act then proceeds to grade the tax which it imposes, with-out furnishing any solution of the difficulties above stated.

Next in order, as we proceed in our examination of "these existing laws," stands the " act to license and tax merchants," approved March 25th, 1845. The first section of this last mentioned act declares that " every person, or co-partnership of persons, who shall deal in the sel-ling of goods, wares or merchandise, at any stand, store, or place oc-cupied for that purpose, is a merchant."

The second section imposes a penalty of from fifty to one hundred dollars for dealing without a license. The third section shows that this license shall continue only for six months and protect the person taking it only in one place. The fifth section explains what is meant by the words " amount received for sale," in the act of March 12th, 1849, and the words " amount received according to the provisions of the pre-ceding section," etc., in the act of February 13, 1847. It declares that before any person shall receive a license to vend merchandise, he shall deliver to the collector an aggregate statement, in writing, of the " amount " of all goods, wares and merchandise (except such as are the growth, produce or manufacture of this State,) received at his store, etc. It is then " amount received," as just stated, with the ex-ception, as stated, that is taxed by the act of 1849. The first section of the act of 1849, was intended merely to change the rate of tax as-sessed, and to substitute a new tax instead of the old one, which new tax the law declares is to be levied on persons licensed by the existing law." The question then arises, how were licenses procured under the law as it existed prior to the 12th of March, 1849 ? The fifth section of the act of 25th March, 1845, above quoted, answers by furnishing a statement of all merchandise, (the produce, growth or manufacture of this State excepted.) I am well satisfied then, that the exception in the fifth section of the act of 25th of March, 1845, is not repealed by the act of March 12th, 1849, but was intended by that act to be recog-nized as a part of the existing law on which it was made to rest, as ex-planatory in many material particulars.

By the tenth section of the act of 25th March, 1845, it is further pro-

vided that the collector shall collect, as an ad valorem tax, such per centum upon all merchandise offered for sale as aforesaid, (except such as may be offered in the packages, boxes, bales, barrels, or crates in which they were imported, or in which they have remained without being broken,) such amount as may for the time being be levied on real estate.

By the first section of an act to sustain the credit of the State, approved February 16th, 1847, it is provided that the annual tax levied on all objects of taxation shall be at the *following rate*, viz:   On all free male persons over twenty-one and under fifty-five years of age, thirty-seven and a half cents, and all other objects of taxation now made taxable by law, one-fifth of one per centum on the assessed value thereof.   The second section of the act, March 12th, 1849, abolishes the distinction between wholesale and retail dealers which had previously obtained.   These are all the statutes appertaining to this subject.   It is a well settled rule of construction that all legislative enactments in *pari materi* not repugnent to each other must be regarded as one act, and construed accordingly.

Proceeding on in this view, there seems to be no difficulty in identifying in a few words the leading features of these several acts :   1st. There is imposed on each merchant's and grocer's license where the amount received for sale at his place of business during the six months previous to his application is five hundred dollars or less, a tax of one dollar ; where it is more than five hundred dollars and not exceeding six hundred dollars, a tax of one dollar and twenty cents, and twenty cents for each additional hundred dollars, provided the same has been produced, manufactured or grown out of the State of Missouri ; but if the merchandise, &c., be of Missouri growth, manufacture or produce, it may be sold without license or tax.

2d. The same merchandise when of foreign production, &c., is to be taxed again by an ad valorem tax of twenty cents on the one hundred dollars worth as soon as offered for sale in Missouri, provided it be not so offered in the packages, bales, boxes, barrels or crates in which it was imported, or may have remained unbroken ; while no such tax is imposed on the sale of the same kind of goods or merchandise produced, grown or manufactured in Missouri.

3d. The said taxes so imposed are not laid with the view to any police regulation, but are purely revenue measures, and fall upon every species of goods, wares and merchandise which can enter into the commerce of the world, provided the same are produced, grown or manufactured out of the State of Missouri.

The whole matter, then, may be further condensed, thus : These laws require the Missouri merchants dealing in foreign goods to pay twenty cents on every one hundred dollars worth received for sale, as a license tax, before his packages are opened, and an additional twenty cents, called an ad valorem tax, as soon as the packages are opened for sale, being in every instance a tax of 20 cents per one hundred dollars worth; and where the merchandise remains on hand for sale after breaking the packages, a tax of forty cents on each one hundred dollars worth ; and these operations are required to be repeated under the provisions of the act *toties quoties* as often as the goods pass by sale from one merchant to another ; while goods of like kind produced in the State are exempted from all taxation. It is upon this state of facts that the question of law is raised : Has the legislature the power thus to restrict and burthen the free intercourse of trade between the people of Missouri and the people of her sister States or of the world ?

Can the legislature, for revenue purposes, impose upon goods introduced into the markets of Missouri from beyond her limits, other and different and higher taxes than they impose on the same kind of goods produced, grown and manufactured in the State ? If these questions can be answered in the affirmative, then there are other propositions important to be looked at. The power to lay upon the foreign article the discriminating burthen of one cent additional tax above the general tax rate of the State, establishes the power to add the second cent, and so with the third. Discriminating taxation is restrictive in its effects on the traffic in the thing that is thus taxed, and the restriction which a small discriminating tax produces becomes exclusion when you raise the discriminating tax high enough. The power, therefore, to impose upon the beef, pork and lard of our sister State of Illinois, when introduced here for sale, a tax or duty not paid on the sale of these articles produced in Missouri, is a power to exclude in toto from the channels of commerce in this State all these foreign articles ; of course all other foreign productions can be expelled and driven out of the State in the same way.

Has, then, the legislature of the State of Missouri the power to lay an embargo on trade between her borders and the rest of the world? This proposition has not been asserted as the ground on which the State rests her cause, but after the best reflection I have been able to give to the views which she seeks to maintain, I am unable to see how the State, with the course of reasoning here insisted on, is to stop short of this position.

The appellants (the defendants below) resist both the premises and

reasoning which would lead to such a conclusion.   They have insisted that the statutes on which this indictment is found have been enacted in violation of the constitution of the United States, and they rely on the following clauses in that instrument as showing that the powers claimed by the legislature of Missouri are actually vested in the general government.

*First.* That congress shall have power to lay and collect taxes, duties, imposts and excises to pay the debts and to provide for the common defence and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States.

*Second.* To regulate commerce with foreign nations, among the several States and with the Indian tribes.

*Third.* No tax or duty shall be laid on articles exported from any State.   No preference shall be given by any regulation of commerce or revenue, to the ports of one State over those of another, nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another.

*Fourth.* No State shall, without the consent of congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws, and the net proceeds of all duties and imposts laid on imports or exports by any State, shall be for the use of the treasury of the United States, and all such laws shall be subject to the revision and control of congress.

The question arises, what is commerce?   We are informed by Justice Story, in his commentaries on the constitution, vol. 2, page 506, that it is 'traffic,' 'buying and selling,' 'interchange of commodities,' and that it includes navigation and intercourse.

We are also informed by the same author, on the same page, that to regulate commerce is to prescribe the rules by which commerce is to be governed.   It will be readily perceived, therefore, that all the foregoing provisions of the federal constitution concern the subject of commerce, and are intended, in one way or other, either to grant or restrict the power of controlling or interfering with it; and after considering these full and explicit provisions there would appear to be little room to question that the discriminating tax imposed by the statutes under consideration on foreign merchandize, is a regulation of commerce on the part of the State in the proper meaning of the federal constitution— and that the regulation is attempted to be made, not merely of commerce between the States, but with foreign nations.   The congress of the United States, by virtue of duties on imports, regulates commerce, in this very way restricts and diminishes the amount of importations,

expels or invites trade to the Union, and protects home industry and manufactures.

All this is done by force of a discrimination in the amount laid on articles of trade. Tariffs, in the regulation of trade, are more potent engines than armies or navies. Their silent but mighty influences are felt in every citizen's private dwelling, extend over seas and oceans, and reach to the ends of the earth. This is a truth well known to, and in constant employment by all civilized nations. Nor are these simple facts and principles at all controverted by the counsel for the State in this case. They admit that congress has the power to regulate commerce with foreign nations, and between the States, and that these acts of the Missouri legislature are regulations of commerce, but they insist that the same power also belongs the States, and may be exercised by them where congress has failed to pass any law on the same subject on which the States attempt to legislate. In other words, that the power to regulate commerce is in a manner concurrent. The congress can take up and grasp the whole, but not doing so the States may take up and appropriate what congress neglects or prefers not to exercise.

I will not deny that there are jurists in this country who have expressed the opinion that the State government possessed the power to participate with congress in the regulation of commerce, and it has been sometimes inferred that the power to regulate commerce vested in congress, was dormant and inoperative until exercised by congress, and in the meantime the power returned to the States to be employed by them. But it is believed that such opinions have always been thrown out in cases where some plainly acknowledged State power was to be upheld, and which was confounded in the mind of the writer with a regulation of commerce, when in fact no such thing was in issue. Now, I have never doubted the power of the State government to do many things which more nearly or remotely concern the subjects and operations of commerce. The power of the State authorities to protect the lives of persons engaged in the trade within its borders, to preserve health or morals, to protect property, promote education, punish crime, restrain practices and habits leading to vice, to make internal improvements by constructing roads, dams, bridges, canals, wharves, ferries, &c. To raise revenue by taxation for these purposes or any others appertaining to the most ample and liberal police power requisite for the internal government and prosperity of the State, is inherent in its sovereignty, and is as well established by the dictates of reason as the authority of adjudged cases.

But, when a State is employed in the exercise of one of these powers,

24

although the instrumentalities she may bring to bear may occasionally conflict with the operations of commerce, still the State is not "regulating commerce." I will illustrate: When a cargo of beef is landed in the city of St. Louis, and the State officers require it to be destroyed, because it is putrid, they are regulating health, not commerce. But if the same beef were sound, and was forbidden the market, merely because it was designed to prevent competition in the traffic in that article, it would be a regulation of commerce. In both cases, we perceive that beef as a subject of commerce, has been interfered with, but in one case the purpose was to protect the health of the community, and was constitutional, and in the other the object was to regulate commerce, and was unconstitutional.

Many adjudged cases have been referred to, and relied on by counsel, as asserting the power here contended for on the part of the State. But, on careful examination, it will be found, as I think, that they rest on nothing but the general police power which has been already fully conceded. I will briefly notice some of these cases: In the Commonwealth vs. Kimball, 24 Pick., 360—a statute of Massachusetts, forbidding the sale of all ardent spirits in less quantity than 28 gallons, on pain of $20 fine, and providing that no license should be issued without a certificate of the selectmen as to the good moral character of the applicant, and that the public good required it, and the payment of $1 to the clerk as a fee for issuing the license, was adjudged no violation of the constitution of the United States, because the said statute (say the court) fell within that of powers necessary to the regulation of the police, morals, health, &c., of the community. In Breed vs. Commonwealth, 4 Pick., 460—a statute athorizing the building of a bridge over a navigable stream, was declared constitutional, as in affirmance of a power to authorize improvements required by convenience and necessity of the people. In Beall vs. State, 4th Blackford, 107—a statute of Indiana, was pronounced no violation of the constitution of the United States, which provided that no person should vend any merchandize not the product of the United States, without a license, on pain of $100.

It does not appear from anything in the case, what the tax on the foreign article was, or whether it exceeded the tax on the domestic article or not. The court say, "the act does not interfere with the power to 'regulate commerce.'" "It contemplates no restriction," "imposes no burdens on commerce," "nor can it be tortured into a transit duty." There is nothing in the case to countenance, ever so remotely, the idea of a discriminating tax on foreign productions over and above the do-

mestic production. In 3d Smedes and Marshall's Rep., 585—an ordinance of the city of Vicksburg, levying an ad valorem tax on sales of produce by flat-boatmen in the city, and imposing fifty dollars fine for non-payment, was declared valid. In this case the question was not whether the foreign article could be burthened with a discriminating tax, tending to expel it from the State, but whether it could be taxed at all, the flat-boatmen insisting upon trading and selling their goods in the State of Mississippi, free from all taxation whatever. The court say, "the State has power to tax persons and property within its limits. When a citizen of Ohio comes into this State and sells his merchandize, there is no reason why he should be exempted from the operation of the State laws." In 4 Dev. and Bat. North Carolina Rep., 320—an act prohibiting the sale of ardent spirits near a meeting-house or a place of divine worship, without license, was valid, as being in support of good morals. The case in 13 Serg. and Rawle is much like that in Blackford, and cannot be made to prove more than the mere taxing power of the State. It does not show there was any discrimination in favor of domestic articles, and it is asking quite too much to presume there was. Ingersoll vs. Skinne, 1st Denio 540, the question was, whether a license act not discriminating in its burthens between foreign and domestic liquors, was valid; it was very properly held to be so. In Raguet vs. Wade, 4 Ohio, 107, the tax was on all persons trading in foreign or domestic goods within the State. The law was upheld on the simple ground of a power in the State to tax all property for revenue, and not on any power to levy a discriminating or restrictive tax. The court say, the amount of the tax upon the capital (of the merchant) bears a just proportion to that upon land and almost every species or property in the State. The State power to tax must be taken with the limitation; that it is not an impost, or duty on imports or exports, and that it does not conflict with the power of congress to regulate commerce. The power of the State to tax its own cititizens, or their property, within its jurisdiction, while it is admitted to be sacred, cannot be so exercised as to obstruct the operation of an act of congress, or defeat the constitutional right of congress, to "regulate commerce." In Perry vs. Torrence, 8 Ohio 521, the question was, can the State cause the owners of steamboats employed on the Ohio river, and Lower Mississippi river, but occasionally touching at Cincinnati, to be taxed therefor. The court held it might, and declared it to be a "fundamental principle of taxation, that the property of all citizens be made to contribute as equally as possible to the public burthens." The court declare that the act in question was probably framed with the purpose

of attaining that great object, as it imposed a general tax on stock of all descriptions. Here, again, is the absence of the discriminting feature.

But the decision, which has been probably more strenuously relied upon by the State, is Nathans vs. State of Louisiana, 8 Howard, 73. Nathans was indicted under a law which required every "exchange broker" in Louisiana, whether dealing in foreign or domestic bills, to pay a tax of $250. There was no discrimination, no exemption in the case, all were taxed alike. Nathans' counsel contended that, as he dealt in foreign exchange, he was exempt from all taxation, but the court ruled otherwise. The court in this case, remark, "No one can claim an exemption from a general tax on his business, within a State, on the ground that the products may be used in commerce." But what similitude is there between the case at Bar and Nathans? He was taxed like every other person dealing in exchange in Louisiana, and was subjected to the same burthens as other citizens engaged in the same avocation, and no more. Had he been taxed 20 or 40 cents on the $100 worth, where other brokers were taxed nothing, had all foreign capital in his hands been subjected to a heavy discriminating burthen, and crippled in its employment, or expelled the State, the cases would have been more alike.

The next case is Austin's, (10 Missouri Rep. 591,) and claims for the legislature of Missouri the power of placing under restrictions any trade or profession whatever. It is by no means necessary to call in question the correctness of that doctrine. Grant that such a power exists, whenever it is the general policy of the State to exercise it. It is enough, that the trade in the articles mentioned in this indictment, has not been abolished or restricted. On the other hand, the policy of the State would seem to encourage and promote the traffic, when produced at home, by means of the very law we are now considering. The case, therefore, is not in point.

The case of the Black Bird Marsh Creek Company vs. Wilson, 2 Peters, 250, involved the constitutional power of a state to authorize the building of a dam, &c., and when the opinion of the court is construed with reference to the subject before them, it cannot be made to establish more than the power of a State, to regulate improvements, when no intention is indicated thereby to interfere with commerce.

In the celebrated cases, known as the License Cases, in which the statutes of New Hampshire, Massachusetts and Rhode Island, were called in question, the matter for adjudication was, whether these States had the power to restrain the use of ardent spirits by laws, in which no discrimination was made between foreign and domestic liquors, no tax

was imposed at all, nothing required to be paid, over the fees for issuing the license, was in violation of the constitution of the United States— and it was held no violation; the decision resting on the broad ground of the police power of the State to protect the morals and good order of its inhabitants. I think I may say, that not one of the foregoing cases can bring any legitimate support to the statutes now under consideration.

I belive it should not be doubted that every one of these is merely in affirmance of the police power; and if it be true, that in some instances the proper distinctions were not made by individual judges, or remarks were thrown out, tending to confound such powers with the power to regulate commerce with foreign nations and between the States; and thence deduce the consequence of concurrent jurisdiction in both governments over these great and delicate interests; it must yet be observed, that these sentiments have found utterance only on questions of the police; and it will be time enough to regard them as authority when they have been applied to regulations of commerce, properly as such, and received the judicial sanction of the courts of the last resort.

If the State of Missouri can restrict or expel the productions of other States from her borders, they can retaliate, by similar enactments, against her productions; and to suppose they will not do so, is to disregard the dictates of experience.—2 Story's Const. 511. They will do so, and that speedily, and the effect of their opposing regulations and retaliative measures, will lead to consequences which no friend of this country can desire to see.

It may be proper here to remark that there is no clause in the Federal Constitution the history of which is more distinctly traced than that which gives to the general government the power to "regulate commerce." The want of such a power in a common head, to be employed with energy and unity of purpose, was the bane of the confederacy. Mr. Madison says, (Papers 119,) "The want of authority to regulate commerce had produced in foreign nations—particularly Great Britain —a monopolizing policy injurious to the trade of the United States, and destructive to their navigation." "The same want of a general power over commerce lead to an exercise of the power separately by the States, which not only proved abortive, but engendered rival, conflicting and angry regulations." The States having ports for foreign commerce taxed and irritated adjoining States trading through them, as New York, Pennsylvania, Virginia and South Carolina. "Some of the States taxed imports from others, as from Massachusetts, which complained in a letter to the Governor of Virginia, and doubtless to those

of other States.   In sundry instances, as of New York, New Jersey, Pennsylvania and Maryland, the navigation acts treated the citizens of other States as aliens."

When it had become manifest that the existing condition of commerce would not only lead to a dissolution of the confederacy, but probably to bloodshed, a convention of delegates was held at Annapolis, under a calling of the legislature of Virginia, whose duty it was made to "examine the relative situations and trade of the said States to consider how far a uniform system in their commercial regulations might be necessary to their common interest and permanent harmony."   Madison Papers, 112, 113.

The deliberations of this convention, which met to discuss the single subject of commerce, lead to other movements, that finally brought about the assembling of a greater convention, and the entire re-organization of the government into its present form.

This thing of imposing duties on the productions of sister States was then regarded as a part of commerce.   This appears by the proceedings at Annapolis and in the debates of the convention, and the whole cotemporaneous history.   It is admitted in this case by both parties to be such.   When, therefore, the proposition to give to Congress power to "regulate commerce with foreign nations, and between the States," passed by the convention without a division and without any qualification or language sufficiently broad as to vest the whole power, I am compelled to believe that such was the intention.   2. Story Const. 508.

Chancellor Kent, 1 vol. Com. page 269, lending his sanction to an opinion of Justice Story, informs us, "That the commercial system of the United States has been employed sometimes for the purposes of revenue, sometimes for prohibition, sometimes for retaliation and commercial reciprocity, sometimes to lay embargoes, sometimes to encourage domestic navigation and shipping and mercantile interests by bounties, discriminating duties by special preferences and priviveles; sometimes to regulate intercourse, with a view to mere political objects, such as to repel aggression, increase the pressure of war, vindicate the rights of neutral sovereignty; and in all these cases the right and duty have been conceded to the national government by the unequivocal voice of the people."

Now, conceding a concurrent power in the States with the general government to interfere in all these important matters, we are permitted to obtain a startling view of the extent of the authority which is claimed for them in this cause.   That such powers should belong to the general government, seems to be as easily perceived on the one hand, as it is

difficult to imagine on the other, to what end they could be rationally employed by the States under our present general Union.

To return again to the language of the constitution, when it declares that Congress shall have power to "regulate commerce," I wish to be informed by what rule of construction it is that part of the power to regulate is retained by the grantors? If a mere agency is created, then all the power is retained in one sense, for the agency may be annulled at pleasure; but if anything is definitely granted, everything embraced in the descriptive words of the grant is gone. The regulation of commerce is the thing granted, not in part by the descriptive words, but in whole; then the whole regulation is surrendered.

In the case of grants of power touching 'naturalization' and bankruptcies, and the grant of power touching the organizing of the militia, grants made in the same section, and sometimes relied on as tending to justify the anomalous assumption of a concurrent power in congress and the States to regulate commerce, it will be seen that in neither of the cases is the grant made in the general, unqualified terms employed with reference to the commerce regulating power. In neither case is the whole power given in terms, but in each instance there either are limitations on the grant itself, or reservations taking back a part of the power.

It seems to me not only plain that the power to "regulate commerce" was intended to be given to the exclusion of any interference by the States, but that this purpose has been indicated by all the other provisions on the same subject.

Commerce is regulated often, by the levying of taxes, duties and imposts. This the convention understood very well, and not being willing that the commerce power which they had given to congress should be abused by unequal legislation, it was provided that congress, in laying these burthens, should make them uniform.

The members of the convention had seen enough of conflicting and unequal duties, under the confederacy, not to be suspicious lest dishonest combinations might be formed, and unequal duties assessed, on different sections of the country, they laid the injunction, therefore, on that party which was clothed with the power to act.

If the States retained this power of levying taxes, duties and imposts, it must be seen at once there never could be uniformity, and the restriction on the power of congress is vain and nugatory.

Again, congress is restricted in its commerce-regulating power in this—"no tax or duty shall be laid on articles exported from any State."

If the States hold a divided jurisdiction with congress in regulating exports, how abortive this effort of the convention to tie up the hands of congress, under the evident impression that congress was the only agency whose action was feared in that behalf.

Again, no preference shall be given by any regulation of commerce or revenue, to the ports of one State over those of another, nor vessels bound to or from one State, be bound to enter, clear or pay duties in another. These restrictions on the power of congress, tying up its hands, in the use of the power to regulate commerce, which had been given to it, guarding assiduously and carefully against abuses, which it was feared might creep into its administration of the commerce reguting power, which had just been transferred from thirteen quarreling and almost belligerent States to congress as a common depository of a power which they admitted themselves incompetent to wield; and yet we are told that congress was never vested with more than a concurrent power over the subject; that the States retained a right to legislate on every matter which congress omitted to legislate upon, and are at perfect liberty in the first instance, to do all these things, which the convention so solemnly declared that congress should never do.

Let it be conceded for a moment that the power is concurrent: a State, then, is at liberty to cause vessels belonging to a sister State to enter, clear and pay duties therefor in her ports. Now let us suppose that congress neglects or refuses to interfere—the law is valid—the courts must enforce it, and the wishes of the convention so clearly expressed, that congress should never require such a thing to be done, are utterly defeated.

This is only one of the many singular consequences growing out of a concurrent power.

There are other views enforcing still more clearly the doctrine that the power is exclusively in congress. The 2d member of the 10th section of the 1st article U. S. constitution, provides in substance—

1st. That congress may consent to a State's laying imposts or duties on imports or exports.

2d. That congress may consent to a State's laying a tonnage duty, unless it can be shown that the levying of tonnage duties and impost duties on imports and exports are regulations of commerce.

I am entirely at a loss to conceive why, with a concurrent power in the State to regulate commerce, it was necessary or proper to introduce these stipulations into the constitution. A State was not bound to wait for the consent of congress, but might act as it pleased, and if congress

never repealed its enactment, the courts would have been obliged to enforce it.

There are practical difficulties in the doctrine of a concurrent jurisdiction, as contended for, which I have been unable, after most anxious reflection, entirely to reconcile either with the philosophy of legislation or the public convenience.

It is said that the States have the right to legislate where congress has not legislated. Now, suppose that congress should feel it to be their duty, after examining thoroughly the condition of trade between the States or foreign nations, or after looking at the traffic in a particular article, say salt, to do nothing, but leave it to pursue its course; or after passing a law to regulate the trade between Missouri and New Mexico, resolve to pass no law in reference to the trade between Ohio and Kentucky. Is there not often as much effected by not acting, as by acting? I have, myself no doubt of the fact; and I regard a prudent forbearance to interfere, in many cases, quite as conservative as a contrary course. The father who corrected his child yesterday has not ceased to exercise the parental power because it is omitted to-day, nor has that power necessarily become dormant, or ceased to exist.

In the manifold relations and highly delicate nature of the commercial interest of this country, it would be no small difficulty for the congress of the United States effectually to watch the progress of legislation by so many different sovereignties, and apply with requisite wisdom and dispatch the necessary cerrective remedies.

Troublesome and annoying as such a tax would be, it is yet more incomprehensible how the States can be supposed so to administer the commerce regulating power as to cause all duties to be uniform throughout the United States, or to lay down a navigation and tonnage system in which no preference should be given in the ports of one State over those of another, nor do I yet see how they are to agree upon any common commercial system of regulations for the Indian tribes.

But this very question has been several times before the supreme court of the United States, and has been thoroughly examined. In the case of Gibbons vs. Ogden, 9 Wheaton's report, 196—the matter in issue was whether the power to regulate commerce with foreign nations and among the several States, was exclusively in congress. That court decided that "the power vested in congress was complete within itself—might be exercised to its utmost extent, and acknowledged no limitations, other than those prescribed in the constitution itself. That it was vested in congress as absolutly as it would be in a single government," page 197. "When a State proceeds to regulate commerce

among the several States, it is exercising the very power granted to congress," page 199. Mr. Justice Johnson, in a separate opinion, declared that the judgment of the court had his entire approbation, page 222. In the same opinion, he declared, that the States could not so exercise their power as to restrain the free intercourse between the States. In Houston vs. Moore, 5 Wheaton, 23, the supreme court of the United States say: "They are altogether incapable of comprehending how two distinct wills can, at the same time, be exercised in relation to the same subject, to be effectual, and at the same time compatible with each other."

In Holmes vs. Jennison, 14 Peters, 570, the opinion was delivered by chief justice Taney, and established, "that all the powers which relate to foreign intercourse, are confided to the general government." And, if there is no error in the judicial tribunals, the "intercourse" is "commerce;" and if there is no distinction as to the degree and kind of power granted to congress to regulate commerce between the States and that which is granted to regulate it with foreign nations, all the powers which relate to commerce between the States, are also vested in congress.

In Groves vs. Slaughter, 15 Peters, 504, Justice McLean delivered the opinion of the court, again affirming the doctrine of exclusive power in Congress, as laid down in Gibbon vs. Ogden, above cited; and that no part of the power to regulate commerce could be exercised by a State.

Mr. Justice Baldwin, in the same case, said: "The power of congress to regulate commerce among the several States, is exclusive of any interference by the States, and has been, in my opinion, conclusively settled by the solemn opinions of this court; nor can there be any adjudications of this court considered authoritative if these are not."

In Brown vs. Maryland, 12 Wheat. 448, it was adjudged by the court that the power to regulate commerce was exclusively vested in congress; and extended to the whole subject—meaning, the whole subject of commerce, properly speaking. Justice Thompson dissented from the balance of the court.

In this case, as well as that of Gibbons vs. Ogden, 9 Wheat., the opinions of the court were delivered by chief justice Marshall, who discussed the whole subject with an amptitude and force of reasoning, and a copiousness and variety of illustration never since surpassed in any adjudications of that court, when the same subject has been under consideration.

I am satisfied that the doctrine of these cases was correctly laid down, and that it disposes of the case at the bar.

It has been contended here, that the opinions of the same court in the License cases, 5 Howard, and in the Passenger Cases, 7 Howard, have established another doctrine inconsistent with that of Gibbons and Ogden, and Brown and Maryland, but I am not certain that this position is tenable.

In the License cases, the question was not before the court, but I admit it was discussed by the judges. The cases were decided, and the statute of the States pronounced constitutional, on the ground of the police power in a State to restrain the sale of ardent spirits, for the sake of peace and good order. No such question, as whether a State may use its taxing power or any part of its police power, to discriminate against the productions of sister States, or foreign nations, or Indian tribes, was to be decided; and construing the several opinions of the members of the court, with the matter before them, I not only find no fault with them, but am satified, that even in the opinion of some of those members of that court, who insisted on the concurrent power to regulate commerce, the law now under discussion before this court would be deemed unconstitutional. And I may here remark generally, of nearly all such members of that court, that it will appear from their opinions, not only in the License Cases, but in the Passenger Cases also, that while they make scarcely a distinction between the commerce regulating power and the police power, they neverthless concede that the power of a State to regulate commerce, which they contend for, is not co-extensive with the subject, but confined and limited within a narrow bound.

Thus in 5 Howard. 516, Chief Justice Taney, laying down what he considers the limits of the State power of taxation, uses this strong language :

" Undoubtedly, a State may tax its own citizens, in proportion to the amount they respectively are worth, and the importing merchant is liable to the assessment, like any other citizen, and is chargeable according to the amount of his property, whether consisting in money, engaged in trade or imported goods which he proposes to sell, or any other property of which he is owner, nor can this affect the price of the commodity to the consumer, since foreigners, as well as citizens of other States, who are not chargeable with the tax, may import and sell," &c.

In page 579 he says "the controlling and supreme power over commerce with foreign nations and the several States, is undoubtedly conferred on congress, but in my judgment the States may nevertheless,

for the safety and convenience of trade, or the protection of health of its citizens make regulations of commerce."

It will be remembered it is on this ground of health and morals, &c., that the learned judge rests the decisions of the License Cases.

The above remarks of the Chief Justice are nearly co-incident with those of Mr. Justice McLean, who denied the concurrent power, when he says, 5 Howard, 592:

"Under pretence of police regulation, a State cannot counteract the commercial policy of congress. The State cannot, with a view to encourage local manufactures, prohibit the use of foreign articles, or impose such a regulation, as shall in fact be a prohibition. But it may tax such property as it taxes other and similar property in the State, either specifically or in form of a license."

Mr. Justice Daniel thought that the foreign article ought to be subject to State taxation, in common with all other property of the same citizens. 5 Howard, 612.

In the License Cases, so far as the taxing power of a State was brought into view, one question was, can the State tax it at all? The point decided was, that it could tax it, as other property in the State was taxed.

Here the question is, can the State tax the foreign article differently and by a discriminating tax which amounts to a regulation of commerce unconnected with any question of the State police. The difference is important. In the Passenger Cases the question of the exclusiveness of power in congress to regulate commerce with foreign nations, and between the States was directly up for decision; as was, also, the nature and extent of the State taxing power in connexion therewith. Justice Woodbury contended again for the concurrent power in the States and general government, as he had done in the License Cases, but it will be seen that on a careful examination of his opinion, that he does not claim a power to regulate commerce in the State co-extensive with the subject.

It will appear that he claims a power in the State to regulate only some things in connexion with commerce, and though he does not distinguish between the commerce regulating power of the general government, and the police power of the State in principle, he is prepared to do so in practice, as the cases arise.

In 7 How. 529, Passenger Cases, he says, (speaking of the State taxing power,) "such is the case of Turner vs. Smith, considered in connection with this, collecting the same of its own citizens as of others;

Crow et al. vs. The State of Missouri.

and to argue that the States may abuse the power, by taxing citizens of other States different from their own, is a fallacy, because congress would also be quite as likely to abuse the power, because an abuse would react on the State itself, and lessen or destroy this business through it, and because the abuse, instead of being successful, would probably be declared unconstitutional by this court, whenever appealed to."

Again, on the same page, he intimates an opinion, that the clause of the constitution, which provides that "the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." ought "to protect the citizens of sister States from any legislation by a State which does not press, at least, as hard on its own citizens as those of sister States."

But, on page 557, he employs the following language, remarkable, if in fact, there be a real substantial difference of opinion between him and the majority of the court, as to the exclusive power of congress to "regulate commerce" in its proper sense.  "There is nothing in the nature of much which is here connected with foreign commerce, that is in its character foreign, or appropriate for the action of a central and single government; on the contrary, much that is entirely local; something, universal or required to be general or uniform.  For, though congress is empowered to regulate commerce, and ought to legislate for foreign commerce as for all its leading incidents and uniform and universal wants; yet to "regulate commerce," could never have been supposed, by the framers of the constitution, to devolve on the general government anything except exterior intercourse with foreign nations, with other States, and the Indian tribes.  Everything else within State limits was, of course, to be left to each State."  In this way much was meant to be left to the States, and much ever has been left, which partially related to commerce, when I say much was left, I mean concerning details and local matters inseperable, in some respects, from "foreign commerce," but not belonging to its exterior or general character, and not conflicting with anything Congress has already done.

So far as reasons exist, to make the exercise of the commercial power exclusive, as on matters of exterior, general and uniform cognizance the construction may be proper to render it exclusive, but no further, as the exclusiveness depends, in this case, wholly on the reasons, and not on any express prohibition, and hence cannot extend beyond the reasons themselves; when they disappear, the exclusiveness should halt, "cessante ratione, cessat et ipsa lex."

It nowhere appears to have been settled that this power is exclusive

in congress, so that the State can enact no laws on any branch of the subject; and whether conflicting with the acts of congress or not; on the contrary, the majority of the court, in the License Cases, 5 How. 604, appear to have held that it is exclusive as to some matters connected in some degree with commerce." It must not be contended therefore that Justice Woodbury asserts a power in the States to regulate commerce in all particulars where congress has not acted; on the contrary, there are reasons for holding that, in many cases, the States cannot interfere, and what these cases are will depend much upon his future opinion, as to whether the State ought or ought not, to act in the matter, as drawn from the peculiar nature of the case, when it arises.

Chief Justice Taney merely insists on the power of the State to make regulations of commerce, for the safety and convenience of trade, to protect morals, health, etc., all of which is conceded by the court under the police head.

In these Passenger Cases, the question was whether the State of New York had power to impose a tax of one dollar and fifty cents, on the master of the vessel, for each cabin passenger coming into the port of New York, by sea, from any foreign country; and twenty-five cents for each passenger coming from sister States in coasting vessels; and whether the State of Massachusetts had power to impose a tax of two dollars on the master of the vessel, for all alien passengers coming by sea into the port of Boston.

It was held by the court as follows: that the tax on passengers from foreign countries, was a regulation of commerce with foreign nations, and the tax on the passengers coming from sister States, was a regulation of commerce between the States—Justices McKinley, Grier, McLean and Wayne gave separate opinions, that there was an exclusive power in congress to regulate commerce, and that *ipso facto*, by virtue of the grant to congress of this power, these statutes are void. Mr. Justice Grier, however, after deciding that to tax intercourse with foreign nations, or between the States, challenges the power to exclude this intercourse altogether, and thus thwart the policy of other States and the Union, was a violation of the constitution, also insisted that congress had regulated commerce between the States and with foreign nations by willing that it should be free. In this opinion Mr. Justice Catron concurred; so that it is impossible to doubt what would be the opinions of the same Judges on the law now before us.

In the case of Brown vs. Maryland, that clause of the constitution which forbids the State to lay any duties or imposts on imports or exports, save what may be absolutely necessary for executing its inspec-

tion laws, was also most ably reviewed. Nothing but the length of this opinion already prevents me from transcribing it here, *ipsissimis verbis*, the substance of an argument which ranks its author, in my estimation, the ablest Judge that ever sat on the bench of the Supreme Court of the United States; but I am compelled to omit it. The point decided in the case in connection with this clause, may be stated as follows: In 1821 the State of Maryland passed an act requiring all importers of foreign articles or commodities, by bale or package, of wine or rum, and all other persons selling the same by wholesale, bale or package, hogshead, barrel or tierce, before allowed to sell, to take out a license, for which they were to pay fifty dollars, on penalty, &c. It was held to be a violation of the constitution to require this license. It was decided that duties on imports was a mere tax on the act of importation, or on the article imported. That though the tax was usually collected in advance of any sale by the importer, yet this was merely to prevent evasions of the tax, and it was no less a duty when collected afterwards. That no object could be effected by taxing the act of importation, which would not be effected equally by a tax on the article after importation; that Brown, who was indicted for selling such articles by wholesale, he having imported them directly from a foreign country, was not obliged to pay the tax, the law being in violation of the above clause of the constitution.

The court held that while the goods remained in the hands of the importer, in the forms imported, they were not subject to any tax whatever, on the part of the State—that in that condition they were taxable by congress, but not by the State government, and that although it was competent to the State authority whenever imported articles have passed out of the channels of commerce, by being so altered as to become a portion of the common mass of the property of the State to tax them by its local laws; yet, that until that fact had transpired by breaking the bales or otherwise divesting them of the distinctive character of the imports, they were subject to the taxing regulation power of congress, and not of the States.

Now, it must be admitted that there is great difficulty in laying down any fixed rule, adapted to all cases, which will sufficiently designate when imported goods have lost their character as such, when they have fully ceased to claim the protection of congress, and may rightfully demand the protection of State laws. The difficulty on this point, is not peculiar to the case before us, but is common to the entire subject matter of legal adjudication, where the condition of persons or property is

Crow et al. vs. The State of Missouri.

dependent on questions of conflicting jurisdictions, embarrassed by questions of intention.

But it seems to me, the legislature of Missouri has relieved the case of any difficulty on this head. They have signified their will, that no goods, wares, or merchandise, the production, growth, or manufacture of any place out of the limits of Missouri, shall ever mix with the common property in this State; shall ever be placed on a footing with other property in the State, so long as it remains in the merchant or grocer. They have denounced it as separate in its nature; as worthy of heavier burthens, and a peculiar restrictive system of taxation, known to no other property in the State, and all this because it is foreign; has been imported into the State, either from foreign nations or from sister States. While they so designate it and treat it, what right have they to say it has mixed with the common property of the State? When "it has so mixed, it has ceased to be foreign," says Judge Marshall. But our legislature says it is foreign, and they tax it as foreign. Then they ought not to be allowed to tax it as mixed. It is conceded at the bar, that if the twenty cents were laid upon the act of importation, it would be void, or if it were laid on the imported article, and secured by a lien on the article, it would be a duty on the import and void. Now I am unable to perceive, if this be so, how the holdng up the tax awhile, but laying on and collecting it at the end of a short time without a lien, can make it valid. Forms here are nothing, substance everything.

My opinion, then, is, that the tax imposed on the property of the appellants in this case, was for the reasons stated, repugnant to the constitution of the United States.

The question which has been raised on the State constitution, grows out of the provision in the Bill of Rights, which declares "That all property subject to taxation in this State, shall be taxed in proportion to its value."

It would seem at the first statement to be perfectly manifest that the object of this clause was to render taxation equal—to cause the burdens of government to bear with equal weight, in proportion to taxable property, on every citizen. The inherent justice of such a rule evinces the same view. Nor does the history of taxation, often flagrantly iniquitous and arbitrary, both in England and America, at all tend to relieve the mind of the first impression naturally suggested on reading this provision of the Bill of Rights; that it was intended to do just what it says—cause all property in the State, subject to taxation, to be taxed in proportion to its value.

It is insisted, however, that the cotemporaneous construction is

Crow et al. vs. The State of Missouri.

against this understanding. (See act of legislature, Dec. 12, 1820.) Cotemporaneous construction has been sometimes relied on in such cases, and it may be proper to be looked to, where the language is doubtful and other rules of construction fail. But if constitutional enactments are to be made to bend solely to the rule of cotemporaneous legislative construction, it is believed that in many cases important principles might be entirely fritted away. Some of our most universally acknowledged constitutional principles at the present day were established by judicial action, not only against cotemporaneous construction, but long after it had supplanted in practice the constitutional rule.

If the constitutional provision does not mean that all property taxable by law, shall be taxed equally in proportion to its value, what does it mean ? We are told at the bar that the purpose was to impose ad valorem, instead of specific taxes on whatever classes of property may be taxed ; that the object was not to make each hundred dollars' worth of property, required to be taxed, pay the same amount to government, but to impose an ad valorem tax of any given rate on all property of one kind, and an ad valorem tax of a different rate upon all property taxable of another kind. To illustrate—slaves may be all taxed at one-fifth of one per centum on the value, while lands may all be taxed at the rate of one-tenth of one per centum on the value. I am not aware that this idea has the weight of cotemporaneous construction, and I am at a loss to conceive the motive which could have sought to fix upon the people so unfair a principle of taxation.

It cannot be doubted that wherever unjust and oppressive systems of taxation have obtained, they have assumed this very form, which, it is contended, was purposely provided by the convention for the people of Missouri. My recollection does not now serve me with an instance in which a tax has been levied unequally on the same subject of taxation. When in the vicissitudes of political contests, taxes have shifted their burthens, they have fallen on this class or on that class. But to fix a tax of five per cent. on this landholder, and ten per cent. on that, and twenty per cent. on the third landholder, would be a degree of political iniquity which I apprehend has, rarely, if ever, been witnessed. I do not think, therefore, that the object was to require merely that each class of property holders should be taxed alike.

I cannot imagine why the convention should seek to have a system of unequal taxation, graduated upon an ad valorem principle. But it has been very well remarked at the bar, in reply to this, that, even if it be the correct exposition of the constitution, the case will still not be relieved of its difficulties.

25

The property of the appellants on which this tax is imposed, is of the same class precisely with the property of other citizens, and, indeed, with other property in their own possession which is not taxed at all.

The fact that one barrel of flour comes from Illinois, and another barrel from Missouri, will not make them different kinds of property, to be taxed differently, even under the view of the constitution, insisted upon by appellee's counsel.

But to return again to the words of the constitution:   " All property subject to taxation," &c.—not each separate class of property—" shall be taxed in proportion to value."

In the absence of any other rational explation of the meaning of the provision, I am of the opinion that the legislature, in proceeding to raise revenue, is bound, where they tax at all, to impose upon all taxable property an equal rate of taxation.   That is, no person who is taxed for the support of Government can be required constitutionally to pay a higher rate pet cent. per annum on any one hundred dollars' worth of his taxable property than he pays on any other, nor than any other citizen pays on his taxable property.

The constitutions of Illinois, Arkansas, Tennessee and Maryland contain provisions not very dissimilar to our own.

" The constitution of Illinois is in these words: "The mode of levying tax shall be by valuation—so that every person shall pay a tax in proportion to the value of the property he or she has in his or her possession."   This constitution was adopted in 1818, but two years before our own, and was doubtless intended to embody the same principle.

I will also give here the clause from the constitution of Arkansas, which is fuller but to the same purport :

"All property subject to taxation shall be taxed according to its value, that value to be ascertained in such manner as the General Assembly shall direct, making the same equal and uniform throughout the State. No one species of property from which a tax may be collected, shall be taxed higher than another species of property of equal value; provided the General Assembly shall have power to tax merchants, hawkers, pedlars and privileges, in such a manner as may from time to time be prescribed by law."

These constitutional provisions have each been reviewed by the Supreme Courts of their respective States, and expounded in a manner entirely concordant with the view here taken of the clause in our own State constitution.   See 1 Gill Rep. 308; 5 Ark. 207; 3 Scam. 138, and 5 Yerger R. 456.

I do not concur with my brother Birch, if it be his opinion that the

constitutional provision requires the legislature to declare all property taxable in the State which is not exempt by the compact with the general government. I will not pretend to say in advance of the question coming before me, that the legislature may not exempt any species of property from taxation, especially property devoted to purposes of religion, education or charity. Nor will I say what is the effect of those laws which have been passed from time to time, releasing individuals from the payment of taxes. In devising a just and equal system of taxation upon constitutional principles, it may be necessary for the legislature to omit to tax some articles of property while others are taxed.

But another point has been presented which it is contended, renders all the principles which have been discussed and settled above, inapplicable to this case. It is this : That the several acts of the legislature are not intended to impose any tax whatever on property, but are merely directed against the occupation or privilege of the merchant or grocer; and conceding that for the reasons already shown, it would not be constitutional to discriminate against or exclude from the State, the articles of property employed in the business of the merchant or grocer, or that it would not be constitutional to tax them unequally, as a portion of the common mass of domestic property of the State, yet there is no infringement of either constitutional guaranty, when it is observed, that no property is really taxed in the case, but merely an "employment," or "occupation."

I must admit, that this objection has been very forcibly presented to my mind—and that I have had different opinions in regard to it; it was the only difficulty in my way on the first argument; and I was particular in directing the attention of counsel to the subject.

During the present term of the court, my mind has been anxiously endeavoring to realize the propriety and reality of a distinction, which appears to have very generally obtained; so difficult is it to divest the mind of a false impression, once fixed upon it. I have, however, after much thought and inquiry into this subject, come to the opinion, that this distinction is one of form only, and should not interfere with what would otherwise be the judgment of the court.

A tax of $500 worth of property belonging to one citizen, of one dollar, and a tax on the privilege of holding, using and enjoying $500 of property by another citizen, of the same amount, exhibits a difference, if there be one, so impalpable and evanescent, as not to be clearly identified by language. Long habits of conceding the existence of a difference, may induce us to suspect there must be something in it— but we shall have more difficulty when we attempt to define by any fair

process of reasoning, in what the supposed difference consists. In the case put above, it is the property in both instances which is looked to in fixing the tax. The citizen finds one exactly as heavy as the other, and has precisely the same resources out of which to pay it. In the latter case it is assumed that the tax is imposed merely on the occupation; and yet it is plain that if the license taker had had no property, he would not only have had no tax to pay, but could not have received a license.

To say it is not a tax on property, but a tax on an occupation, because the party taxed has property, is to argue in a circle, and to confuse ourselves without convincing the understanding.

Let us endeavor to test the principle of the distinction by its practical operation. Let us suppose the property of the defendant, Crow, is not subject to a direct tax, the constitutions forbid it—but then his occupation in having that property may be taxed—how is this tax to be collected? He does not choose to pay, and the revenue officer goes into his house to distrain for the tax—he cannot seize any of his property, it is all protected by the constitutions from his power.

To say that the goods are not liable to be taxed as here claimed, and yet may be seized and sold to pay it, is still following the circle, in which the premises and the conclusion are both assumed, and alternately made to prove each other.

If such a process of reasoning shall be tolerated, then the constitutional enactment is made a dead letter, by the change of a few words in a revenue law. You have only to provide that every person who is the holder of any real estate, or uses or occupies the same, is declared to be a farmer, and require him to take out a license, and apply the same rule to slaves and other property, and the whole system of property taxation vanishes from the statute book. The better doctrine would seem to be, that where the property itself is liable to taxation, the license mode of reaching it may be employed; but where the property itself is forbidden to be touched, the prohibition cannot be evaded by substituting for the word "property," the phrase "license to use, enjoy or sell property."

I am unable to see on what principle one of these should be constitutional and the other unconstitutional. I see nothing against the employment by our legislature of the license form of taxation, if they choose to do so, but I deny their power to lay a higher or different tax by license than in the direct way. They have the power to tax vocations, I have no doubt—but such a tax should be what it pretends to be: a vocation tax.

This same objection was made in the case of Brown vs. Maryland. Brown's property, it was said, was not taxed, but his "occupation" was. The court say, (Chief Justice Mashall delivering the opinion) "But if it should be proved that a duty on the article itself would be repugnant to the constitution, it is still argued that this is not a tax upon the article, but on the person. The State, it is said, may tax occupations, and this is nothing more. It is impossible to conceal from ourselves that this is varying the form without varying the substance. It is treating a prohibition which is general, as if it were confined to a particular mode of doing the forbidden thing. All must perceive that a tax on the sale of an article imported only for sale, is a tax on the article itself. It is true the the State may tax occupations generally; but this tax must be paid by those who employ the individual, or is a tax on his business. The lawyer, the physician or the mechanic, must either charge more on the article in which he deals, or the thing itself is taxed through his person. This the State has a right to do, because no constitutional prohibition extends to it. So a tax on the occupation of an importer is in like manner a tax on importation. It must add to the price of the article, and be paid by the consumer, or by the importer himself, in like manner as a direct duty on the article itself would be made. This the State has not a right to do—because it is prohibited by the constitution." And this seems now to be the settled doctrine of that court.

In the license cases, 5 How. 575, Chief Justice Taney, speaking of goods, wares, and merchandise in the hands of the importer, says, "a tax upon them while in this condition, for State purposes, whether by direct assessment, or indirectly by requiring a license to sell, would be hardly more justifiable in principle than a transit duty on merchandise passing through a State."

Justice McLean quotes, with approbation, the ruling of the court in Brown's case, that a "tax on the sale of an article imported only for sale, is a tax on the article itself."

In the Passenger Cases, 7 How. 467, Justice Catron held, "that imposing a tax on the master of a vessel, of two dollars for each passenger coming in the vessel, was a tax on the passengers through the master, and was as unconstitutional as if laid directly on the passenger as an import."

Mr. Justice Grier (ib. 458) held, that it was "a tax on the master, as the representative of the vessel and cargo, and was not valid, because the vessel and cargo were exempt from such a tax." Chief Justice Taney, in the Passenger Cases, (p. 481) says, "unquestionably a

tax on the captain of a ship bringing in merchandise, would be indirectly a tax on imports, and consequently unlawful."

Mr. Justice Woodbury (ib. 531) says, "it is customary in most countries, as before named, to impose taxes on particular professions and trades, or businesses, as well as on property, and whether in the shape of a license, or fee, or an excise or poll tax, or any other form, it is of little consequence, when the object of the tax is legitimate." But I infer that, when the object of the tax is not legitimate in any given case, as to the property, it would not be legitimate, in his opinion, in a different form.

It has been insisted that this tax does not profess to be assessed on property. The law says, "when the amount received shall amount in value to more than five hundred dollars, or less, the tax shall be one dollar." But I do not know that it is very important what the law may profess to do, or not to do, as the validity depends upon the actual fact, rather than the form in which a tax may be covered up or disguised.

That the tax is not graduated by the amout of property on hand, but by the amount which was received six months before, is no answer to the allegation that the tax falls on the property, because when the next license is taken, all the property on hand is covered by it. If no other license is taken out, there is, in that case, a mere evasion of the law, which can prove nothing either way as to the nature of the tax.

The same thing may happen in regard to the land tax. A man buying real estate after one assessmet, and selling it before another, escapes the payment of any tax; but no one will pretend that this fact can have any influence in determining whether the land tax is a property tax or not.

The case of Nathans vs. Louisiana, (8 Howard, 78,) is again appealed to on this branch of the subject. There is no prohibition in the constitution of Louisiana, I believe, on the power of her legislature to license occupations. Nathans, was but a license on his occupation or avocation. It was not graduated by the amount of bills of exchange he had sold in the last six months, or had on hand to sell. It was a license established and fixed by law, whether the broker sold one bill or ten thousand bills of exchange.

Unconstitutional laws are more or less unjust and unequal, and are always unwise. Look at the effect of these statutes now under consideration. The merchants are now compelled, instead of paying only their just proportion of taxes, according to their wealth, like our other citizens, to pay nearly one-half of the entire revenue of the State. These laws operate by extracting a forced loan from the merchants, to

Crow et al. vs. The State of Missouri.

pay and support the burthens of the govenment thus taken from them, on their merchandize, with such additional per centage thereto added, as they judge they can realize from their customers.

The consumers pay it—but who are the consumers? The people generally—the great agricultural portion of our citizens. All those who use salt, iron, sugar, coffee, tea, domestics, and various other articles now of daily consumption.

It is no answer to say, "this consumption is voluntary." It is a voluntary consumption of the necessaries of life.

I have ever considered it the duty of the judiciary to have a proper respect for the legislative department; and feel that the mind of the judge should, with reluctance, come to the conclusion that an enactment of that body is unconstitutional and void. But I believe whenever such a law is brought under judicial notice, it is better and wiser at once to declare it so.

I consider it the plainest dictate of wisdom, to have our legislation properly within the pale of the constitution.

Let each government, State and general, scrupulously keep within its constitutional limits, in their various acts of legislation, encroaching not the least upon the rights and privileges of each other, and our national Union will bid defiance to "foreign levy, malice domestic," frenzied fanaticism, and the host of hydra-headed combinations springing up against the rights of man.

I, therefore, come to the conclusion that the statutes of this State, imposing the present discriminating tax upon the merchants and grocers, are not only unjust and unequal in operation, but are unconstitutional, both in regard to our own State constitution as well as that of the United States—consequently I am for reversing the judgment of the criminal court, and for discharging the defendants below.

NAPTON, J.

The questions presented by this case involve the taxing power of this State, and its restrictions both under the State constitution and the constitution of the United States. As the power to tax all the property and business within a State is an essential attribute of its sovereignty, and the only restraint upon its exercise, in the absence of express constitutional provisions, is to be found in the responsibility of the legislature to their constituents, the importance of ascertaining the limitations to this power, whether by the State or the federal constitution, will be readily perceived. The law now in question is entitled: "An act to license and tax merchants." It has, in all its essential features, been

Crow et al vs. The State of Missouri.

the law of this State since its organization, and never, until the present time, has its validity been questioned.

It is now urged that this law conflicts with the provisions both of our State and federal constitutions, and to this conclusion a majority of this court has arrived. In dissenting from a conclusion involving such important consequences upon our State revenue, it is proper that I should state the grounds upon which such dissent is based.

The material provisions of the law now in force, regulating the license and tax upon merchants, are to be gathered from the act upon this subject in the revised code of 1845, and two amendatory acts passed in 1847 and 1849. From these several statutes, the law may be stated substantially as follows:

A merchant is declared to be a person who deals in the selling of goods, wares or merchandise, at any stand, store or place occupied for that purpose.

All merchants, whether retailers, or wholesale dealers, are required to furnish the collectors of revenue a statement of all goods received by them within six months previous to taking out license, excepting such as are the growth, manufacture or produce of this State.

There is levied upon every such license, a tax of one dollar for the first five hundred dollars worth of merchandise embraced in the statement, and twenty cents upon every additional hundred dollars worth of merchandise.

An ad valorem tax is also levied upon merchandise, the same as upon real estate, excepting such as is in the original bale, package, box, crate, &c., which it is imported.

This law is said to be void, both because it conflicts with the constitution of the United States and violates our State constitution. I will first consider the last proposition.

The provision of our constitution, which is supposed to be violated, is the 19th section of the article containing a declaration of rights, and its language is: "That all property, subjected to taxation in this State, shall be taxed in proportion to its value."

To all objections based upon this provision, may answer is: first, that the license law in question is not a tax upon property, and therefore, not within the restriction; and secondly, if it were conceded to be such a tax, there is nothing in the law conflicting with the true intent and meaning of this constitutional provision.

This law does not profess to tax property upon its face, or in its terms, but professes to tax the occupation of those who deal in the sel-

ling of goods, wares and merchandise. Why the law should be thought to have in view a different purpose from what its language indicates, I have been unable to conjecture. If the amount of license tax had been specific, as it once was, or had been regulated by any other criterion, than the amount of merchandise received for sale, within a given period, there would have been no plausible ground for calling this a tax upon property, and thus the very plan adopted by the legislature to arrive at a more fair and equitable adjustment of this tax, by conforming it to the rule furnished by the constitution for a property tax, is construed into an admisssion of a constitutional restriction, where nothing but an exercise of legislative discretion was designed. This graduation of the tax by the amount of merchandise received is obviously with a view to tax the probable value of the business, so that each merchant may pay for his liscense an amount proportioned to his profits. It may be that the standard adopted is not a correct one, and that more satisfactory and just ones might be suggested. The amount of sales, or of actual profits, or any other criterion, might have been adopted instead of the one we now find in the law. If the amount of actual profits had been fixed as the basis of the tax, could such tax, with any propriety, have been called a tax upon property? It cannot be, that the character of the tax is changed by the manner in which its amount is fixed. How shall we class the taxes now or lately levied upon licenses to lawyers, physicians, auctioneers, pedlers, keepers of billiard tables or dram-shops? These licenses are regulated by the supposed value of the pursuit or calling, and upon the same course o freasoning must be taxes upon property.

A slight examination into the details and practical operations of this law, will show that the legislature had no design of taxing property as such, and if they had, that they have failed in attaining their purpose; although so far as property is reached, the constitutional rule in relation to such taxes is strictly complied with. To procure a license, the merchant is required to state the amount of merchandize received by him during the six months preceding his application, and upon this statement the tax is based. If the merchant begins with a capital of ten thousand dollars, upon which he obtains his license, and in the course of six months buys and sells an additional amount of one hundred thousand dollars worth of goods, and then declined business, and asks no renewal of his license, no license tax whatever is derived from the one hundred thousand dollars' worth of goods. His occupation ceasing, the tax ceases. But the ad valorem direct tax does not cease in such a case, nor can it be evaded by such a contingency. So, if his

receipts during the first six months should go up to fifty thousand dollars, all of which are disposed of during this term, his license for the ensuing six months will be in this proportion, although the stock on hand during the period covered by the license may be greatly diminished.

It will be observed that I am now considering this question solely with reference to our State constitution, and that provision which restricts a property tax. I am aware that in the case of Brown vs. Maryland (12 Wheat.,) Judge Marshall has declared that where the State is prohibited from laying direct taxes, the prohibition cannot be evaded by indirectly taxing the same commodities under guise of a license. The principle may be conceded, but the concession will not reach a case where the power of direct taxation exists beyond dispute. That was a case where a State, in the opinion of the court, attempted to levy, indirectly, a tax upon imports—a direct tax upon which was expressly prohibited by the federal constitution. The present is a case of indirect taxation upon occupations and business, and the rule prescribed in the constitution for direct taxation upon property is sought to be applied to it. It is fortunate that in the present case the rule has not been violated, as I shall presently show—but it is quite obvious, that in relation to many other kinds of indirect taxation, it would be difficult, if not totally impracticable, to observe it, and to concede its application would be to abolish all power in the State to tax occupations. That power undoubtedly exists in every sovereignty, unless it has been taken away by some express stipulation in its constitutional organization. There is none such in our State constitution.

This law, then is a tax upon an occupation or business. It is a revenue law, and is solely designed for revenue purposes, and is an indirect tax upon the citizens of this State, who are the consumers of the merchandise. This law and similar laws licensing grocers, ferrymen, tavern keepers, billiard table keepers, lawyers, physicians, &c., are the only modes of indirect taxation left to the States. With the expediency of such laws I have no concern. There is a class of political economists, I believe, who regard all indirect taxation as an evil, and who insist upon a general ad valorem levy upon *all* the property of *all* the citizens of the State. Such direct taxation it is thought, as it would be sensibly felt, would be a beneficial check upon extravagance, and it is therefore preferred on the same principle that would induce a man to make his food unpalatable in order to prevent his becoming a glutton. But this is a question for the legislature, and not the judiciary, and to that body it may be safely left to determine, whether they will continue to raise revenue through the medium of licenses, or will choose

rather to levy direct taxes upon all the property within their reach. I pass to the second branch of this proposition, which relates to the true construction of this restrictive clause in our constitution.

I have already endeavored to show that the license tax in question is not a property tax, but a tax upon an occupation or business, and therefore not within the provision of our State constitution, prescribing a rule for property taxation, and if this opinion be correct, the whole question is ended, so lar as our constitution is concerned. But I will now assume that it is a property tax and that it is within the restriction imposed on the legislature by the constitution.

There seems to be two distinct views entertained and urged in this discussion in relation to the proper construction of this injunction upon our legislature, in relation to their exercise of the taxing power. One opinion, I understand to be, that the legislature are compelled by the constitution to levy a general ad valorem tax upon all property within its limits, not expressly exempted from taxation by our compact with the federal government. This opinion construes the language of the constitution as imposing upon the legislature a constitutional obligation to tax all the property within the State, according to its value, and not an injunction to confine their taxation to an ad valorem tax, whenever they see proper to tax property at all. If this construction be correct, we have never yet had a revenue law in this State which was constitutional or binding. From the year 1820, up to the present time, no such law is to be found in our statute-book. This circumstance certainly does not prove the construction wrong, but it is calculated to favor it, if any other rational one can be found. I shall not dwell upon this proposition, believing that we can readily give this clause of our constitution a meaning, not inconsistent with its terms, and better adapted to effect the object in view by its framers.

Another position, and one which has been strongly urged in this case, is, that although this constitutional provision does not compel the legislature to tax all the property of the State, yet it does not prohibit all discrimination in reference to anything except value. Hence, if the legislature tax horses, or slaves, or cattle, they must lay the tax upon all such property without reference to age, or place of production, or any other circumstance except value.

It is upon the one or the other of these positions, that the provision of the act now in question, which exempts from taxation property which is the growth, produce, or manufacture of this State, is said to be a violation of our State constitution.

I understand this provision of our constitution to be simply designed

as an injunction upon the legislature to lay ad valorem taxes upon such property as may be selected for taxation. It does not prohibit exemption or discrimination; it does not deny to the legislature the right to select such objects of taxation as they may deem most appropriate. It does not forbid the legislature from taxing such property as may be thought most productive, and omitting to tax what may be considered unproductive. It does not prohibit a tax upon all horses over three years old, or all cattle over two years old, or of all slaves over ten years old; omitting to tax such as are under a particular age; our statute book is full of such enactments. The legislature cannot make a law declaring that my horse, which is worth fifty dollars, shall pay the same tax with my neighbor's, which is worth one hundred. This would be a specific tax upon horses, without reference to their value. But they may decline to tax, or exempt from taxation all horses under a certain age, or all horses of a particular breed. Upon the same principle, they must discriminate with reference to the place of production as well as the age or breed. They may decline to tax the wheat, and hemp, and corn, and tobacco raised in this State, and may yet tax those same articles when brought from other States.

I speak now of the taxing power in this State, as an independent sovereignty, without reference to her relations to the federal government. That relation presents another topic, distinct from the one now under consideration, and will be noticed when that branch of the subject is reached. I hold that, independent of her duties to the federal government, the State of Missouri is a sovereignty, and as such, possesses unlimited powers of taxation over all the property and business within her limits, except where the State constitution has made limitations. And, I ask, where is the limitation sought to be imposed? If I am correct in the interpretation I have given to the restriction already noted, there is none whatever to be found. Cannot the legislature give direct premiums to any branch of industry they may desire to patronize and encourage? There is nothing in the constitution to forbid it, and if they can vote a sum of money out of the treasury to pay an inventor for his invention, or a farmer for a skilfully conducted farm, or a mechanic for an improvement in his art, what is to hinder them from indirectly encouraging the same persons, by adapting their revenue laws to such purposes? It is in vain to denounce such legislation as *class* legislation, or to stigmatize it by any other harsh epithets. It is with the power of the legislature only, not the expediency of the laws they pass, that I am concerned as a judicial officer. If the legislature pass unwise and unequal laws, their constituents will hold them responsible. It

has not been entrusted to the judiciary to review or amend constitutional enactments.

Admitting, then, that the tax upon licenses to merchants must be regulated by the same rule which, under the constitution, governs a property tax, that rule, as I understand it, is not infringed by the present law. It is unnecessary to refer to the details of the act to show this. If it be said that the law, in effect, taxes the same property twice, this is either an objection to the amount of taxation, in relation to which the legislature had discretionary power, or it results in a total prohibition of all indirect taxation, through the medium of licenses. It being contended that a tax upon a merchant's license is equivalent to a tax upon merchandise, it necessarily follows that no such license tax can be valid, whenever there is a direct tax upon the property employed in the exercise of the vocation or profession or business attempted to be taxed. The same course of reasoning will annul all the taxes now levied upon licenses to the learned professions, or to any other class of persons who are pursuing an occupation which the legislature have thought proper to tax. An examination of the general revenue law of the State will also show that it reaches several other branches of State revenue. In short, the argument travels back to the starting point of those who maintain the constitutional injunction of a general ad valorem tax upon all property subject to taxation within the State. It may be also objected, that all the merchandise is not reached by this act, and precise equality or a due proportion between value and property, has not been exactly attained, but it is as near an approximation as is usually attained in such laws. If it be expected that any revenue law which the wisdom of man can frame, is to be based upon the most exact rules of equality, so that it shall operate upon all classes and all individuals alike, and lay the same burthen upon all, in proportion to their means, I confess myself to be one of those who believe such expectations delusive. There is no branch of legislation so difficult, so delicate, so hard to be adapted to the conflicting interests and conflicting views of the constituent, as the framing of a revenue law. It is an easy task to find fault, and point out defects in any one that may be framed, but not quite so easy to suggest a better one. However this may be, I am happily relieved from the responsibility of either making such a law, or revising one made by others. That task has been entrusted by the constitution to other hands, and if it has been badly performed, the corrective must come from a different quarter than this.

To conclude this branch of the subject, I hold that the taxing power of this State extends to all the property, and every occupation or pur-

suit within its limits—that the only restraint upon the exercise of this power over occupations or business, is the responsibility of the members of the legislature to their constituents—that there is an additional restriction in relation to property taxation, imposed by the constitution, requiring such taxes to be ad valorem, and not specific—that the legislature may, however, select the object of taxation, and omit to tax any property they choose ; but when that object is selected, and that object is property, it must be governed by the constitutional rule.

Assuming these principles as the true criterion of legislative power, I find nothing in the law entitled "An act to license and tax merchants," infringing any provision in our State constitution.

The second branch of this case, which relates to the constitution of the United States, presents a wide field of enquiry, and one which, I regret the approaching termination of our term and the press of other causes awaiting adjudication, will not allow me so thoroughly to investigate as its importance demands. I shall confine my examination to the leading principles involved, and the leading cases upon them decided by the federal judiciary.

Under our complex system of government, no task has been found more difficult or delicate, than that of defining the exact line of distinction between the powers of the State and federal governments. In some cases, the distinction is broad and obvious, but as we approach nearer to the line, it becomes more difficult clearly to define it, and fix the point where the power of the State ends, and that of the federal government begins. The general rule on this subject has been aptly and forcibly expressed by Judge Story, in Houston vs. Moore, (5 Whea. 48), and as that distinguished jurist has not been supposed to have any disposition to enlarge the powers of the States at the expense of any just right of the federal government, I prefer to adopt his views, expressed in his own language, as the basis of further investigation.

"The constitution containing a grant of powers in many instances similar to those already existing in the State governments, and some of them being of vital importance to State sovereignty and State legislation, it is not to be admitted that a mere grant of such powers in affirmative terms to congress does per se transfer an exclusive sovereignty on such subjects to the latter. On the contrary, a reasonable interpretation of that instrument necessarily leads to the conclusion that the powers so granted are never exclusive of similar powers existing in the States, unless where the constitution has expressly in terms given an exclusive power to congress, or the exercise of a like power is prohibited to the States, or there is a direct repugnancy or incompatibility in

the exercise of it by the States.   In all other cases, not falling in the classes already mentioned, it seems unquestionable that the States retain concurrent authority with congress, not only upon the letter and spirit of the eleventh amendment of the constitution, but upon the soundest principles of general reasoning.   There is this reserve, however, that in cases of concurrent authority, where the laws of the States and of the Union are in direct and manifest collision on the same subject, those of the Union, being the supreme law of the land, are of paramount authority, and State laws, so far, and so far only, as such incompatibility exists, must necessarily yield."

There are two provisions in the constitution of the United States which are thought to conflict with the act of our legislature to license and tax merchants.   One is the clause which gives to congress power to regulate commerce with foreign nations, between the several States and with the Indian tribes.   The other is that section which prohibits the States from laying any duties on imports or exports, except such as may be necessary to execute their inspection laws.

To maintain a conflict between the law now in question and that provision of the constitution which gives to congress the power to regulate commerce with foreign nations and between the States, it is necessary to determine that this law is a regulation of commerce, either with foreign nations or among the States, and is repugnant to some law of congress touching the same subject, or that it is such regulation of commerce, and that the power over commerce is exclusively vested in the federal government.   I deny both propositions.

Whatever diversity of opinion may be found among the Judges composing the present bench of the supreme federal court, in relation to the character of the power vested by the constitution in congress over foreign commerce and commerce between the States, an examination of the late cases usually called the License cases, (5 Howard,) will show that the deliberate judgment of that court is, that the power is not exclusive in congress, but concurrent with the States.   Five of the judges distinctly announce their opinions, and base their judgment on that point. Judges McLean and Wayne being the only two who distinctly avow a different opinion, Judge McKinley apparently coinciding with them, and Judge Grier not having in these cases, or any other, that I am aware of, intimated any opinion upon the question.   It is true that Judge Catron, in the subsequent cases, termed the Passenger Cases (7 Howard,) is found acting with the majority, which included the judges who, in the license cases, held the doctrine of exclusive power, but his concurrence in the judgment is based solely on the ground that the laws of New York

and Massachusetts, then under consideration, were totally repugnant to and irreconcilable with the positive enactments of congress, and treaties made with foreign nations.

If, therefore, it be conceded, that the law of Missouri now in question was a regulation of commerce, among foreign nations or between the several States, it would not for that reason be deemed unconstitutional, unless its provisions conflict with some act of congress, passed on the same subject. It is not pretended that congress have passed any such law.

But this law is not, in my judgment, a regulation of commerce, either with foreign nations or among the States. That it was passed with no such object,—that the legislature which enacted it, entertained no such purpose, even remotely, I presume will hardly be questioned by any one. Can even a suspicion be entertained, that the legislature of Missouri, when they passed the act to license and tax merchants, had the most distant thought of crippling the commerce of this State with her sister States, or of affecting it to any perceptible degree ? Unfortunately it may be for our State, we have no domestic manufactures to protect, and our agricultural productions need no protection. If the clause which exempts from the tax the domestic productions of the State, were stricken out from the act, the revenue of the State would scarcely be diminished to an appreciable extent, and as it now stands, does not affect perhaps a single merchant out of this city to the amount of a dollar. But, I readily concede, that law may be framed with honest intent, and for a legitimate purpose, and yet its effects may be illegitimate and unconstitutional, and if such a character can be fastened upon the present law, it must be declared void. To ascertain the object and bearing of a law, however, when its validity depends on the relative powers of the State and Federal Government, we are not to look at remote consequences, and because it may have an indirect operation upon commerce, therefore conclude that it is a regulation of commerce within the meaning of the federal constitution. Such a course of argument would annul a very large class of laws, found in the statute-book of our State, and every other State of the Union, and would effectually undertime the sovereignty of the State. The taxing power, especially, without which the State government would be but phantoms of sovereignty, would be essentially impaired, and to an extent never contemplated by the framers of the federal constitution.

It must be borne in mind, that the taxing power of congress and the power to regulate commerce are distinct and independent powers, not derived from the same source nor leading to the same results. The

power of Congress to tax imports does not spring from the power to regulate commerce, although we see obviously that a tax upon imports incidentally affects commerce, but it is derived from another clause in that instrument, expressly giving to congress the power to lay imposts, excises, &c. And the restriction, or rather, prohibition upon the States, which prevents them from laying duties or imposing taxes upon imports or exports, arises from an express clause of the constitution, and is not an inference from the fact that the power to regulate commerce had been given to congress.

It does not follow, therefore, that because the act now under consideration incidentally or remotely affects commerce with other States, it is, therefore, a regulation of commerce, within the meaning of the federal constitution. Judge Woodbury observed in the Passenger Cases (7 How:) "The fair exercise of powers rightfully belonging to a State, as the power of taxation, though connected often with foreign commerce, and indirectly or slightly affecting it, cannot, therefore, be considered, in any point of view, hostile, by their intent and origin, as regulations of such commerce." In the same case, the Chief Justice declares that the taxing power of the State remains just where it before existed, except where it is expressly prohibited. "They are expressly prohibited," he adds, "from laying any duty on imports or exports, except what may be absolutely necessary for executing their inspection laws, and also from levying any tonnage duty. So far, their taxing power over commerce is restrained, but no further. They retain all the rest; and if the money demanded is a tax upon commerce, or the instrument or vehicle of commerce, it furnishes no objection to it, unless it is a duty on imports or a tonnage duty, for these alone are forbidden." The same Judge reiterates the doctrine more emphatically in the following terms: "The taxing power of the State is restrained only where the tax is directly or indirectly a duty on imports or tonnage. And the case before us is the first case in which the power has been held to be still further abridged by mere affirmative grants of power to the General Government. In my judgment, this restriction on the power of the States is a new doctrine, in opposition to the contemporaneous construction and the authority of adjuged cases. And if it is hereafter to be the law of this court, that the power to regulate commerce has abridged the taxing power of the States upon the vehicles or instruments of commerce, I cannot foresee to what it may lead; whether the same prohibition upon the same principle may not be carried out in respect to ship owners and merchandise in a way seriously to impair

26

the powers of taxation which have been heretofore exercised by the States."

It will be observed that these remarks of the Chief Justice, foreshadowing the consequence of the doctrine against which he protested—consequences now no longer imaginary—point out the true position of the majority of the court upon this point, although falling from a Judge who was in a minority in rendering the judgment in the case. Judge Taney assumes that the conclusion to which the majority arrived could not be reached, without an assertion of the doctrine of exclusive power in congress over commerce; but in this, the result proved him to be mistaken, since Judge Catron, who was of the majority that gave the judgment against the validity of the State laws, agreed with him upon this point, and placed his opinion entirely upon the ground that congress had actually exercised the power upon the subject, and that the laws of New York and Massachusetts conflicted with laws and treaties of the United States, and must therefore yield upon any construction of the constitutional grant of power, whether exclusive or concurrent. We must therefore regard this position of the Chief Justice, concurred in, as it was substantially by Judges Woodbury, Daniel, and Nelson, as that of the majority of the court, Judge Catron's assent to the judgment being based upon different grounds, and that Judge having also previously assumed the same position on this point in the License Cases.

In the Passenger Cases, the validity of certain laws enacted by the States of New York and Massachusetts was the question before the court. By these laws no alien passenger was permitted to land in the ports of these States, until the master or agent of the vessel paid the boarding officer two dollars for each person so landing. These laws were declared unconstitutional by a bare majority of the court, Judge Catron being one of that majority, and adhering still to the same doctrine, in relation to the nature of the general power over commerce vested in congress by the constitution, which he had maintained in the License cases. It is manifest that Judge Catron's opinion decided the case, and that opinion, as I have heretofore stated, is based on the ground that these acts conflicted with laws previously passed by congress, regulating the introduction of foreigners into this country, and with treaties made with foreign nations, and were against the general scope and spirit of the entire legislation of congress on this subject. If Judge Grier's general concurrence with Judge Catron, in this case, is to be understood as committing him to the reasoning as well as conclusion of the former, there are then six out of the nine judges composing the then bench, declaring that the power over commerce with foreign

nations, and among the States, is concurrent with the States, and that this power does not involve the taxing power—that the power of congress to tax imports is derived from an independent and different source, and its prohibition to the States arises from an express provision in the constitution ; and that the taxing power of the States upon the articles or vehicles of commerce is not affected by the grant to congress of the power to regulate commerce.

It would be superfluous to point out the distinction between the State law now in question and the laws of New York and Massachusetts, held to be unconstitutional in the Passenger cases.   They are essentially dissimilar in all their features, character and object, and that dissimilarity is obvious and apparent.

The License Cases, (5 Howard) maintain the same doctrine with the Passenger Cases.   Massachusetts passed an act which virtually prohibited the sale of spirituous liquors in many portions of that State, whether imported from abroad or from other States.   Sales were prohibited in any case, except by license, and it was left to the discretion of certain State officers to determine whether a license should be granted or not.   Such a law was virtually a total prohibition of sales, wherever public opinion favored it.   Similar laws were enacted in Rhode Island and New Hampshire.   These laws were held constitutional, and the judgment of the court was based upon the doctrine that the laws were in effect regulations of the internal commerce of these States and therefore not an infringement upon federal authority.

It is to be remarked in these cases, that the chief justice directly admits the propriety of the decision in Brown vs. Maryland, and yet in the New Hampshire case, where a barrel of American gin was brought round from Boston and sold in the barrel, he held that the State could prohibit its sale.   And of this opinion was all the judges.   I shall hereafter advert more particularly to this New Hampshire case, as it principally concerns another branch of the question now under consideration, merely stating here, that the opinion of a majority of the courts in this case did not proceed upon an undefined and indefinable notion of a police regulation.

The decision in the License Cases was made in 1847, the court being constituted then as it is now.   Can that decision be reconciled with the position that the law of this State to license and tax merchants is a regulation of commerce and therefore void ?   The laws of Massachusetts and Rhode Island, and New Hampshire, virtually prohibited the sale of an imported article of commerce—one which under the laws of the United States was authorized to be imported, and from the duties on

which the general government derived a large revenue. Our law does not prohibit the introduction of any article of commerce whatever, nor has it any design or tendency to diminish importations either from foreign countries or sister States. The former laws were unanimously held valid, not upon the ground, as it has been assumed in the argument of this case, that they were police regulations or regulations to preserve the health or morals of the people of those States, but upon the broad ground, that if the laws were conceded to be regulations of commerce between the States, (which concession most of the judges denied,) they were nevertheless valid, since no law had been passed by congress conflicting with them. It is true, that Judge McLean placed his opinion principally upon the former ground, and probably others of the judges, who are in a minority upon the doctrine of exclusive or concurrent power over commerce, concurred with him, but the Chief Justice and judges Catron, Woodbury, Daniel and Nelson, expressly took the latter position.

The case of Nathan vs. Louisiana, (8 Howard) contains, perhaps, a more full exposition of the qualifications under which we are to understand this power to regulate commerce, than either of the cases which I have referred to, and is more analogous in its facts to the present case.

This was a revenue law of the State of Louisiana, enacting that every money or exchange broker should pay an annual tax to the State of two hundred and fifty dollars. An indictment was found under this law, and the defence was, that the business taxed was exclusively that of buying and selling bills of exchange, or instruments of foreign commerce, or commerce between the States, and that the tax was repugnant to the grant of power to congress on this subject. The court held the law to be valid. Judge McLean, who delivered the opinion of the court, said "The right of a State to tax its own citizens for the prosecution of any particular business or profession, within the State has not been doubted. And we find that in every State money or exchange brokers, vendors of merchandise of our own or foreign manufacture, retailers of ardent spirits, tavern keepers, auctioneers, those who practice the learned professions, and every description of property, not exempted by law, are taxed. * * Money is admitted to be an instrument of commerce, and so is a bill of exchange, and upon this ground it is insisted that a tax upon an exchange broker is a tax upon the instruments of commerce. What is there in the products of agriculture, of mechanical ingenuity, of manufactures, which may not become the means of commerce? And is the vendor of these products exempted from State taxation, because they may be thus used? Is a tax upon a ship as property, which is

admitted to be an instrument of commerce, prohibited to the States? May it not tax the business of ship building, the same as the exercise of any other mechanical art? And also the traffic of ship-chandlers and others who furnish the cargo of the ship, and the necessary suppli·s? There can be but one answer to these questions. No one can claim an exemption from a general tax on his business, within the State, on the ground that the products sold may be used in commerce." Again, he says, "the taxing power of a State is one of its attributes of sovereignty. And where there has been no compact with the federal government, or cession of jurisdiction for the purposes specified in the constitution, this power reaches all the property and business within the States which are not properly denominated the means of the general government, and as laid down by this court, it may be exercised at the discretion of the State. The only restraint is found in the responsibility of the members of the legislature to their constituents."

"If this power of taxation," he proceeds, "by a State within its jurisdiction, may be restricted beyond the limitations stated on the ground that the tax may have some indirect bearing on foreign commerce, the resources of a State may be thereby essentially impaired. But State power does not rest on a basis so undefinable. Whatever exists within its territorial limits, in the form of property, real or personal, with the exceptions stated, is subject to its laws, and also the numberless enterprises in which its citizens may be engaged. These are subjects of State regulation and State taxation, and there is no federal power under the constitution, which can impair this exercise of State sovereignty."

This is the doctrine of the supreme court, given in the forcible and pointed language of a judge, who on the question relating to the extent of the power over commerce vested in the general government, has been uniformly in favor of its exclusive character.

I shall add no more on this branch of the case. It seems to be established, beyond all dispute, by the present supreme judicial tribunal of the general government, to which we look for authoritative expositions of the constitution and laws of the Union, that the grant of power to congress to regulate commerce with foreign nations and among the several States, is a mere affirmative grant of power, not exclusive in its character, not affecting in the slightest degree, the taxing powers of the States—that the federal government has an ample protection to a full and efficient exercise of this power over commerce, in the supremacy of its laws, made in pursuance of the constitution over any conflicting State enactments, and in the total prohibition to the States of all power

to impose duties on imports or exports, or tonnage. These safeguards are sufficient and ample to secure a just and fair execution of the powers rightfully claimed by the general government, and to prevent all collision with the States. To require more, and by construction to claim that the taxing power of the States is only to be exercised on such conditions, and over such property as may not even incidentally or remotely affect foreign commerce, or commerce between the States, whether conflicting with any law of congress, or not, would be, in the judgment of the federal judiciary itself, destructive of all efficient State government. Such a construction has been properly disclaimed by that high tribunal. Its assertion might justly subject them to the imputation of converting themselves into what an eminent statesman termed a truly formidable "corps of sappers and miners," engaged in loosening the foundations of State sovereignty."

I have not referred to the case of Gibbons vs. Ogden, (9 Wheat.) New York vs. Milne, (11 Peters, 102) and Wilson vs. Blackbird Creek Marsh Company, (2 Peters, 261,) for the reason that these cases merely assert the general principles, a practical application of which is more distinctly seen in the later cases. Nor shall I allude to the case of Brown vs. Maryland, (12 Wheat.) in this connection, that case being chiefly relied on to support the second position taken on this branch of the case, which I shall now proceed to consider.

The only clause in the constitution, in addition to the one already spoken of, supposed to conflict with the act of our legislature now under consideration, is the one prohibiting the States from taxing imports. As the arguments drawn from this clause rest almost exclusively upon the case of Brown vs. Maryland (12 Wheat.) it will be necessary to examine that case with some attention.

I shall not find it necessary to question the authority of this case, so far as the points determined by it are concerned, but I may not deem it obligatory on me to sanction all the reasoning of the learned Judge who delivered that opinion. In doing so, I trust I shall not be found wanting in a due respect for the ability and learning of so distinguished and upright a jurist as the late Chief Justice Marshall. I shall but tread in the footsteps of his own successors, without venturing to discuss the subject as an original question.

What then is this case of Brown vs. Maryland, of which so much has been said in the present investigation ?

In 1821 the State of Maryland passed a law, "that all importers of foreign articles, or commodities, of dry goods, wares or merchandise, by bale or package, or of wine, rum, brandy, whisky, and other distilled

spirituous liquors, and other persons selling the same by wholesale, bale or package, hogshead, barrel or tierce, shall before they are authorized to sell, take out a license, for which they shall pay fifty dollars." This law was held to be a tax upon imports, and therefore unconstitutional. The decision was, that an article authorized to be imported by Congress, continued to be a part of the foreign commerce, and therefore within the exclusive jurisdiction of the federal government, whilst it remained in the original bale or package, in the hands of the importer, and that no State, either by direct assessment or by requiring a license, could impose any burthen beyond what the laws of Congress did; but when the original package was broken for use or retail by the importer, and when the commodity passed from his hands into the hands of a purchaser, it ceased to be an import or a part of foreign commerce, and might be taxed for State purposes.

Now, it must strike one as a little singular, that this decision is invoked in a case, where his honor, the Judge of the criminal court, held precisely the doctrine advanced by the supreme court, and struck out the 2d and 3d counts of the indictment in which the defendants were indicted as importers, for selling in the original bale and package.

How, then, is the decision in Brown vs. Maryland to affect the validity of this law to license and tax merchants? The feature of our law mostly objected to, is that which exempts from taxation our domestic goods—but if the law was altered in that respect, and the domestic productions included in the statement, would it be less obnoxious to the decision in Brown vs. Maryland than it now is? If the license is now to be regarded as a direct tax, and that tax a tax upon imports, will it be any the less a tax upon imports by also taxing the domestic manufactures and agricultural products of our State? The case of Brown vs. Maryland held that the importer could not be taxed for the privilege of selling his imports, whilst they remained in the shape imported, and in his own hands. If he is also taxed for selling domestic productions as well as foreign articles, how does this help the validity of the taxation upon the foreign articles? In my judgment, there is nothing in the decision of Brown vs. Maryland, confining it to the facts before the court for adjudication, which touches the discriminating feature of our State law. We must go into the reasoning and dicta of the learned Judge, to get a platform upon which to attack the discrimination or exemption.

"An impost," says Judge Marshall, "or duty on imports, is a custom or tax levied upon articles brought into the country." An import is a thing imported, and a tax upon imports is therefore a tax upon things

imported.   Now the monstrous consequences of following out this po-
sition are so apparent as to need no comment.   Nobody pretends that
a State cannot tax things imported, and no revenue law of any State
in the Union was ever framed with reference to such a principle.
Judge Marshall himself admitted that there was a point beyond which
the principle could not be carried, and that point he fixed, not at the
custom house, but in the warehouse of the original importer, and whilst
the import was unaltered in form.   The distinction is, at best, a very
imperfect one, for there are imports upon which the general govern-
ment le¬ ies duties, such as horses, pictures, &c., to which the distinc-
tions will not apply.

A right to import, according to Judge Marshall, implies a right to
sell the thing imported; but he limits this right to sell to the original im-
porter, and does not extend it to any subsequent vender.   Nor does the
right, in his opinion, continue any longer in the original importer than
the import remains in its imported shape.   If it is broken up, as he ex-
presses it, or mixed up with the property of the State, this right ceases.
So that so much of our revenue law as reaches imports from abroad,
that have left the custom houses at New York, Philadelphia, Boston,
or Baltimore, and are here in the hands of merchants who have pur-
chased from the original importers, whether still in the box, bale, or
package in which they were imported or not, is clearly unobjectionable,
according to the opinion of Brown vs. Maryland.   How is it with the
domestic manufactures of other States, which have never been in the
U. S. custom house, but are brought here for wholesale or retail?
Judge Marshall intimated that such importations from other States
would be within the principle, but it was not so held by the supreme
court in the license cases.   In the New Hampshire case, a barrel of
American gin was brought from Boston to a port in New Hampshire,
and was there sold without license in its original imported form.   This
sale was against the law of New Hampshire, and the court declared
that law to be valid.

I am aware that in the argument of the case now before the court,
this decision is said to have been based on the idea that the law of New
Hampshire was a health law, or a law to preserve the morals of her
citizens, and therefore within the competency of her legislature.   And it
is true that Judges McLean and Grier, and perhaps one or two others,
placed their opinion partly on this ground; and Judge McLean further
declared that the laws were not regulations of commerce, but that the
license was a charge upon the business or profession, and not a duty
upon the thing sold; but this was not the ground upon which a majority

of the court placed it. On the contrary, the Chief Justice, together with Judges Catron and Nelson, expressly repudiated any such ground, and in this they met the concurrence of Judges Woodbury and Daniel, the two latter, however, going still further, and entirely disavowing the whole doctrine in the case of Brown vs. Maryland. Are not revenue laws as much police laws as health laws, or quarantine laws, or laws to promote public morals? By calling a law a police regulation, its real character is not altered. If it conflicts with the constitution or any law passed in pursuance thereof, its invalidity is not cured by calling it a police regulation. All laws relating to the internal concerns of a State, are police laws, whether they are designed to promote the health and good morals of the people, or to bring revenue into the treasury for the support of government. Those of the latter character are far more important, since without them the wheels of government must stand still, and all other laws remain unexecuted

In the New Hampshire case, as I before remarked, Judges Woodbury and Daniel expressly repudiated the positions of Judge Marshall in Brown vs. Maryland. They held, with Judges Taney, Catron and Nelson, that the word police included all internal legislation of a State, and was not confined to mere health laws, or laws to promote morality, and that the validity of the laws in question did not depend upon any such distinction. They further held, that the right to import did not include a right to sell, regardless of State regulations, that the subject of buying and selling within a State belonged exclusively to that State, and was a matter with which the Federal Government could not interfere. They denied that congress, when they allowed importations and derived revenue from duties upon them, also enacted that the importer should sell his articles in such quantities, at such places and at such times as they pleased, but that these matters depended upon State regulations, and that even a prohibition upon the sale was not a tax upon imports, or an interference with foreign commerce, since a man may still import for his own consumption or use. They deny that the laws of New Hampshire and Massachusetts are regulations of foreign commerce or commerce between the States, but declare that these laws simply determined the mode in which a particular commodity might be circulated within their jurisdictional limits—a matter with which the Federal Government has no concern, and over which she has no control.

The Chief Justice, with Judges Catron and Nelson, admit the doctrine of Brown vs. Maryland, but yet hold that the New Hampshire law was not affected by it. They concede the law to be a regulation of

27

commerce between the States, but maintaining, as I have shown before, the doctrine that this power was only concurrent with the States, they hold it valid, because no law of Congress was infringed by it.    Judge McLean held, that the owner of the property who purchased it in Massachusetts and transported it to New Hampshire, was not an importer within the meaning of Brown vs. Maryland.    So that, when we recollect that the case was one of an importation from one State to another of a home-made article, Judge Marshall's intimation in Brown vs. Maryland, that such a case would be within the principle therein decided, is manifestly overruled by six of the nine Judges.

I deem it useless to enlarge upon this point.    The case of Brown vs. Maryland stands by itself—a decision rendered twenty-four years ago —nearly all its principles since doubted or over-ruled, and narrowed down, and frittered away, until its power for good or evil is gone.    As a precedent, it will reach no case except just such an one as itself was. It is possible, that if a State should now enact a law precisely in the language of the Maryland act of 1821, such a law would yet be pronounced unconstitutional by the tribunal to which such questions belong, but I hesitate not to venture the opinion, that the doctrine will never be carried one jot or tittle further.

Having thus disposed of the case of Brown vs. Maryland, the decision in which has been strictly adhered to in the judgment given by the Criminal Court, I am not aware that any other leading case has been cited, having any material bearing upon this branch of the subject.    A prominent idea seems to have pervaded the argument of those, who in the discussion of this case, have maintained the invalidity of this law, because of its discriminating between foreign and domestic productions, which is derived from the danger which they apprehend from an abuse of the power of taxation by the States, whilst no fears seem to be entertained of any encroachments on the part of the Federal Government.    They argue that, if the States can tax merchandise brought from other States, or from foreign countries, and yet be at liberty to leave their domestic productions untaxed, this power has no definable limits, and may be exerted to such an extent as to cut off all foreign trade or intercourse with our sister States.    It would perhaps be a sufficent answer to such extreme cases, that the injury inflicted to the State herself by such legislation, would be an ample guarantee against its ever being attempted, and at all events that it will be time enough to determine such cases when they occur.    But no such danger exists. No State can prohibit the introduction of foreign merchandise, if congress has authorized its introduction, but each State may regulate her

internal traffic according to her own pleasure. Each State can act upon an article of commerce after it has passed from foreign commerce, and become a part of the property of its citizens. Whether it can act upon the article after it leaves the custom house, and before it leaves the warehouse of the importer, or must delay taxation until the package is broken, or its form is changed, or it has passed from the hands of the original importer, is not material in this case, since the indictment before us after the second and third counts were stricken out, did not charge any such sale. The point at which the merchandise would most naturally be considered as having become a part of the property of the State, is when the duties upon it have been paid, and it has left the custom house, and there is no longer any lien upon it for dues to the Federal Government. But the Supreme Court of the United States, at an early day, fixed upon a different point, and until that court chooses to say otherwise, there let it remain. By the tenth section of the law to license and tax merchants, all imported goods in the original package, box, &c., are expressly exempted from the direct ad valorem tax, and it is probable that the omission to exempt them in the section providing for a license was inadvertent. At all events it does not affect the present judgment—nor would it materially affect the revenue under the present law, if the exception was extended, as the Criminal Court has extended it, to the act of 1849.

It will be seen that in discussing this branch of the case, involving the compatibility of our law with the federal constitution, my object has been simply to ascertain the present state of adjudications in the Supreme Court of the United States touching the question. In discharging this task, I have found it necessary to allude more particularly to the opinions of individual judges than I could have desired, but this course, if it needs apology, will readily find one in the practice which of late prevails in that tribunal of delivering almost as many opinions as there are judges. To select, therefore, the passing remark of any particular judge, and assume it to be the opinion of that court, without first ascertaining how far it has been sanctioned by the majority, is only calculated to mislead. I have endeavored to avoid this, and have therefore spoken of opinions as being those of the court, only where a majority have concurred in them, and where such views of individual judges as seemed pertinent to this case are merely referred to for their intrinsic weight, but not sanctioned by the whole court, or a majority of the judges, I have so stated them.

I have not offered any extended views of my own on this part of the case. The question is one of federal cognizance, and it is to the na-

tional judicial tribunals that we look for authority. Nor will time enable me to bestow even a passing remark upon the consequences which I apprehend from denying to our legislature power to pass such an act as the one herein considered. With its expediency I have no concern.

I am for affirming the judgment of the Criminal Court.

